# EXHIBIT 5

Case 1:07-cv-07101-CM   Document 9-6   Filed 08/31/2007   Page 1 of 12

HARIDASS HO & PARTNERS

'07 MAR 23 17:37

IN THE MATTER OF AN ARBITRATION     RECEIVED

Between

PRESTIGIOUS SHIPPING CO. LTD.

... Claimants

And

AGROCORP INTERNATIONAL PTE LTD

... Respondents

### POINTS OF CLAIM

1. The Claimants are owners of the ship or vessel M.V. "Prestigious" (the "Vessel"). By a charterparty dated 21st February 2005 on Sugar Charterparty 1999 form with additional clauses (the "Charterparty"), the Respondents chartered the Vessel for a shipment of a cargo of "minimum/maximum 21.000 metric tons up to max 21.500 metric tons in owners' option of bagged sugar sf about 48' without guarantee" from "1 – 2 safe berth Santos" to "1 – 2 safe berth and/or anchorages Chittagong" and there deliver the Cargo. A copy of the Charterparty is annexed herewith and marked as "**Annex 1**".

2. The Claimants will refer the Charterparty as may be necessary for its full terms and effect.

Background Facts

3. Pursuant to the Charterparty, the Vessel proceeded to Santos and loaded a total cargo of 430,000 bags of sugar, weighing a total of some 21,500.000 mt

2

(the "Cargo"). In respect of this, 23 bills of lading were issued on the Congenbill 1994 form. Copies of the aforesaid bills of lading are collectively annexed herewith at "**Annex 2**".

4. The Vessel sailed from Santos on 15th April 2005 at 0030 hours and proceeded to Chittagong, the Respondents' nominated discharge port. The Vessel arrived at Chittagong on 1st June 2005, and notice of readiness was tendered at 1900 hours LT to the Respondents' agents M/s Mutual Shipping Limited (hereinafter the "Respondents' Nominated Agents"). A copy of the notice of readiness is annexed herewith and marked as "**Annex 3**".

5. Clause 22 of the Charterparty provides, inter alia:-

> "*At discharging port, ... laytime for discharge to begin ... at 0800 hours next working day if written / cabled / telexed notice of readiness is tendered after noon.*
>
> *Master has the right to tender notice of readiness from the customary waiting place in ordinary office hours.*
>
> *Notice of readiness to be tendered to Agents in ordinary office hours (or local equivalents) and holidays excepted whether in berth or not / WIPON / WIFCON / WICCON.*

6. In the premises and pursuant to the Charterparty, laytime for discharge of the Cargo commenced on Saturday, 4th June 2005 at 0800 hours, when the Vessel was ready in all respects to discharge the cargo.

7. Pursuant to the Charterparty, the Vessel was to discharge the Cargo at an average rate of 2,000 metric tons per weather working day of 24 consecutive hours, and time from Thursday 1200 hours, Fridays and Holidays from 1700 hours on a day preceding legal or local holidays till next working day 0800 hours, not to count even if used.

8. Clause 22 provides as follows, inter alia:-

3

> *Ship to discharge at the average rate of 2,000 metric tons calculated on gross weight provided vessel can deliver at this rate, per weather working day of 24 consecutive hours, time from Thursdays noon to 0800 hours Saturdays (or local equivalents) and from 1700 hours day preceding a holiday as per Bimco calendar until 0800 hours next working day excepted, even if used.*

9. Further, Clause 33 of the Charterparty provides as follows, inter alia:-

> *Discharging Rate*
> *2,000 metric tons per weather working day of 24 consecutive hours, Thursday noon, Fridays, Holidays excluded even if used.*
>
> *At discharging port time from Thursday 1200 hours, Fridays and Holidays from 1700 hours on a day preceding legal or local holidays till next working day 0800 hours, not to count even if used.*
>
> *Loading and discharging rate will be independently of the number of holds the shippers / receivers will use. Master will always provide 5 ho/ha at shippers / receivers disposal.*

10. In the premises, laytime for the discharge of the cargo expired at 1057 hours on 20th June 2005 and consequently, the Vessel was on demurrage from 1057 hours on 20th June 2005. Demurrage begun to run and continued to run from 20th June 2005 until final discharge of the cargo laden onboard the Vessel.

