# EXHIBIT 6

**IN THE MATTER OF THE ARBITRATION ACT 1996
AND IN THE MATTER OF AN ARBITRATION**

Between

**PRESTIGIOUS SHIPPING CO LTD**

... Claimants

And

**AGROCORP INTERNATIONAL PTE LTD**

... Respondents

---

# POINTS OF DEFENCE

---

**M/s Haridass Ho & Partners**
24 Raffles Place
#18-00 Clifford Centre
Singapore 048621
Tel: 65332323
Fax: 65337029

Dated the 14th day of May 2007

## POINTS OF DEFENCE

TAB NO.

**A.    INTRODUCTION**

1.    This is the Charterers' Points of Defence.  It is divided into the following sections:

      A.    Introduction

      B.    Parties

      C.    The Facts

      D.    Charterers' Response to Points of Claim

      E.    Summary of Charterers' Defence and Orders sought by the Charterers

2.    Unless otherwise expressly stated, all pager references in bold square brackets are to the documents attached to these Points of Defence.

3.    Finally, all date references are to the year 2005, unless otherwise expressly stated

**B.    PARTIES**

4.    The Claimants in this arbitration are the owners of the vessel MV Prestigious (hereinafter referred to as the "Owners").

5.    The Respondents are Agrocorp International Pte Ltd, a company incorporated in Singapore (hereinafter referred to as the "Charterers") and have a registered office at 133 New Bridge Road #22-01 Chinatown Point Singapore 059413.

6.    The Charterers are an international trading house having

been formed in 1990.   They trade in commodities including pulses, cereals, wheat, rice, sugar, steel, coal, cement and fertilisers worldwide.

7.    The following are also relevant parties in this matter.

| Name | Description |
|------|-------------|
| Mutual Shipping | Vessel's agent at Chittagong |
| East West Trading | Cargo receiver |
| Musa & Sons | Cargo receiver |
| Hudson & Higgins | Owners' agent appointed to arrange the discharge & destruction of damaged cargo' |
| Safe Shipping Lines | Owners' Protective Agent |
| Universal Navigation Pte Ltd | Vessel Manager |
| Captain Ashgar | Owners' Port Captain |

## C.    SUMMARY OF THE DEFENCE

8.    In summary of the Charterers' defence, we say that the Charterers are not liable for demurrage or to indemnify the Owners as claimed or at all because the delay in discharge of the cargo at Chittagong was the caused by the Owners act or default.

9.    Shortly after the vessel arrived at Chittagong, water was found to have entered Hold No. 1 and all the bagged sugar in Hold No.1 (i.e. 78,324 bags or 3,916.20 mt) was damaged.  The sugar had turned brown. Some sugar was now in syrup form and some sugar had caked. This cargo had been imported by the Receivers for human consumption.  Because the cargo was now damaged, the authorities in Chittagong were very concerned that

damaged cargo should not find its way to the market. There were serious penal consequences against those who allowed damaged cargo unfit for human consumption to be sold on the market. At that time, the port already had another vessel, the MV Celtic, with damaged wheat cargo on board which had been imported for human consumption. The Receivers and authorities were therefore extremely concerned about the damaged sugar on the 'Prestigious'.

10.     This vessel was in fact not fit to load this cargo because the vessel's hatch covers were in fact not in Order not in order. This is evident from the Non-Conformity Report issued by Bureau Veritas during the SCMA Audit of the vessel on 14th April 2005.

**1**

## C.    THE FACTS

11.     Set out below is a summary of the facts which are relevant to the arbitration. Suffice it to say for now that the Owners have in their Points of Claim been very selective and economical with the facts as will become apparent.

The Fixture Re-Cap

11.1    On 18th February, the main terms for the hire of the vessel were concluded between Tramp Marine Inc of Piraeus acting for the Owners and the Charterers.

**2**

11.2    In response to specific queries from the Charterers, Owners warranted at Rider clause 30 of the Charterparty that the vessel was "*in all respects suitable for the safe load, carriage and discharge bgd sugar and that all pertaining international*

*certificates are on board"*

11.3    Owners also warranted that there were no recommendations or conditions imposed by Class at the time the charterparty was agreed or from the commencement of the voyage (See Q4.2 of the Questions at page 3 of the Rider Clauses)

A Charterparty on the Sugar Charterparty 1999 Form was subsequently executed by the parties on 21st February.