11. In breach of the Charterparty, the Vessel did not complete the discharge of the Vessel until 15th November 2005 at 0430 hours LT, for reasons particularized in paragraphs 16 to 37 below.

12. Accordingly, the Vessel was on demurrage for 146 days 10 hours and 29 minutes (approximately 146.44 days), as particularized in the laytime statement of facts attached herewith and marked as "**Annex 4**".

13. Clause 23 of the Charterparty provides, inter alia:-

4

> *If longer detained in loading and/or discharging ports, demurrage to be paid at the rate of USD10,000 per day, or in proportion for any part of a day.*
>
> ...
>
> *Laytime to be non-reversible between loading and discharging ports.*
>
> *Demurrage or dispatch to be settled directly between Owners and Charterers in accordance with the terms, conditions and exceptions of this Charterparty.*

14. Further, Clause 47 of the Charterparty provides:-

> *Demurrage US$ 10,000 per day, pro rata, half dispatch payable to Charterers on working time saved, both ends. Demurrage / dispatch, at both ends, to be settled directly between Owners and Charterers. <u>Charterers shall remain responsible for any demurrage at loading and discharging ports.</u>* (emphasis ours)

15. In the premises and by reason of the Respondents' breach of Charterparty, there is now due and owing demurrage in the sum of USD1,464,368.06. However, despite the Claimants' repeated demands, the Respondents have failed and/or refused to pay the sum of USD1,464,368.06 or any part thereof.

Respondents' Failure to Procure Discharge of the Vessel

16. The settled and well established custom of practice at Chittagong is that the consignee together with the customs officer would board the Vessel and draw samples of the cargo for compulsory radiation test prior to customs clearance. After the completion of the radiation tests, the consignee would proceed to obtain a reduction of taxes and/or customs duty at the Chittagong courts.

17. Clause 14 of the Charterparty provides:-

> <u>Stevedores F/OST</u>
> *Stevedores for loading, stowing, trimming and discharging to be employed by Charterers or Shippers/Receivers at their expense and under Master's*

5

> control. Stevedores shall be considered as Owners servants, and the Charterers/Shippers/Receivers are not to be responsible for any negligence of whatsoever nature, default or error in judgment of the stevedores employed.

18. Pursuant to the said Clause 22 of the Charterparty, the Respondents were under an express and/or an implied duty to ensure that the Cargo was discharged within the laytime allowed.

19. However, in breach of the Charterparty, the Respondents failed to ensure that the Cargo was discharged within the laytime provided.

### Failure to ensure that documentary formalities for the Vessel to discharge the cargo were complied with

20. On or about 30th May 2005, prior to the Vessel's arrival at Chittagong, the Claimants' protective agents, M/s Safe Shipping Lines (hereinafter the "Claimants' Protective Agents"), requested the Respondents to clear and/or discharge the Cargo by lightening the Vessel against a special 78-Customs guarantee from Chittagong Customs House whilst waiting for the consignees to clear documentation from the Chittagong courts and/or customs. The lightening of the Vessel was necessary so as to enable the Vessel to go alongside at berth as the Vessel's draft would not allow her to enter the shallow berth to commence discharge of the Cargo. A copy of the Claimants' Protective Agents' email to the Claimants dated 30th May 2005 is annexed herewith at "**Annex 5**".

21. However, from 1st June 2005 to 12th June 2005, whilst the Vessel was at Chittagong, the Vessel was unable to discharge the Cargo as the documentary formalities for the Vessel to discharge the cargo laden onboard were not ready and completed by the Respondents and/or their agents and/or their receivers. Copies of the Vessel's daily reports and



6

correspondence showing the chain of events from 1st June 2005 to 12th June 2005 are collectively annexed herewith at "**Annex 6**".

22. In breach of the Charterparty to ensure that the Vessel would be discharged within the laytime allowed and/or their duty to discharge cargo, it was only at 0330 hours on 13th June 2005 that the Respondents, their agents and/or servants commenced the lightening of the Vessel after completion of the documentary formalities for the lightening of the Vessel by the Respondents, their agents and/or receivers. However, after lightening of the Vessel at anchorage, the Vessel could not berth until 7th July 2005 at 1336 hours as a berth was not available. A copy of the discharge report dated 13th June 2005 and 8th July 2005 are collectively annexed herewith at "**Annex 7**".