The following terms were material express terms of the Charterparty: **[Annexure 1, Points of Claim]**

*Clause 7*

*At port(s) of loading and discharging Owners to appoint, employ and be solely responsible for Agents. As selected by Charterers without risk or liability to Charterers, for all ship's business, owners paying the agency fee. Owners right to appoint Protecting Agents both ends.*

*Clause 18*

*Vessel to be in possession of a valid certificate of efficiency for winches and derricks/cranes for the duration of this Charter. Vessel is to supply at both ends, at all times, free of charge to Charterers, winches and derricks/cranes, power and gear in good working order at all hatches as required for loading and discharging sugar, also full lights for night work on deck and in the holds, if required. In the event of a breakdown of a winch and derrick/crane or winches and derricks/cranes by reason of disablement or insufficient power and/or failure of lights, the laytime to be extended pro-rata for the period of such inefficiency in relation to the number of working hatches available. If on demurrage, time lost pro-rata to be deducted from same. Owners are to pay in addition the cost of labour for the shift or shifts during which such break down occurred if shore gear used laytime or time on demurrage to court.*

*Clause 28*
*In the event that whilst at or off the loading place or discharging place the loading and/or discharging of the vessel is prevented or delayed by any of the following occurrences: strikes, civil commotions, . . . accidents and/or breakdown on railways, . . . government interferences . . . time so lost not to count as laytime or time on demurrage or detention.*

**Rider Clause 32**
*Vessel will be held responsible for any damage to the cargo caused by master through ventilators and leakages of water and/or oil, from pipes and or valves and or tanks etc on board, due to wear and tear of the above, or any cause due to lack of due diligence..*

**Rider Clause 33**
. . .
*Loading and discharging rate will be independently of the number of holds the shippers/receivers will use. Master will always provide 5 ho/ha at shippers/ receivers disposal*

**Rider Clause 52**
*In tendering notice of readiness of load port, vessel's holds/hatches to be presented in clean/good and absolute working conditions, dried, free of previous cargo residues, rust pieces, insects and up to the satisfaction of Shippers/ Charterers surveyors for loading intended cargo as regard the cleanless / dryless / odourless of the holds.*

*In case vessel fails on hatch / hold inspection, time not to count proportionally from the time that each hold was rejected till the time that each hold is ready for loading and passes the survey.*

*In case of dispute abt vessel's hold cleanliness then an independent surveyor to be appointed and his findings to be final and binding on both parties. Surveyors expenses to be for the party in default.*

<u>Loadport Dispatch</u>

11.4   The vessel loaded 21,500 mt of bagged sugar at Santos, Brazil between 21st March 2005 and 14th April and dispatch of US$10,211.81 was earned at the loadport.      **3**

<u>The Vessel arrives at Chittagong</u>

11.5   The vessel then sailed for Chittagong and arrived at Chittagong on 1st June.

<u>NOR at Chittagong</u>

11.6   The vessel tendered NOR 1st June at 1900 hours. **[Annexure 3, Points of Claim]**

11.7   NOR was received by Mutual Shipping, the Owners' agent at Chittagong on 2nd June.

Initial Email Exchanges

11.8   Between 3rd and 6th June, the parties exchanged email correspondence.  Owners were anxious that no cargo had been discharged.

**4**

11.9   The Charterers on the other hand had explained that whilst they were pushing their receivers to discharge quickly, there were certain customs procedures to be completed.   The Charterers advised that once these procedures were completed, discharge would be fast. The Charterers expected to discharge at a rate of on more than 3000 mt per day and were conscious that they would be exposed to a demurrage claim if the cargo was not discharged quickly. This position continued until 14th June when for the first time, the Charterers came to hear that water had seeped into Hold No. 1.

**4**

Water Enters Hold No. 1

11.10   However, although the Owners were aware as of 7th June that water had entered Hold No. 1. However, they wrongfully withheld this information from the Charterers/ Receivers until 1 week later on 14th June.  The fact that Owners knew that water had entered Hold 1 is evident from the entry for 7th June 2005 in the Statement of Facts originally prepared by the Master but disputed by the Receivers.  This Statement of Fact is not the one exhibited to the Points of Claim.

**5**

11.11　On 14th June, for the first time, the Charterers and Receivers were notified that water had seeped into Hold No. 1.

**6, 7**

Survey of Damaged Cargo

11.12　In fact, on 14th June, GMS International, a survey company in Chittagong, was appointed to and did survey the damaged cargo on behalf of the receivers. The appointment letter from East West Trading to GMS International dated 14th June was copied to various parties including to the Master of the vessel and Mutual Shipping.

**7**

11.13　GMS International issued their Survey Report dated 14th June in which they said:

"*considering the condition of cargo in bags in 3 layers from the top and the stained marks on the shell plates, we are of the opinion that <u>all</u> the cargo in Hold No. 1 was under water for a long time and subsequently, the water might have been pumped our when identified*".

They also said that the damaged cargo was "*unfit for the purpose imported*".

**6**

11.14　One of the Receivers of the cargo, East West Trading then wrote directly to Owners to claim for compensation on account of damage to the cargo in Hold No. 1.

**8**

11.15　On 15th June, Mutual Shipping forwarded to the Owners a claim issued by East West Trading. This message was copied to the Charterers.　The same claim by East West Trading was also sent directly to Universal Navigation.