<u>Failure to procure the "No Objection" certificate in order for the Vessel to discharge the cargo</u>

23. Notwithstanding that the documentary formalities in respect of the lightening of the Vessel was procured, the Respondents were nevertheless unable to discharge the Cargo as the "No Objection" certificate was not procured by the Respondents, their agents or servants and/or their receivers. Consequently, the Cargo could not be discharged from the Vessel, which resulted in further delay and detention of the Vessel.

24. Pursuant to Clause 14 of the Charterparty, The Claimants aver that the Respondents' obligations were to discharge the Vessel. Clause 14 of the Charterparty provides inter alia that "*Stevedores for … discharging to be employed by Charterers or Shippers/Receivers at their expense and under Master's control.*"

25. The Claimants also repeatedly sought the Respondents to obtain the "No Objection" certificate in order to complete customs formalities and to enable

7

the discharge of the Cargo from the Vessel, but the Respondents failed and/or neglected and/or refused to do so and/or they failed to assist and/or to provide the consent timeously to the Claimants' agent, M/s Hudson & Higgins, completing custom formalities to carry out discharge instead.

26. In the premises, the Respondents are in breach of the terms of the Charterparty, resulting in the demurrage being incurred and the detention of the Vessel.

27. As a result of the Respondents' breach of the Charterparty and/or their duty and/or refusal to take delivery of and/or failure to discharge the Cargo laden onboard the Vessel, the Claimants were exposed to claims from M/s East West Trading and M/s Musa & Sons (collectively, the "Receivers") for delay in the delivery of the Cargo to them. The Vessel was further delayed from discharge as the Receivers were demanding payments for the alleged damage of the cargo and the parties were put to negotiate the quantum of payments to be made to the Receivers, which resulted in further delays to the Vessel. Copies of notices from the Receivers are collectively annexed herewith at "**Annex 8**".

28. Additionally, the Claimants aver that the Respondents' refusal and/or failure to take delivery of and/or discharge the cargo in hold number 1 resulted in the hold-up and further delays in discharge of any cargoes from the Vessel's other holds. The Claimants aver that discharging the cargo in hold number 1 by the Respondents was particularly important to facilitate the discharge of the cargo from other holds as a result of the trim of the Vessel and to ensure that the Vessel would not be subjected to structural stresses which could result in damage to the Vessel's hull.

29. The Claimants engaged in many discussions with the Respondents and the Receivers to procure the discharge of the Vessel, which resulted in even

8

further delays to the Vessel. In the course of these discussions, the Respondents verbally informed the Claimants that if the sum of USD 1.1 million were paid to the Receivers, then the Claimants' claim for demurrage of the Vessel against the Receivers would not be prejudiced and that the claim would remain alive, but that if the Claimants paid the sum of USD 1 million, this would be in compromise of the Claimants' claim for demurrage.

30. In mitigation and to avoid incurring further losses through delay and/or detention of the Vessel, as well as to avoid causing damage to the Vessel, the Claimants agreed to execute an Amicable Settlement Agreement dated 7th August 2005 with the Receivers, so as to expedite the discharge of the Cargo and to prevent the Vessel from damage. In consideration of the Claimants paying the sum of USD 1.1 million in respect of the remaining 3,805 mt of cargo in hold number 1, the Receivers would give to the Claimants the "No Objection" certificate to obtain permission for the discharge and the destruction of the allegedly damaged cargo by M/s Hudson & Higgins at the Claimants' risk, time, responsibility and expenses. A copy of the Amicable Settlement Agreement dated 7th August 2005, together with the Addendum Settlement Agreement of even date are collectively annexed herewith at "**Annex 9**".

31. The USD 1.1 million that was paid to the Receivers was not the invoice value of the cargo concerned. The invoice value for M/s Musa & Sons' cargo is USD 144,095.00 (805 MT @ USD 179 per MT) and the invoice value for M/s East West Trading's cargo is USD 537,000.00 (3,000 MT @ USD 179 per MT), i.e. a total invoice value of USD 681,095.00.