**9**

11.16   On 16th June, Mr Bashar of East West Trading wrote to the Charterers detailing events after the damage was discovered. Mr Bashar advised that they had started to take delivery of some cargo from other Holds and had observed that cargo in these other Holds may have also been damaged.

**10**

11.17   Subsequently, as early as 17th June, Mutual Shipping advised the Owners that the consignees had taken a very strict position on the damaged cargo. They said that if the damaged cargo had to be disposed off, then permission would have to be sought from 22 different government agencies and the vessel could be delayed for by 3 – 4 months.

**11**

11.18   On 17th June, East West Trading wrote to Universal Navigation to place them on notice that Owners' surveyor did not survey the damaged cargo jointly with the GMS International.

**12**

<u>Owner Declares General Average</u>

**13**

11.19   On 18th June, the Charterers declared General Average and said that they would be demanding proper security and would also be appointing an Average Adjuster.

<u>Procedure upon Damage to Edible Cargo</u>

11.20   At this stage, we set out the applicable procedures at Chittagong when cargo that is imported for human consumption is damaged on board the vessel.

**14**

(i)   The Customs and Port authorities along with the surveyors board the ship.

(ii)  The cargo is surveyed and the surveyors will advise if the cargo is fit for human consumption.

(iii) If the cargo is not fit for human consumption, the damaged cargo cannot be discharged pending approval on how to discharge and destroy the same.

(iv)  A committee comprising officials from the Port, Customs, Health department, Civic and other local bodies is formed for the purpose of deciding how to discharge and destroy the damaged cargo.

**It is important to note that the cargo of bagged sugar on the 'Prestigious' was edible cargo. The government was extremely concerned that damaged cargo should not find its way into the market. As such there were in fact very severe penal consequences (including capital punishment) for the sale of adulterated food.**

**The fact that there were procedures to be followed is not disputed by the Owners. In addition, by way of reference we attach a letter from the Assistant Commissioner of Customs at Chittagong dated 25th October and also an extract from the Special Powers Act in Bangladesh.**

Owners' Initial Reaction after General Average declared

11.21    Given the above circumstances, on 20th June the Owners rather surprisingly wrote to the Charterers claiming that only 1 gang was working to discharge cargo and that no efforts were being made to discharge the damaged cargo from Hold No. 1.

**15**

Master Refused To Allow Discharge of Cargo

11.22    The Charterers replied on 20th June to refute the Owners' allegation.  In particular, the Charterers said that the Master <u>did not allow</u> cargo to be discharged from other hatches (i.e. other than Hold No. 1) due to stability reasons. **The fact is that the Master wanted the damaged cargo to be discharged. This was not possible until the necessary formalities for discharge of damaged edible cargo was completed. Further, due to concerns for the ship's stability and safety, the Master did not allow more that 1 gang to work the other holds and even then discharge was clearly not permitted at the charterparty rate.**

**16**

11.23    Between 20th and 28th June, the Charterers sent several email messages to the Owners on the situation.  In particular, it became clear that whilst the receivers were ready and willing to discharge the sound cargo, the situation did not permit this because the Master was concerned as to the stability of the vessel and in fact the Master refused to allow the sound cargo to be discharged.  In addition, the Owners also remained silent on the receivers' claims

**17**

despite Mutual Shipping's repeated suggestion that it was best to resolve the receivers' claims amicably. It was unclear what the Owners wanted to do about the damaged cargo, where, when and how it would be discharged and what was to be done with the damaged cargo after discharge. At the same time, Owners had declared GA but again did not act further on this after making the declaration. The Owners also refused to sign the Joint Survey Report on the damaged cargo in Hold No. 1.

11.24    On 20th June, the Owners repeated their previous declaration of General Average through Tramp Marine Inc.

**18**

11.25    Although a Joint Survey of the vessel was carried out on 14th June, the Master and the Owner's P & I Club refused to sign this report for reasons best known to them. The Joint Survey Report was subsequently only signed by the Master on 14th July.

Owners' and Master's Report on Damaged Cargo

11.26    On 11th July, the Master and Owners separately sent messages that stated as follows

**19, 20**

    i.    The cargo in Hold No. 1 was damaged due to the entry of sea water.

    ii.    The cargo in Hold No. 1 appeared to be unfit for human consumption.

    iii.    The exact quantity damaged was subject to a final joint survey.

iv. The damaged cargo had to be discharged concurrently with the good cargo because of the stress on the vessel.

v. Owners' P&I Club were dealing with the Receivers' claims and were willing to make a settlement soon.

vi. Owners appointed M/s Hudson and Higgins to arrange the discharge of damaged cargo. This process required "*a lot of complicated documents and approvals from various authorities and Hudson and Higgins are familiar with that due to past experience*".

Owners were therefore clearly aware of the cumbersome procedures that had to be undertaken in Bangladesh to discharge damaged cargo.

11.27 Owners through their agents, M/s Mutual Shipping, had to obtain the co-operation of the Customs authority to ensure the smooth processing of documentation and discharge of the damaged cargo.