32. The Receivers confirmed receipt of the funds of USD 1.1 million on 8th August 2005 and the "No Objection" certificate was eventually issued on 10th August 2005, which the Receivers had held back from giving the Claimants. The "No Objection" certificate would have expedited the discharge of the

9

Vessel and consequently resulted in substantial delay to the Vessel. A copy of the confirmation and email are collectively annexed herewith at "**Annex 10**". As the "No Objection" certificate was only provided on 10th August 2005, this coincided with the monsoon / wet season at Chittagong, which resulted in even further delays to the Vessel's discharge of the cargo. As a result of the Respondents' breach and/or failure to discharge, and consequently the difficulties in the discharge of the cargo, the Claimants were faced with added bureaucracy of obtaining numerous permits and permissions from the Chittagong Customs Authorities and other authorities at Chittagong such as the Department of Environment, Department & Forest Ministry, Controller of Movement & Storage, Port Police Station, Sea Fish Survey Management Unit (Fishing Directorate).

33.  The discharge of the Cargo from the Vessel eventually commenced only on 16th September 2005.

34.  On or about 29th September 2005, it was alleged by the Receivers that there may be some damage to the cargo in hold number 3 which led to cargo discharge being stopped from the Vessel. In order to expedite the process of the discharge of the cargo in mitigation of their loss and to avoid delay, the Claimants paid the sum of USD 500,000.00 to the Receivers, whereupon discharge re-commenced. The quantity of the cargo allegedly damaged in hold number 3 was 1,104 mt, and the sum of USD 500,000.00 was derived at a price of USD 572 per mt, some USD 139 per mt more than her invoice value of USD 179 per mt, customs duty value at USD 231 per mt and stevedoring expenses at USD 18 per mt. Copies of the exchanges of emails regarding settlement of the discharge of the cargo in hold number 3, the claim bill and the remittance confirmation are collectively annexed at "**Annex 11**".

10

35. Even taking the steps aforesaid at paragraphs 30 to 34 above, i.e. that the sums of USD 1.1 million and USD 500,000.00 have been paid to the Receivers to procure her discharge, the Respondents failed to and/or neglected to and/or refused to expedite the discharge of the Cargo from the Vessel and/or delays which resulted as aforesaid in paragraph 32 above, the discharge was only completed on 15th November 2005 at 0430 hours, resulting in the Vessel's delay and detention.

36. The Vessel eventually sailed out from Chittagong on 24th November 2005 at 2320 LT. A copy of the Master's report is annexed herewith at "**Annex 12**".

37. In the premises, the Respondents suffered losses and/or damages by reason of the Respondents' said breach and/or breaches of the Charterparty.

**AND THE CLAIMANTS CLAIM:-**

(i) Pursuant to paragraph 15 above, demurrage due in the sum of USD1,464,368.06;

(ii) A declaration that the Claimants be indemnified and an indemnity for the Charterers' refusal to take delivery of the Cargo and any other incidental losses arising from the Charterers' breach in not taking delivery of the cargo in hold no. 1 in the sum of USD 418,905.00, being the difference between what the Claimants paid to the Receivers in the sum of USD 1,100,000.00 less the invoice value for M/s Musa & Sons' cargo in the sum of USD 144,095.00 and the invoice value for M/s East West Trading's cargo in the sum of USD 537,000.00;

(iii) A declaration that the Claimants be indemnified and an indemnity for the Charterers' refusal to take delivery of the Cargo and any other incidental

11

losses arising from the Charterers' breach in not taking delivery of the cargo in hold no. 3 in the sum of USD 27,488.00, being the difference between what the Claimants paid to the Receivers in the sum of USD 500,000.00 less the invoice value including customs duty value and stevedoring expenses for the cargo in the sum of USD 472,512.00;

(iv) Such further and other relief that this Honourable Tribunal deems fit;

(v) Interest;

(vi) Costs.

Dated this 23 day of March 2007

SOLICITORS FOR THE CLAIMANTS
M/S JOSEPH TAN JUDE BENNY