11.28 Owners asked receivers to issue a "No Objection" or other documentation to start the process. The Master's email on 11th July made clear that after the limited discharge of cargo as of 11th July, if the vessel discharged any more sound cargo, the vessel would be subjected to "*enormous structural stresses bending movements and shearing force and is likely to suffer cracking in the full or may even break up...*".

**20**

11.29  As of 12th July, the Owners and/or their agents refused to sign the Joint Survey Report on the damaged cargo.  As explained above, the Owners' execution of this report was necessary because only after this was done could the Receivers proceed towards settlement of their claim.

11.30  On 12th July, the Charterers wrote to the Owners putting on record that Owners had refused to sign the Joint Survey Report.

**21**

11.31  On 13th July, the East West Trading issued an email detailing discussions that took place in a meeting between the Receivers, the Owners, Owners' P&I Club and Hudson & Higgins.  In particular, this email noted that although Hudson & Higgins had been appointed to get the damaged cargo discharged, as of 13th July the Receivers had not heard from Hudson & Higgins on what steps they had taken.

**22**

No Objection Certificate from Mutual Shipping

**23**

11.33  On 17th July, Mutual Shipping issued their No Objection Certificate for the discharge of the damaged cargo onto barges and the damaged cargo to be kept in Hudson & Higgins's custody until the matter was resolved. .

11.34  On 17th July, the Port Health Officer at Chittagong issued a memo stating that the entire quantity of damaged cargo was unfit for human consumption and that this damaged cargo should be destroyed in the presence of various officials.

**24**

11.35   Despite the above, as of 22nd July, the damaged cargo had still not been discharged.  In particular, Hudson & Higgins had not taken any steps to obtain permission from the Custom's authority for discharge of the damaged cargo.                                                    **25**

11.36   On 22nd July, the Owners wrote to the Charterers to say that:                                                                              **26**

   a.   Customs permission was not in hand;

   b.   This permission was only expected early next week; and

   c.   Only then (i.e. after such permission is obtained) is discharge possible.

11.37   On 1st August, the Owners wrote directly to the Receivers to confirm that the Owners, taking full responsibility for the damaged cargo, had appointed Hudson & Higgins to discharge the damaged cargo and to seek permission from all government bodies at Owners' cost, time, risk and responsibility.  This message was sent to the Charterers by a Captain Zahid of Universal Navigation.                                       **27**

11.38   Subsequently, the Owners, Receivers and Charterers negotiated a Settlement Agreement of the Receivers' claim.  An agreement was reached on 7th August. Pursuant to this agreement, Owners agreed, amongst other matters, to appoint Hudson & Higgins of Chittagong to discharge the damaged cargo at

Owners' risk, cost and time. This was expressly provided for in Clause 5 of the Settlement Agreement as follows:

*"5.    Damaged cargo will be discharged and subsequent destruction will be done by Mutual Shipping Ltd (Vessel's declaring agent), <u>at cost risk, time, responsibility and expenses of the owners.</u> Permission for discharge of and destruction of damaged cargo will be obtained by M/s Hudson and Higgins (Owners nominated agents) at owners risk, time, responsibility and expenses. Mutual Shipping will extend Hudson and Higgins all cooperation for obtaining the permission."* [emphasis added]
**[Annexure 9, Points of Claim]**

The Owners also agreed with the Receivers that the Receivers' No Objection Certificate was to be issued **after** the Receivers confirmed receipt of the settlement monies due from the Owners under this settlement agreement [Clause 4 of the Settlement Agreement]

11.39   The settlement monies were received by the receivers on 10th August.                                                                **28**

11.40   On 11th August, Hudson & Higgins advised that they had obtained a surveyor's appointment for the customs staff to survey the damaged cargo. This survey was arranged for 13th August.                    **29**

11.41   On 16th August, East West Trading advised that the customs authority were forming a committee of officials to inspect the damaged cargo.                                **30**

11.42   On 31st August, the Owners wrote to say that the Mayor of Chittagong City Corporation had approved          **31**

the destruction of the damaged cargo on 30th August 2005 at 1900 hours.

11.43   On 1st September, East West Trading advised that Hudson & Higgins expected to receive the official written permission for destruction of the cargo from the Mayor's office on 1st September and that Customs and Port were awaiting final clearance from the Mayor's office.

32

11.44   On 5th September Hudson & Higgins advised that in a meeting with various authorities on 5th September, it was decided that a committee headed by a Joint Commissioner of Customs would visit the vessel and inspect the damaged cargo.

33

11.45   On 7th September, East West Trading advised that Hudson & Higgins had still not obtained permission from the customs authority for destruction of the damaged cargo.    East West Trading therefore suggested that Owners instruct Mutual Shipping to obtain all necessary permissions.

34

11.46   On 7th September, Hudson & Higgins issued an email, after the inspection of the damaged cargo by various government officials, to advise as follows:

35

a.   the damaged cargo had been inspected by a team of government officials;

b.   The Customs authority had strong reservations about dumping the damaged cargo at the City Corporation dumping grounds and that the

damaged cargo might find its way back to the retail market;

c.  To avoid this, the Customs authority advised the receivers to obtain permission to dump this cargo at sea or obtain permission to re-export the cargo;

d.  The decision on whether to dump the cargo at sea or re-export the same was to be made by the Government Destruction Committee on 12th September; and

e.  Unless the Customs authority allowed the cargo to be destroyed, dumped or re-exported, the vessel would not be released.

11.47  On 10th September, Mutual Shipping sent an email advising that hopefully Customs Authority will issue permission for commencement of discharge of sound cargo simultaneously with discharge of damaged cargo from Hold No. 1. Mutual Shipping advised that they were going ahead to arrange for the hire barges and that *"all cost, risk and responsibility for obtaining permission and subsequent discharge and destruction will be on Owners' account."* It is clear for this email that the parties were still awaiting permission from the Customs authority.

**36**

11.48  Universal responded on the same day. They said that they had made a similar suggestion to Hudson & Higgins and asked Mutual Shipping to liaise with Hudson & Higgins. Significantly,

**37**

(a) Universal did not dispute that the time, costs and risk in obtaining permission for the discharge and the actual discharge and destruction of the damaged cargo was for Owners' account.

(b) Owners did not want to load the damaged cargo onto barges and then be at risk of the authorities overruling the arrangement for dumping.

11.49 By an email dated 12th September, from East West Trading to the Charterers, East West advised that the Customs authority issued a letter instructing them to discharge the damaged and sound cargo. Mr Fadoo of Universal was reluctant to hire barges to receive the damaged cargo unless permission to dump the same at sea was obtained. In this regard, East West also advised that although Hudson & Higgins had obtained permission to destroy the damaged cargo on shore, the Destruction Committee was reluctant to allow destruction on shore.

**38**

11.50 On 14th September, Universal gave permission to the Master for discharge of both the sound and damaged cargo on condition that:

**39**

a. Original Bills of Lading be surrendered;

b. Copy of Customs permission for discharge of damaged cargo onto lighters be given to Master;

c. Lighters hired by receivers with Owners

paying an agreed lump sum.

11.51  Subsequently on 15th September, Hudson & Higgins **41**
advised that permission for discharge and destruction
of the damaged cargo was issued by Customs on 14th
September.    They further advised of the Customs
authorities' instructions that Port Clearance for the
vessel not be granted until the destruction was
completed.

11.52  On 16th September, discharge resumed from Hold No.
1.

11.53  Between  16th  and  21st  September,  discharge
operations continued.

11.54  On 21st September, the Receivers advised that **42**
damaged cargo was found in the middle section of
Hold No. 3.

11.55  On 22nd September, the East West Trading issued an **43**
email advising of damaged cargo in Hold No. 3. They
advised Owners that if the Customs Authority came
to know about this incident of damage, then the
process of obtaining approvals from the government
agencies would be complicated.  East West Trading
also advised that they had paid customs duty on this
damaged cargo and required Owners to compensate
them for the cargo value and customs duty.

11.56  Universal Navigation replied on 23rd September to say **44**
that Owners would settle the Receiver's claim after
the actual damaged quantity was determined.

11.57  On 24th September, the Receivers sent their proposal     **45**
       to Owners for settlement of their claim with respect
       to the damaged cargo in Hold No. 3.

11.58  Between 26th and 28th September, the Owners,     **46**
       Charterers and Receivers exchanged messages
       regarding a settlement of the Receivers' claim with
       respect to the damaged cargo in Hold No. 3.  During
       this time, Charterers advised Owners on 26th
       September that the discharge rate was reduced
       because the Receivers had to separate the good
       cargo for the damaged cargo.

11.59  On 29th September, the Owners, Charterers and     **47**
       Receivers agreed to a settlement of the Receivers'
       claim with respect to the damaged cargo in Hold No.
       3.  The agreement was for Owners to remit
       US$500,000 to Receivers via Charterers.   Upon
       remittance of this amount from Charterers, Receivers
       were to complete the discharge of the damaged
       cargo in Hold No. 3.

11.60  Owners paid the US$500,000 to Charterers on 30th     **48**
       September.

11.61  On 29th September, the vessel shifted to J/6.     **49**
       However, discharge could not resume because of bad
       weather.  In this regard, Cyclonic Signal No. 3 was
       raised on 29th September.

11.62  In the meantime on 10th October, Mutual Shipping     **50**
       advised that they had finally managed to persuade

the Department of Environment to issue the necessary permits for clearance and destruction of the damaged cargo in Hold No. 1 at sea instead of on shore.

11.63   On 19th October, Mutual Shipping advised that they had obtained the *"last required permission for Department of Environment for destruction of damaged cargo in Hold No. 1....".*    **51**

11.65   On 29th October, Mutual Shipping advised Charterers that they had received a letter from the Chittagong Customs Authority with confirmation of Schedule of destruction of the damaged cargo in Hold No. 1. This destruction was scheduled for 30th and 31st October.    **52**

11.66   On 30th October, Mutual Shipping advised that the Destruction Committee had commenced destruction of the damaged cargo in Hold No 1.    **53**

11.67   The destruction of damaged cargo in Hold No. 1 was completed on 16th November.    **54**

11.68   Port clearance from the vessel to sail was granted on 24th November and the vessel sailed for Chittagong on 24th November.

11.69   Subsequently, on 27th November, GMS issued their Report and Certificate No. 3001/0037 detailing their attendance on the vessel between 14th June and 17th November.    **55**

E.    **CHARTERERS' RESPONSE TO THE POINTS OF CLAIM**

12.    Paragraphs 1 and 3 of the Points of Claim are admitted.

13.    Paragraphs 4 and 5 of the Points of Claim are admitted. The Charterers aver that the following were also material terms of the Charterparty.

*Clause 7*
*At port(s) of loading and discharging Owners to appoint, employ and be solely responsible for Agents. As selected by Charterers without risk or liability to Charterers, for all ship's business, owners paying the agency fee. Owners right to appoint Protecting Agents both ends.*

*Clause 18*
*Vessel to be in possession of a valid certificate of efficiency for winches and derricks/cranes for the duration of this Charter. Vessel is to supply at both ends, at all times, free of charge to Charterers,    winches and derricks/cranes, power and gear in good working order at all hatches as required for loading and discharging sugar, also full lights for night work on deck and in the holds, if required.    In the event of a breakdown of a winch and derrick/crane or winches and derricks/cranes by reason of disablement or insufficient power and/or failure of lights, the laytime to be extended pro-rata for the period of such inefficiency in relation to the number of working hatches available.    If on demurrage, time lost pro-rata to be deducted from same. Owners are to pay in addition the cost of labour for the shift or shifts during which such break down occurred if shore gear used laytime or time on demurrage to court.*

*Rider Clause 32*
*Vessel will be held responsible for any damage to the cargo caused by master through ventilators and leakages of water and/or oil, from pipes and or valves and or tanks etc on board, due to wear and tear of the above, or any cause due to lack of due diligence..*

*Rider Clause 52*
*In tendering notice of readiness of load port, vessel's holds/hatches to be presented in clean/good and absolute working conditions, dried, free of previous cargo residues, rust pieces, insects and up to the satisfaction of Shippers/Charterers surveyors for loading intended cargo as regard the cleanless / dryless / odourless of the holds.*

*In case vessel fails on hatch / hold inspection, time not to*

*count proportionally from the time that each hold was rejected till the time that each hold is ready for loading and passes the survey.*
*In case of dispute abt vessel's hold cleanliness then an independent surveyor to be appointed and his findings to be final and binding on both parties. Surveyors expenses to be for the party in default.*

**Rider Clause 33**
. . .
*Loading and discharging rate will be independently of the number of holds the shippers/receivers will use. Master will always provide 5 ho/ha at shippers/ receivers disposal*

14.    Save that it is denied that Mutual Shipping were the Charterers agents, paragraph 4 of the Points of Claim is admitted. Mutual Shipping were at all material times the Owners' agent at Chittagong.

15.    Paragraph 6 of the Points of Claim is admitted.

16.    Paragraph 7 of the Points of Claim is admitted. However, the Charterers aver that the discharge rate of 2,000 mt per day was conditional upon the Owners making 5 holds/hatches available at all times. As the facts show, Owners in breach of the Charterparty failed to make 5 holds/hatches available at all times.

17.    Paragraph 8 and 9 of the Points of Claim are admitted.

18.    Paragraph 10 of the Points of Claim is denied. The Charterers aver that due to an incident that occurred on or before 7th June, water entered Hold No. 1 and damaged the cargo of sugar that had been loaded there. As a consequence of this incident and the events that followed, the Charterers claim that laytime was suspended and/or did not count because discharge of the cargo could not take place on

account of an act or default of the Owner.   The incident and subsequent events are described in detail below.

19.     On or about 7th June, the Owners, their servants and/or agents discovered that water had entered Hold No. 1 and that the cargo loaded in Hold No. 1 was damaged.  The Owners wrongfully withheld this information from the Charterers and the Receivers until much later on 14th June.   Subsequent events showed that the damage to the cargo in Hold No. 1 was such that the cargo was declared unfit for human consumption and was in fact ultimately removed from Hold No. 1 and destroyed.

20.     Following the seepage of water and discovery of damage to the cargo in Hold No. 1 on 7th June, on 18th June, the Owners declared General Average.

21.     Between 7th and 12th June, the cargo in the other holds were not discharged as the Receivers were preparing the necessary documentation.

22.     On 13th June, discharge commenced from Hold No. 3 at 0330 hours and continued until 1400 hours.

23.     Discharge resumed on 14th June at 0745 hours but the Chief Officer only allowed discharge using 1 Gang and therefore only one hatch could be worked at any point in time.  The reason given by the vessel's Chief Officer for allowing only one Gang was that discharge could not take place from the other holds (same for Hold No. 1) due to stability problems.

24. The position described in paragraph 9 above persisted from 14th June until.

25. It is noted that the fact the discharge of the cargo posed a risk to the stability of the vessel is admitted by Owners in the 2nd sentence of paragraph 28 of the Points of Claim.

26. In the meantime, on 7th August, an agreement was reached by the Receivers of the cargo and the Owners. The following were material express terms of the Amicable Settlement Agreement (referred to in paragraph 30 of the Points of Claim).

1. *Owners will pay USD 1.1 Million (hereinafter called the settlement money) for losses suffered by receivers in respect of the damage to 3,305 M. Tons of Bagged Sugar ex Hold No. 1 in full and final settlement of all claims of the Receivers inclusive of Invoice value, LC commission, Bank Interest, Insurance Premium, Loss of goodwill, Consultancy and survey Fees & Business loss etc.*

2. *Receivers further expressly agree that the settlement money represents full and final settlement and actual extinguishments of all claims, counter claims, demands OF WHASOEVER SCOPE AND VALUE HOWSOEVER DERIVING ARISING OUT OF OR RELATED TO THE DAMAGE TO THE 380smt SUGAR CARGO CARRIED IN Hold No. 1 from the port of Santos. Brazil to the port of Chittagong, Bangladesh to under Bill of Lading numbers S-12, S-21, #-22 & S-23.*

   (c) *This settlement money will be placed by or on behalf of owners with receivers agents M/s Agrocorp International Pte Ltd, 133 New Bridge Road Hex 22-01/22-02 Chinatown Point Singapore 059413 within 48 hours of signing of this agreement.*

   (d) *Upon receipt of this settlement money by receivers agents, M/s Agrocorp International Pte Ltd. And after receipt of confirmation of the same by the receivers, M/s Mutual*

*Shipping Ltd. Vessels declaring agent and the receivers will give No Objection Certificate for discharge of the damaged cargo.*

(e)    *Damaged cargo will be discharged and subsequent destruction will be done by Mutual Shipping Ltd (Vessel's declaring agent), at cost risk, time, responsibility and expenses of the owners. Permission for discharge of and destruction of damaged cargo will be obtained by M/s Hudson and Higgins (Owners nominated agents) at owners risk, time, responsibility and expenses. Mutual Shipping will extend Hudson and Higgins all cooperation for obtaining the permission.*

(f)    *Owners of the vessel will deliver and discharge balance as per B/L and 3805 of damaged cargo as per Joint Survey Report with due consideration to the safety and stability of the vessel.*

(g)    *(A) Upon completion of discharge of all remaining cargo on board. Mutual will obtain Port Clearance from respective authority from sailing of the vessel and submit the same to the Master of the vessel along with all Ships Trading Certificate.*
        [Emphasis added]

27.    The Charterers aver that as a consequence of the incident and damage to cargo in Hold No. 1, the remaining cargo could not be discharged because that affected the vessel's stability. The discharge of the good cargo could only take place after the damaged cargo had been discharged. This in turn, required the approval of various relevant authorities in Bangladesh because the cargo was an edible product which had been imported for human consumption but was now unfit for human consumption.

28.    The effect of the incident was encapsulated in Clause 5 of the Amicable Settlement Agreement by which

Owners agreed to discharge and destroy the damaged cargo at their time, risk and cost. At all material times, it was the Owners' obligation to obtain permission for the discharge and destruction of the damaged cargo. Until such permission was sought and granted, the vessel was physically and legally not ready to discharge any cargo.

29. On 28th August, the Owners' agents Universal Navigation, wrote to the Charterers to claim that the receivers had not resolved the issue of custom duty on account of the damaged cargo and that the Owners held the Charterers accountable for the detention of the vessel.

30. The Charterers replied on 29th August to state that pursuant to clause 5 of the Amicable Settlement Agreement, responsibility for obtaining permission to discharge the damaged cargo was the Owners.

31. The Owners' agents replied on 29th August to confirm that the Owners would abide by the agreement. Neither the Owners nor their agents disputed that the Owners were responsible for obtaining permission to discharge the damaged cargo or that the Charterers could not be held responsible if such permission was delayed.

32. Although permission to discharge and dump the damaged cargo was obtained by the Hudson & Higgins from some of the authorities, the Mayor of Chittagong refused to allow dumping on shore. Therefore permission was necessary to allow

destruction at sea and this permission was obtained sometime on or about 29th October.

## DISCHARGE OF CARGO IN OTHER HOLDS PENDING DISCHARGE OF DAMAGED CARGO IN HOLD NO. 1

33.    Pending the discharge of the damaged cargo from Hold No. 1, the cargo in the other holds could only be discharged using 1 Gang due to hatch restrictions and stability issues.  Further, bad weather also delayed these discharge operations.

34.    Discharge of the damaged cargo in Hold No. 1 commenced on 13th June and was completed on 16th November.    During this period, the discharge operations were suspended from time to time by the vessel's Chief Officer due to stability problems and hatch restrictions.  These interruptions are set out in the Statement of Facts prepared by the Receivers.

**56**

35.    <u>Interruptions due to Weather</u>
From time to time, discharge was not possible because of the weather conditions.  These interruptions are duly recorded on the Receivers' Statement of Facts.

**56**

<u>Interruptions due to Strike</u>
There were also strikes on 15th August, 18th and 21st September which also prevented discharge.  Again, these interruptions are duly recorded on the Receivers' Statement of Facts.

**56**

37.  By reason of the above paragraphs 11, 12 and 15 of the Points of Claim are denied. The Charterers aver that the discharge was delayed due to the Owners'/Vessel's fault for which the Charterers cannot be held responsible. The Charterers also aver that in breach of the Charterparty, the Owners did not make available at all times 5 Holds and 5 Hatches for discharge. The effect of the damage and inability of the vessel to discharge even all the remaining sound cargo meant that the vessel simply could not discharge at the rate stated in the Charterparty.

38.  We refer to paragraphs 20-22 of the Points of Claim. We refer to paragraphs 20-22 of the Points of Claim. Whilst it is admitted that the documentary formalities for discharge of the cargo was only completed on 13th June 2005, it is denied that the Charterers were in breach of the Charterparty as alleged in paragraph 22 or at all. As the facts show, the water seepage into Hold No. 1 and the subsequent events suspended laytime from running after 14th June 2005. The fact that the vessel berthed on 7th July 2005 is irrelevant because as of 18th June 2005 the Owners declared General Average and further as of 13th June, the Master refused to allow even the sound cargo to be discharged due to the risks to the vessel's safety.

39.  Paragraphs 23 – 27 of the Points of Claim are denied.

40.  The first sentence of paragraph 28 of the Points of Claim is denied. The Charterers aver that the second sentence in paragraph 28 is an admission by the Owners that the discharge operations were affected

because of stability issues caused by the damage to the vessel and damage to the cargo in Hold No. 3 for which the Owners were responsible.

41.    We refer to the first sentence in paragraph 29 of the Points of Claim.   It is admitted that substantial discussions took place between the Owners, Charterers and the cargo receivers and as a result discharge operations were delayed but it is averred that such discussions necessary only because of the damage to the cargo for which the Owners were solely responsible.

42.    The second sentence of paragraph 29 of the Points of Claim is denied and the Owners are put to strict proof thereof.

43.    Save that the Owners paid US$1.1 million to the Receivers via the Charterers, paragraph 30 of the Points of Claim is denied and the Owners are put to strict proof thereof.

44.    Paragraph 31 of the Points of Claim is not admitted and is in any event irrelevant.

45.    We refer to paragraph 32 of the Points of Claim and deny that the No Objection Certificate was held back by the Receivers as alleged or at all.   Firstly, the Master/Owners had refused to sign the Joint Survey Report until 14th July. Secondly, the Receivers very reasonably wanted their claim for damages to be settled. There was already another vessel. i.e. the "Celtic" which had discharged damaged wheat onto

barges but the same had not been destroyed for some 3-4 months. The Receivers were thus conscious of the penal consequences of discharging the cargo without ensuring that all proper consents from the relevant authorities were in place. Finally, by the terms of the Amicable Settlement Agreement, the Owners agreed that the Receivers were only obliged to issue their No Objection Certificate after the Receivers confirmed receipt of the settlement sum.

46.    Paragraph 33 of the Points of Claim is denied. The discharge of cargo commenced on 13th June but was halted by the Master on 13th June due to events related to the damage in Hold No. 1 for which the Owners also wholly responsible.

**56**

47.    We refer to paragraph 34 of the Points of Claim. Damaged cargo in Hold No. 3 was discovered on 22nd September. The Owners then entered into negotiations with Receivers to settle their claim in relation to this cargo (i.e. in Hold No. 3) and all parties were anxious to avoid the scenario that had occurred in relation to the damaged cargo in Hold No. 1.

48.    Paragraphs 35, 36 and 37 of the Points of Claim are denied.

49.    The various heads of relief sought by the Owners at sub-paragraph (i) to (vi) are denied.

50.    Save as is expressly admitted, the Charterers deny each and every allegation in the Points of Claim as if

the same were expressly set out and specifically denied.

Dated this 14th day of May 2007

SOLICITORS FOR THE RESPONDENTS