# APPENDIX

# APPENDIX 1

Westlaw.

Slip Copy

Slip Copy, 2007 WL 2456629 (S.D.N.Y.)

**(Cite as: Slip Copy)**

Page 1

Essar Int'l Ltd. v. **Martrade** Gulf Logistics, FZCO
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
**ESSAR INTL LTD.**, Plaintiff,
v.
**MARTRADE GULF LOGISTICS, FZCO,**
Defendant.
No. 07 Civ. 3439(WHP).

Aug. 23, 2007.

Manuel Antonio Molina, Esq., Freehill, Hogan &
Mahar, LLP, New York, NY, for Plaintiff.
Keith B. Dalen, Esq., Hill Rivkins & Hayden LLP,
New York, NY, for Defendant.

*MEMORANDUM AND ORDER*
WILLIAM H. PAULEY III, District Judge.
**\*1** Non-party Marlog-LBG Logistics GmbH (" Marlog" ) moves to vacate an attachment of funds resulting from an Order of Maritime Attachment and Garnishment against Defendant Martrade Gulf Logistics, FZCO (" Martrade" ). For the following reasons, Marlog's motion is denied.

*BACKGROUND*

On May 1, 2007, Plaintiff Essar International, Ltd. (" Essar" ) commenced this action seeking attachment of Martrade's assets pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (" Rule B" ). On May 2, 2007, the Court issued an Order of Maritime Attachment and Garnishment against Martrade in the amount of $1,327,249.78 (" the Attachment Order" ).

On June 1, 2007, Deutsche Bank informed Essar that it had restrained a $157,000 electronic funds transfer (" EFT" ) pursuant to the Attachment Order (the " June 1 EFT" ). (Declaration of Keith B. Dalen, dated June 29, 2007 ¶ 5.) The June 1 EFT originated with Marlog and was remitted to Inchape Shipping Services (" Inchape" ). Deutsche Bank restrained the June 1 EFT because the transaction confirmation included the description, " Grand Glory V7807 for Martrade Gulf Logistics." (Declaration of William L. Juska Jr., dated July 5, 2007 (" Juska Decl." ) ¶ 11.) The bank advised Essar that Martrade was neither the originator nor the beneficiary of the remittance, but Essar requested that

the restraint be maintained, based on the transaction description in the confirmation. (Juska Decl. ¶ 12.)

On June 29, 2007, Marlog moved to vacate the attachment of the June 1 EFT pursuant to Supplemental Rule E(4)(f) for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (" Rule E" ). This Court heard argument on the motion on July 6, 2007. At the hearing, Martrade produced an invoice from Inchape that contained the notation, " enclosed please see payment-order from mgl-dubai [Martrade Gulf Logistics] executed from marlog-account," as well as a payment order prepared by Martrade. These documents confirm that the EFT was intended as payment for a debt owed by Martrade to Inchape. (Court Exhibit 1.) Additionally, Marlog conceded that the June 1 EFT represented payment of a debt owed by Martrade to Inchape, and that the transaction had been structured to circumvent the Attachment Order. (July 6, 2007 Hearing Tr. at 9 (" [T]his transfer was effected to avoid a [Rule] B[ ] attachment. We'll stipulate to that." )

*DISCUSSION*

Marlog's motion is predicated on two related arguments: First, that Martrade has no property interest in the June 1 EFT for Rule B purposes. Second, that its property cannot be attached because it is not a defendant in this action. Both arguments are without merit.

*I. Legal Standard*

" Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Rule E(4)(f). The Court must vacate an attachment if the plaintiff cannot, at a minimum, show that it has complied with the " filing and service requirements of Rules B and E ." *Aqua Stoli Shipping Ltd.v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir.2006).

*II. Martrade's Property Interest in the June 1 EFT*

**\*2** Rule B provides, in relevant part:
If a defendant is not found within a district ... a verified complaint may contain a prayer for process to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2456629 (S.D.N.Y.)

(Cite as: Slip Copy)

attach the defendant's tangible or intangible personal property-up to the amount sued for-in the hands of garnishees named in the process ... The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing the process of attachment and garnishment.

Rule B(l)(a)-(b). The Second Circuit has stated that the definition of " property" under Rule B is broad. _Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 275 (2d Cir.2002)_ (" It is difficult to imagine words more inclusive than ' tangible or intangible' .... The phrase is the secular equivalent of the creed's reference to the maker ' of all there is, seen and unseen.' " ). Thus, attachable property under Rule B includes debts owed to a defendant, " even if they have not yet matured or have only partially matured," as well as electronic funds in the possession of an intermediary bank en route to a defendant recipient. _Winter Storm,_ 310 F.3d at 276-78. Under Rule B, it is also possible for more than one party to have an interest in the same property. For example, the sender and recipient of an EFT may have " overlapping property rights," rendering the EFT attachable under Rule B if either party is a named defendant. _HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V.,_ No. 04 Civ. 6884(NRB), 2005 WL 1036127, at *4 (S.D.N.Y. May 4, 2005).

Citing _DS Bulk Pte. Ltd. v. Calder Seacarrier Corp.,_ No. 05 Civ. 10146(SHS), 2006 WL 1643110, at *2 (S.D.N.Y. June 13, 2006) and _T & O Shipping, Ltd. v. Source Link Co., Ltd.,_ No. 06-Civ-7724 (KMK), 2006 WL 3513638, at *4 (S.D.N.Y. Dec. 5, 2006), Marlog argues that Martrade has no interest in the June 1 EFT. However, those cases involved only " bare assertion [s]" of a property interest. _DS Bulk,_ 2006 WL 1643110, at *2. Here, Marlog _admits_ that the payment to Inchape was made for Martrade's benefit, and that the transfer was orchestrated to avoid the Attachment Order.[FN1] This establishes that Martrade had a property interest in the June 1 EFT sufficient to render it attachable under Rule B. _See Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.,_ 169 F.Supp.2d 1341, 1359-60 (M.D . Fla.2001) (upholding the attachment of funds nominally belonging to non-parties because the plaintiff provided evidence they were controlled by the defendant); _see also Greenwich Marine, Inc. v. S.S. Alexandra,_ 339 F.2d 901, 905 (2d.Cir.1965) (" The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the

sound discretion of the district judge sitting as an admiralty judge." ).

> FN1. _T & O Shipping_ is also distinguishable because the plaintiff in that case exceeded the scope of the attachment order, whereas that is not the case here. On the contrary, the Attachment Order provided that " [t]he Clerk ... is directed ... to issue ... [process] for seizure of all tangible and intangible property ... belonging to, due, or being transferred to, from, _or for the benefit of the Defendant_ ... including but not limited to [property] as may be held, received, _or transferred for its benefit."_ (Emphasis added.)

### III. _Marlog's Non-Party Status_

Rule B limits attachable property to that of a named defendant. " Modern conceptions of fairness ... dictate that actual notice be given to persons known to claim an interest in the property that is the subject of the action where that is reasonably practicable." _Winter Storm,_ 310 F.3d at 269; _see also DS Bulk,_ 2006 WL 1643110, at *2 (" The language of Supplemental Rule B clearly anticipates that only a ' defendant' will be subject to an order of attachment." ); _T & O Shipping,_ 2006 WL 3513638, at *4 (" Rule B limits the scope of an attachment to a defendant who is named in the verified complaint" ). Marlog argues that, because Essar did not name it as a defendant or allege an alter-ego relationship between it and Martrade in the Complaint, it has failed to satisfy the technical requirements of Rule B. This Court disagrees.

*3 A plaintiff need not aver an alter-ego relationship in the Complaint for a Rule B attachment to be proper. _Maersk, Inc. v. Neewra, Inc.,_ 443 F.Supp.2d 519, 527-30 (S.D.N.Y. Aug. 1, 2006) (holding that an analysis of whether reasonable grounds exist for a Rule B attachment is not limited to the allegations in the Complaint). As stated, Defendant Martrade had an interest in the June 1 EFT sufficient to uphold its attachment under Rule B. Accordingly, the requirement that the property attached be that of the named defendant is satisfied.

### CONCLUSION

For the foregoing reasons, Marlog's motion to vacate the attachment of the June 1 EFT is denied.

SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2456629 (S.D.N.Y.)

**(Cite as: Slip Copy)**

S.D.N.Y.,2007.
Essar Int'l Ltd. v. Martrade Gulf Logistics, FZCO
Slip Copy, 2007 WL 2456629 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 2

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2006 WL 3408799 (S.D.N.Y.), 2007 A.M.C. 186

(Cite as: 2006 WL 3408799 (S.D.N.Y.))

C

United States District Court,
S.D. New York.
DOMINION BULK INTERNATIONAL, S.A.,
Plaintiff,
v.
NAVIERA PANOCEANICA, S.A.C., Defendant,
ARMADA (SINGAPORE) PTE, LTD, Third Party
Movant.
No. 06 Civ. 6854(LAP).

Nov. 21, 2006.

*MEMORANDUM AND ORDER*
PRESKA, J.

*1 This is a motion to vacate an order of maritime
attachment and garnishment. Plaintiff Dominion Bulk
International ("Dominion") commenced the original
action in the Southern District of New York on
September 7, 2006 by filing a Verified Complaint that
included a prayer for an Order for Process of Maritime
Attachment pursuant to Rule B, seeking to attach
funds of Defendant Naviera Panoceanica ("Naviera")
based on claims of breach of the charter party between
the two parties. [FN1] The Order authorized
Dominion to attach Naviera's property, up to the sum
of $2,078,439.80, located within this judicial district.

> FN1. Specifically the stated actions of breach
> included damage to the vessel's equipment,
> placing the ship off-hire without cause,
> failing to pay certain amount of the hire,
> failing to pay the cost of an ABS certificate,
> failing to pay for victualling, and failing to
> remit the ballast bonus. The underlying
> dispute between Naviera and Dominion in
> the instant case does not involve third-party
> movant Armada and is not relevant to this
> motion so it is not necessary to examine that
> dispute at length.

Pursuant to a charter party dated September 8, 2006,
third-party movant Armada sought to time charter the
M/V DOXAD from Naviera, the disponent owner.
Regarding delivery of the vessel, the charter party
states: "The vessel shall be placed at the disposal of
the Charterers on dropping last outward sea pilot
Pisco, any time day or night, Sundays and holidays

included." (Time Charter dated September 8, 2006,
("Time Charter") Cl. 2, Cl. 95, attached as Ex. 1 to the
Declaration of Nancy R. Peterson, executed on
October 3, 2006 ("Peterson Declaration")). There is no
factual dispute that the vessel left the port of the last
sea pilot on September 14, 2006. The charter party
specifies the charter hire rate as "U.S. $ 16,000
(Sixteen Thousand Dollars) per day/pro rata including
overtime, payable every 15 days in advance." (Time
Charter, Cl. 10, 80).

On September 18, 2006, Armada authorized its bank
to send an advance hire payment, as required by the
terms of the charter party, to Naviera. On or about
September 18, 2006, Citibank, located within the
Southern District of New York, confirmed that it had
attached electronic funds moving pursuant to a wire
transfer originating from Armada in the amount of
$305,571.73, intended for Naviera, pursuant to the
Order of Attachment. (Peterson Decl., ¶ 11). Armada
then filed the present motion, asking that the
attachment be vacated.

The charter party provides that "[a]ll disputes arising
out of this contract shall be arbitrated at London....
Any dispute arising hereunder shall be governed by
English law." (Time Charter, Cl. 45(b)).

A. Choice of Law

At issue on this motion is the propriety of Dominion's
attachment of funds. The attachment of funds is
considered a procedural remedy, and federal law
applies to procedural issues in admiralty cases. *See, T
& O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.,*
415 F.Supp.2d 310, 314 (S.D.N.Y., 2006) (noting that
"Rule B [attachment] is procedural in nature and when
a party brings a Rule B attachment in this district,
questions about its validity are governed by federal
law); *Maersk, Inc. v. Neewra, Inc.,* No. 05-4356, 2006
WL 2854298 (S.D.N.Y., Oct. 6, 2006) (noting that
attachment is a procedural remedy). *See also,
Chaniter Naval Voisin v. M/Y Daybreak,* 677 F.Supp.
1563, 1569 (S.D.Fla.1988) (concluding that applying
French substantive law to a admiralty claim does not
divest the court of its equitable powers or require it to
apply French procedural law). Therefore, federal law
is to be applied to Armada's claim that the funds it
transferred were improperly attached by Dominion,
while English law is to be applied to substantive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2006 WL 3408799 (S.D.N.Y.), 2007 A.M.C. 186
(Cite as: 2006 WL 3408799 (S.D.N.Y.))

questions of interpretation of the charter party, such as if and when delivery of the vessel was made. *See, e.g., T & O Shipping, Ltd.,* 415 F.Supp.2d at 314; *Filia Compania Naviera S.A. v. Petroship, S.A.,* No. 81-7515, 1982 U.S. Dist. LEXIS 9404, at *8 (S.D.N.Y. March 19, 1982) (applying federal law to a motion to vacate an attachment based on a charter party governed by English law and noting that "[a] general principle of conflict of laws provides that on procedural matters, as opposed to substantive rights of the parties, the law of the forum applies due to the interest of the forum in the manner of judicial administration."). *See generally, Hausman v. Buckley,* 299 F.2d 696, 700 (2d Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1157 (1962) (Under New York law procedural questions are governed by the law of the forum).

B. Attachable Interest

*2 In a motion to vacate a maritime attachment, the plaintiff who obtained the attachment has the burden to show that the attachment should not be vacated. *E.g., Sea Transport Contractors, Ltd. v. Industries Chemiques Du Senegal,* 411 F.Supp.2d 386, 390 (S.D.N.Y.2006). A district court also has the authority to vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of the plaintiff. *Id.* at 391.

The Court of Appeals in *Winter Storm Shipping Ltd. v. TPI,* 310 F.3d 263, 276 (2d Cir.2002) accepted that the language of Rule B governing maritime attachments was "broadly inclusive," permitting a plaintiff to attach a defendant's tangible and intangible personal property. While electronic funds transfers ("EFT") did not exist when maritime attachments became an "inherent component of the admiralty jurisdiction given to federal courts under Article III of the Constitution," they are now accepted as a form of personal property that can be attached by a maritime attachment order. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty, Ltd.,* 460 F.3d 434, 437 (2d Cir.2006). In *Aqua Stoli Shipping Ltd.,* the Court of Appeals again noted that Rule B(1) is a "relatively broad maritime attachment rule" and concluded that EFTs to or from a party in a maritime case are attachable as they pass through banks located in that court's jurisdiction. 460 F.3d at 443. *See also, HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas Y Oleicos S.A. de C.A.,* No. 04-6884, 2005 WL 1036127 (S.D.N.Y. May 4, 2005) (holding that an EFT does not remain the exclusive property of the

sending-payor until it enters one of the banks associated with the recipient-beneficiary as opposed to an intermediary bank and declining to adjudicate the competing property interests of the sending-payor and recipient-beneficiary in a motion to vacate attachment).

Armada initially claimed that because Naviera refused to permit the vessel to berth as Armada instructed, Naviera effectively repudiated the contract before it was performed. Thus, Armada argued, Naviera never earned any of the advance payment and, therefore, there were no funds to attach. [FN2] In its later submissions, however, Armada appears not to dispute that the vessel was "delivered" on September 14, 2006, but only disputes the attachment of the "unearned" portion of the advance hire. (Armada Reply Memorandum, p. 2). [FN3]

> FN2. Naviera disclaimed any right to or interest in the funds that Armada sent. (Declaration of Javier LaBarthe, executed on October 18, 2006, ¶ 3). However, the position of Naviera is not dispositive in this action.

> FN3. While in a recent letter to the Court Armada states that Naviera could not deliver the vessel to Armada, Armada's Reply Memorandum stated that it did not disagree with Dominion's English law expert's declaration that the vessel was delivered under the terms of the charter party. As the language of the charter party is controlling as to the definition of delivery, the Court adopts that conclusion.

To the extent that this question of whether Naviera has a sufficient interest in the EFT to support an attachment under Rule B is governed by federal law, as noted above, the "property" that can be attached under a Rule B maritime attachment is broadly defined by the statute. The Court of Appeals in *Winter Storm Shipping, Ltd.* stated that "Rule B also permits a plaintiff to attach intangible items, such as debts owed to the defendant" and noted that "[s]uch items may be attached even if they have not yet matured or have only partially matured." 310 F.3d at 276 (citing Robert M. Jarvis, *An Introduction to Maritime Attachment Practice under Rule B,* 20 Journal of Maritime Law and Commerce, No. 4 (October 1989) at 521).

*3 In *Vamvaship Maritime Ltd.,* No. 06-1849, 2006

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 3408799 (S.D.N.Y.), 2007 A.M.C. 186

(Cite as: 2006 WL 3408799 (S.D.N.Y.))

Page 3

WL 1030227 (S.D.N.Y. Apr. 20, 2006), one party had initiated an EFT as an advance payment under an executory purchase and sale contract, and the EFT was seized pursuant to a maritime attachment when it reached the intermediary bank in New York even though none of the goods under the contract had been delivered. The court held that such seizure was proper because "a contract that remains executory may nonetheless be binding and enforceable" and the non-paying party's obligation to perform became obligatory once the paying party had made the advance payment. *Id.* at *6. Thus, the court concluded, "Shivnath's interest in the attached funds is more than a mere expectancy," even though Shivnath had not performed at all. *Id.* at *6-7. (internal quotations omitted).

Here, in contrast to *Vamvaship* where performance had not commenced, Naviera did commence performance by delivering the vessel, and Armada's transfer of funds, whether Naviera admits interest or not, resulted in Naviera's having a property interest in the funds in the intermediary bank in New York. According to the cases under federal law and the broad interpretation of Rule B(1), that property is attachable. *See, e.g., Winter Storm Shipping Ltd.*, 310 F.3d at 278, *Vamvaship Maritime Ltd.*, 2006 U.S. Dist. LEXIS 21114, at *5-6.

C. Interest in Unearned Advance Hire

It is likely that the question of Naviera's interest in the unearned advance hire is a substantive question to be decided under English law. Timothy James Houghton, Esq., Armada's English law expert, eventually seems not to dispute that the vessel was delivered on September 14, 2006, and thus that the advance hire was due. Mr. Houghton then states that "ownership of the unearned hire is outside the scope of English law as the law of contract" and then concludes that "it is not possible for an English lawyer to give a definitive answer on whether [Naviera] has or had a property interest in the advance hire which Dominion Bulk has attached." (Second Declaration of Timothy Houghton, executed on October 16, 2006, ("Houghton Sec. Decl."), ¶ 12). In light of the clear delivery of the vessel, however, this conclusion is not persuasive.

More persuasive is the opinion of Patrick Hawkins, Esq., Dominion's English law expert. In sum, Mr. Hawkins opines that upon delivery of the vessel the advance hire is "unconditionally and fully" due, regardless of subsequent events. (Declaration of

Patrick Hawkins, executed on October 6, 2006, ("Hawkins Decl."), ¶ 15). Mr. Hawkins notes that "[s]ubsequent events may entitle Armada to claim damages against Naviera for repudiatory breach. However, this does not mean that the hire was not unconditionally and fully due to Naviera on 18 September 2006 when payment was authorized and made by Armada." *Id.* Mr. Hawkins elaborates on these conclusions in his October 20 Declaration and attaches the relevant cases. (Reply Declaration of Patrick Hawkins, executed on October 20, 2006, ¶¶ 10, 14, 15-18, 22-24 (discussing English cases *The Trident Beauty,* [1993] 1 Lloyd's Rep. 443 and [1994] 1 Lloyd's Rep. 365, *The French Marine v. Compagnie Napolitaine,* [1921] 8 Lloyd's Rep. 345)). Based on Mr. Hawkins' explanation and a review of the cases, I am persuaded, pursuant to Federal Rule of Civil Procedure 44.1, that his explanation of the English law is correct. Accordingly, based on English law applicable to the charter party, Naviera had an attachable interest in the unearned advance hire, and thus the request to vacate the attachment is denied.

*4 Armada states that equity favors its argument that the maritime attachment of the funds it transferred to Naviera via Citibank should be vacated. However, recently, the Court of Appeals, in *Aqua Stoli Shipping Ltd.*, adopted a limiting view of the equitable power of an admiralty court. *Id.* 460 F.3d at 444, 446. In light of the findings made above, the equitable power of the admiralty court should not be exercised here.

Also, Armada is not without remedy if its funds representing the unearned portion of the advance hire remain attached. Indeed, according to the parties, Armada has already instituted a breach of contract action against Naviera, seeking repayment of the unearned portion of the advance hire payment. *See, e.g., Vamvaship Maritime, Ltd.* 2006 U.S. Dist. LEXIS 21114, at *7 (concluding that the paying party that lost its payment by attachment and received nothing in return must proceed against the other party as equity does not favor vacating the attachment of the funds). Accordingly, the funds transferred by Armada and seized by Dominion's maritime attachment while in Citibank in New York were properly attached, and equity does not necessitate vacatur of the attachment as Armada is free to seek contractual remedies against Naviera for an unearned hire payment.

D. Conclusion

Because Dominion has met its burden of

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 3408799 (S.D.N.Y.), 2007 A.M.C. 186

**(Cite as: 2006 WL 3408799 (S.D.N.Y.))**

demonstrating that the attachment should not be vacated, Armada's motion to vacate the attachment [Docket No.12] is denied.

The parties shall confer and inform the Court by letter how they propose to proceed.

SO ORDERED:

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 3

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 1036127 (S.D.N.Y.), 2005 A.M.C. 1586

**(Cite as: Not Reported in F.Supp.2d)**

▷
HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.a. de C.V.
S.D.N.Y.,2005.

United States District Court,S.D. New York.
HBC HAMBURG BULK CARRIERS GMBH & CO. KG, Plaintiff,
v.
PROTEINAS Y OLEICOS S.A. DE C.V., Defendant.
**No. 04 Civ. 6884(NRB).**

May 4, 2005.

Jeremy Harwood, Jack Greenbaum, Jana Byron, Healy & Baillie, LLP, New York, NY, for Plaintiff.
Michael Unger, Lawrence Kahn, Freehill Hogan & Mahar, LLP, New York, NY, for Defendant.

MEMORANDUM AND ORDER
BUCHWALD, J.
*1 On August 25, 2004, HBC Hamburg Bulk Carriers GMBH & Co. KG (" HBC" or " plaintiff" ), applied *ex parte* for an order of maritime attachment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims (" Rule B" ). HBC's application was granted, and HBC obtained a Process of Maritime Attachment and Garnishment (" PMAG" ) in the Southern District of New York. Pursuant to this PMAG, HBC subsequently attached a number of electronic funds transfers (" EFTs" ) as property of the defendant Proteinas y Oleicos S.A. de C.V. (" Proteinas" or " defendant" ). Proteinas now moves pursuant to Supplemental Rule E(4)(f) to vacate the HBC's attachment of the EFTs. For the reasons set forth below, Proteinas' motion is granted in part and denied in part.

*BACKGROUND* [FN1]

FN1. The facts discussed below are drawn from plaintiff's and defendant's briefs to this court, as well as the accompanying exhibits, and are not in dispute.

On March 8, 2004, HBC, a German leasor of shipping vessels, and Proteinas, a Mexican corporation, entered into a maritime contract whereas HBC agreed to provide Proteinas vessels to transport soybeans from

Brazil to Mexico. A dispute arose among the parties, with HBC alleging that Proteinas owed it $1,590,408.11 for breach of their maritime contract. Pursuant to their charter contract, the parties have submitted the underlying dispute to arbitration in London, England.

HBC filed a verified complaint on August 25, 2004 in the Southern District of New York with a request for the issuance of an attachment order under Rule B. In its verified complaint, HBC alleged that Proteinas could not be found within the district, but that Proteinas had, or would shortly have, assets located in this district. Based on these assertions, we ordered the Clerk of this Court to issue HBC a PMAG allowing for the attachment of Proteinas' property within this district, up to and including the amount in contest. On August 26, 2004 and thereafter, HBC served the PMAG on Bank of America in New York. On September 21, 2004 and thereafter, HBC served the PMAG on Citibank in New York. Proteinas filed a general appearance in this district on September 23, 2004.

Pursuant to the PMAG, both Citibank and Bank of America attached a number of EFTs as property of Proteinas. These attachments included EFTs sent by third-parties to Proteinas as payments, and EFTs initiated after Proteinas filed its general appearance in this district. Proteinas contends that a number of these attachments do not conform to the requirements of Rule B.

The Attached Funds

As part of its business, Proteinas requires its customers to pay for purchases in U.S. Dollars, deposited in Proteinas' accounts at either Banco Del Bajio, S.A. de C.V. (" Banco Bajio" ) or BBVA Bancomer Mexico (" Bancomer" ) in Mexico (collectively " Proteinas' Mexican Banks" ). To make payment in U.S. Dollars at Proteinas' Mexican Banks, many of Proteinas' customers must engage in complex but commonplace international funds transfers, primarily using EFTs to transfer funds through a number of different banks. For the purposes of such transactions, both of Proteinas' Mexican banks maintain bank accounts with certain U.S. banks that act as intermediaries. In essence, all transactions in U.S. Dollars associated with Proteinas' Mexican

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1036127 (S.D.N.Y.), 2005 A.M.C. 1586

(Cite as: Not Reported in F.Supp.2d)

Banks are routed throught two U.S. intermediaries: JP Morgan Chase Bank in New York (" JP Morgan" ) for Bancomer and Bank of America NT & SA in Concord, California (" BA/Concord" ) (collectively " Proteinas' U.S. intermediary banks" ) for Banco Bajio. If the customer is an American company, a transfer is made from the customer's U.S. bank to one of Proteinas' U.S. intermediary banks, and then from the intermediary bank to Proteina's Mexican bank. If the paying customer does not maintain a U.S. banking account, the customer's foreign bank will transfer funds to its intermediary bank in the United States; the customer's intermediary bank then transfers U.S. dollars to Proteinas' U.S. intermediary bank; and finally, Proteinas' U.S. intermediary bank transfers the funds to one of Proteinas' Mexican banks.

*2 The Bank of America EFTs were attached at two different branches that played two different roles in the process outlined above. As noted above, BA/Concord served as the intermediary bank for Proteinas' account at Bank Bajio. As such, BA/Concord froze two payments from customers to Proteinas, both on August 26, 2004: $53,682.21 initiated by Malta Texo de Mexico S.A. de C.V. and $100,000.00 from Scotiabank Inverlat S. A.. In addition, BA/Concord froze two EFTs from Proteinas to third-parties as payments on September 15, 2004 and November 1, 2004.

A different Bank of America branch in Miami (" BA/Miami" ) served as the primary bank for one of Proteinas' customers, Cargill de Mexico S.A. de C.V. (" Cargill" ), and processed payments from Cargill's account to Proteinas. BA/Miami froze three EFTs originated by Cargill to Proteinas Mexican Banks: $229,138.93 destined for Bancomer, $29,104.31 destined for Banco Bajio, and $33,539.43 destined for Banco Bajio. BA/Miami served as Cargill's bank in these transactions, and payment instructions were given by Cargill to BA/Miami to transfer these funds to Proteinas' Mexican banks.

The attached Citibank EFTS are all payments that Proteinas's customers had sent to Proteinas for eventual deposit in its Mexican bank accounts. In these transactions, Citibank was acting as the either the customers' intermediary bank or the customers' U.S. bank. On September 21 [FN2] and 24 and October 8, 2004, Citibank froze three EFTs: $36,526.90 originated by Tron Hermanos S.A. de C.V. of Mexico; $11,968.01 originated by Cognis Corp. of Ohio; and $342,968.43, originated by Pilgrims Pride S.A. de

C.V. of Mexico. Finally, on January 4, 2005, Citibank froze two additional transactions-$501,551.26 and $333,414.53, originated by Unilever de Mexico S. de R.L. as payment to Proteinas' account at Bancomer.[FN3]

> FN2. Defendant states in its brief that this attachment occurred on September 9, 2004. However, the record submitted shows that the transfer was dated September 20, 2004, and the plaintiff states it did not serve Citibank with the PMAG until September 21, 2004. Compare Def.'s Mem. of Law at 4 with Def.'s Ex. 1, at 3. Accordingly, we conclude the EFT was attached on September 21, 2004. For the purposes of this motion, the exact date of the transaction is immaterial.

> FN3. After the bank attached these funds, HBC realized that it was over-secured and directed that $97,000 of funds be released.

### DISCUSSION

### I. Rule B of the Supplemental Rules

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims (" Rule B" ) provides a method of obtaining quasi in rem jurisdiction over a defendant by attaching the defendant's property within a district. Rule B reads, in part: " If a defendant is not found within a district, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property-up to the amount sued for-in the hands of garnishees named in the process." Fed.R.Civ.P. Supp. R. B(1)(a).

Rule B may be invoked only when three prerequisites are met. First, the plaintiff's claim must be an " in personam claim against the defendant which is cognizable in admiralty." Robert M. Jarvis, An Introduction to Maritime Attachment Practice Under Rule B, 20 J. Mar. L. & Com. 521, 526 (Oct.1989) (hereinafter " Jarvis" ). Second, the defendant must not be " found" in the district. Fed.R.Civ.P. Supp. R. B(1)(a). Courts have interpreted " not found" to include two requirements: that the court does not have in personam jurisdiction over the defendant under a minimum contacts analysis, and the defendant cannot be served with process in the district. Jarvis, supra at 527. Finally, the property intended to be attached must be located within the district where a PMAG is sought.

*3 In the instant case, Proteinas challenges the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

attachment of certain EFTs outside the Southern District, the attachment of any EFTs sent by third parties (" sending-payors" ) to Proteinas as the recipient-beneficiary, and the attachment of any EFTs after it filed a general appearance. When the validity of an attachment is challenged, the burden is on the plaintiff to show why the attachment should not be vacated. Fed.R.Civ.P. Supp. R. E(4)(f).[FN4] We address each argument for vacating the attachment in turn.

> FN4. Under Rule E(4)(f), " any person claiming an interest in [attached property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Fed.R.Civ.P. Supp. R. E(4)(f).

### II. Attachment of EFTs outside this district

Proteinas argues that the EFTs attached by BA/Miami and BA/Concord were never located within this district, and thus are not properly subject to Rule B attachment. HBC does not deny this claim, and instead argues that those EFTs are now properly attached under a separate PMAG issued by a court in South Carolina. As it is undisputed that those EFTs attached by BA/Miami and BA/Concord were not properly attached by the PMAG issued by this Court on August 25, 2004, Proteinas' motion to vacate the attachment of those funds by this PMAG is granted.[FN5] See Det. Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50, 52-54 (2d Cir.1965) (finding that writ of attachment is invalid as to bank branches outside district issuing writ).

> FN5. We express no opinion as to the validity of the attachment in South Carolina.

### III. EFTs were property of Proteinas at time of attachment

Proteinas contends that the EFTs attached by Citibank were not its " property" at the time of attachment. The EFTs in question had been sent by third parties as payments to Proteinas, with their ultimate destination being one of Proteinas' Mexican Banks. The attachment of the EFTs, however, occurred at an intermediary bank prior to Proteinas' receipt of the funds in its Mexican bank accounts. Accordingly, Proteinas argues that the EFTs attached were still property of the sending-payors.

The issue is whether, for purposes of Rule B

attachment, an EFT remains the exclusive property of the sending-payor until it enters one of the banks associated with the recipient-beneficiary. We hold that it does not. Rule B permits a plaintiff " to attach intangible items, such as debts owed to the defendant. Such items may be attached even if they have not yet matured or have only partially matured." Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 276 (2d Cir.2002) (quoting Jarvis, supra, at 530). The only limitation on such attachment is that " the defendant's entitlement to the credit or interest in the debt must be clear." Id. Because Proteinas has a clear property interest in the debt owed to it, and because the EFT in the hands of the intermediary bank is intended to satisfy that debt, Proteinas has a property interest in the EFT before it is technically possessed by its bank.

In so holding, we adopt the reasoning of Judge Cote in Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd., No. 03 Civ. 6039, 2003 WL 23021974 (S.D.N.Y. Dec. 24, 2003). In Noble Shipping, the defendant challenged the attachment of an EFT sent by a third-party customer as payment to the defendant as a beneficiary, and attached by the plaintiff while the EFT was at an intermediary bank. The defendant contended that the EFT " remained[ed] the property of [the sending payor] because the funds [had] never reached [defendant's] account." Id. at *2. The Noble Shipping court held that " neither the location of the debt at the time of its attachment, nor the fact that this case arises under maritime law, changes the basic principle that debts are property subject to attachment." Id. at *3 (emphasis added).[FN6] The fact that the beneficiary-defendant had not yet received the funds in its bank account did not diminish its property interest in the EFT, and thus did not invalidate the attachment. Id.; cf. United State v. Daccarett, 6 F.3d 37, 54-55 (2d Cir.1993).

> FN6. " In addition to tangible property, service of quasi in rem process can also be used to reach a variety of intangible property, such as bank accounts, accounts receivable, and other debts owed to the defendant." 29 Moore's Federal Practice, § 705.04[2][c] (Matthew Bender 3d ed.).

*4 Proteinas urges us to ignore the decision in Noble Shipping as " erroneous." Def.'s Mem. of Law, at 8. Proteinas contends that allowing the attachment of EFTs at an intermediary bank as property of the recipient-beneficiary conflicts with the Second Circuit's finding in Winter Storm. There, the Second

Not Reported in F.Supp.2d, 2005 WL 1036127 (S.D.N.Y.), 2005 A.M.C. 1586

(Cite as: Not Reported in F.Supp.2d)

Circuit held that an EFT at an intermediary bank was subject to attachment as property of the sending-payor. *Winter Storm*, 310 F.3d at 35. Accordingly, Proteinas argues that the EFTs sent by its customers and attached at Citibank remain the property of the sending-payors: " [t]he anomalous result of the *Noble Shipping]* decision [that the EFT was property of the recipient-beneficiary] would be to make EFTs the property of two entities at the same time." Def.'s Mem. of Law at 10.

We find Proteinas' criticisms of *Noble Shipping* to be misplaced. The Second Circuit's decision in *Winter Storm* does not require us to find that the intended recipient of an EFT has no property interest in that EFT. *Winter Storm* did not focus on the issue of ownership of an EFT in the hands of an intermediary bank; instead the decision centered on whether an EFT is sizeable *res* for attachment purposes. *Winter Storm*, 310 F.3d at 265. Moreover, in reaching its decision the *Winter Storm* court " itself relied on a case in which the defendants who sought unsuccessfully to vacate attachment were the intended beneficiaries of the EFT." *Noble Shipping*, 2003 WL 23021974, at *3 (citing *Winter Storm*'s reliance on *United State v. Daccarett*, 6 F.3d 37, 54 (2d Cir.1993) (approving attachment at intermediary bank of EFTs being sent to defendant beneficiaries)).

While the attachment of EFTs in the hands of an intermediary as property of either the sending-payor and the recipient-beneficiary might appear peculiar, it is the logical result of the broad terms of Rule B's attachment language coupled with the overlapping property rights of sending-payors and recipient-beneficiaries in EFTs. *See Winter Storm*, 310 F.3d at 276 (" It is difficult to imagine words more broadly inclusive" than that of Rule B); *see also* Donald I. Baker et al., *The Law of Electronic Fund Transfer Systems*, ¶ 30.03[2][c]-[3] (2004 ed.) (describing difficulty in determining the competing rights of parties in a wire transfer and in pinpointing when " payee [beneficiary] has irrevocable right to claim the funds" ). Rule B is intended to impact any property in which the defendant has a legal interest. Nothing in the language of Rule B requires that the property attached be the exclusive property of the defendant, nor that we adjudicate the competing property interests of the sending-payor and the recipient-beneficiary in an EFT at an intermediary bank.

In this case, Proteinas had a clear legal interest in the

EFTs attached, and the attachment of the EFTs as property of the defendant was valid.

#### IV. Filing a general appearance does not end the effects of a valid PMAG

*5 Proteinas argues that its filing of a general appearance negates HBC's right to any attachments after that date. Proteinas contends that once the general appearance is filed, the defendant is " found" within the district under the meaning of Rule B, and therefore no further funds should be attached. Accordingly, Proteinas moves to vacate the EFTs frozen after its appearance on September 23, 2003.

It is widely recognized that the attachment provisions of Rule B serve two different aims: " ' First, attachment provides a means to assure satisfaction if a suit is successful' ; the second purpose is to insure a defendant's appearance in an action, an aspect of attachment inextricably linked to a plaintiff's substantive right to recover." *Winter Storm*, 310 F.3d at 268 (citing *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 48 (2d Cir.1996)). " Without maritime attachment, defendants, their ships, and their funds could easily evade the enforcement of substantive rights of admiralty law." *Aurora*, 85 F.3d at 48. While " security cannot be obtained except as an adjunct to obtaining personal jurisdiction," *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir.1963), it is permissible for a party to seek attachment with the primary goal of attaining security. *Staronset Shipping Ltd. v. North Star Nav. Inc.*, 659 F.Supp. 189, 191 (S.D.N.Y.1987).

We find that the filing of an appearance does not defeat the subsequent attachments by HBC. Without security, the filing of an appearance by a foreign defendant provides plaintiff little assurance that any favorable judgment will later be satisfied. " But for the security of an attachment, because there is no real presence here, the appearance will be of no assistance to plaintiff in enforcing its rights, and is not equivalent to being found within the district." *Constr. Exp. Enters. v. Nikki Mar., Ltd.*, 558 F.Supp. 1372, 1375 (S.D.N.Y.1983). Rule B does not entitle HBC to the smallest amount of security possible to force Proteinas to file an appearance, but grants HBC the right to attach property " up to the amount sued for." Fed.R.Civ.P. Supp. R. B(1)(a). Accordingly, " [t]he right to attachment is not defeated by the filing of a general appearance." *Constr. Exp. Enters.* 558

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 5
Not Reported in F.Supp.2d, 2005 WL 1036127 (S.D.N.Y.), 2005 A.M.C. 1586

**(Cite as: Not Reported in F.Supp.2d)**

F.Supp. at 1375; *see also Ythan Ltd. v. Ams. Bulk Transp. Ltd.,* 336 F.Supp.2d 305, 308 (S.D.N.Y.2004)( " The subsequent appearance [of defendant] had no effect in eviscerating the already effective attachment, including its post-levy effects." ).

Given that process in this case was appropriate, the banks' continued actions to attach funds under that order conform with Rule B's language allowing funds to be attached " up to the amount sued for." Fed.R.Civ.P. Supp. R. B(1)(a). The fact that defendant later filed a notice of appearance does not change the post-levy effects of the properly-served PMAG.

## CONCLUSION

For the aforementioned reasons, Proteinas' motion to vacate the attachment is granted with respect to funds attached by Bank of America, and denied with respect to the funds attached by Citibank.

*6 IT IS SO ORDERED.

S.D.N.Y.,2005.
HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.a. de C.V.
Not Reported in F.Supp.2d, 2005 WL 1036127 (S.D.N.Y.), 2005 A.M.C. 1586

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 4

LEXSEE 2007 US DIST. LEXIS 46841

**OGI OCEANGATE TRANSPORTATION CO. LTD., Plaintiff, -against- RP LO-
GISTICS PVT. LTD. and R. PIYARELALL INTERNATIONAL PVT. LTD., De-
fendants.**

**06 Civ. 9441 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 46841*

June 21, 2007, Decided
June 26, 2007, Filed

**COUNSEL:** [*1] For Plaintiff: LENNON, MURPHY
& LENNON, LLC, New York, NY, By: Nancy Rebecca
Peterson, Esq.

For Defendants: CHALOS, O'CONNOR & DUFFY,
LLP, Port Washington, NY, By: Owen Francis Duffy,
III, Esq.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.**

Defendants RP Logistics Pvt. Ltd. ("RPL") and R.
Piyarelall International Pvt. Ltd. ("RPI") (collectively
"the Defendants") have moved under Supplemental Rule
E(4)(f), Fed. R. Civ. P., to vacate the process of maritime
attachment and garnishment issued in this matter on Oc-
tober 17, 2006, upon motion by the plaintiff OGI
Oceangate Transportation Co. Ltd. ("OGI" or the "Plain-
tiff") and, in the alternative, for an order pursuant to
Supplemental Rule E(7)(a), Fed. R. Civ. P., for security.
This dispute between foreign corporations OGI, the ship
owner doing business in Bejing, the Peoples Republic of
China, and RPL (the charterer) and RPI, both doing
business in Kolkata (Calcutta), India, has so far engaged
courts in China and India relating to a charter party
which has a provision for mandatory Hong Kong arbitra-
tion. For the reasons set forth below, the motion to va-
cate the attachment is granted.

*Prior Proceedings and the Verified Complaint*

This action [*2] was commenced on October 17,
2006, by the filing of a verified complaint by OGI which
alleged that OGI is a foreign company, that RPL and RPI
are Indian companies, and that RPL chartered the M/V
IKAL, owned by OGI, by charter party dated June 21,
2006. (Compl. PP 2-6.) The parties disputed certain
freight and demurrage charges. The dispute was resolved
by an agreement which included the consignee China
Metals and required the payment of $ 45,000, which was
paid by RPI. (*Id.* PP 7-9.) A subsequent dispute. alle-
gedly arose concerning demurrage accrued at the dis-
charge port. (*Id.* P 10.)

In September 2006, according to OGI, RPL wrong-
fully arrested the M/V UTHAI in India. (*Id.* PP 11-14.)

Pursuant to the charter party, all disputes are to be
submitted to arbitration in Hong Kong and OGI is pre-
paring to initiate such an arbitration. (*Id.* PP 15-16.) Ac-
cording to OGI, it expects to recover $ 1,441,464.21 in
the arbitration, including over $ 930,000 in damages
from the alleged wrongful arrest of the M/V UTHAI in
India. (*Id.* P 17.)

According to OGI, RPL is a shell corporation
through which RPI conducts its business without sepa-
rate identity and is the alter ego of RPI, which pays RFL
obligations. [*3] (*Id.* PP 18-24.) OGI further asserts that
RPL is one of several companies operated as an entity
known as the R. Piyarelall Group (*id.* PP 25-26), which
is controlled by the Agarwal Family (*id.* P 27). The or-
ganization hierarchy, representatives, offices, and control
of the R. Piyarelall Group, as described, result in the
allegation that RPI is a party to the charter party between
OGI and RPL (*id.* PP 28-35) or, alternatively, a partner,
joint venturer, or affiliate (*id.* PP 36-37). The Complaint
requests an order of attachment and garnishment on
funds held in eleven enumerated banks. (*Id.* P 38.)

On October 17, 2006, an ex parte order of attachment was filed. An Electronic Fund Transfer ("EFT") in the amount of $ 430,898.44, a freight payment made by RPI as a shipper of cargo, was restrained. (Duffy Aff., Nov. 21, 2006 (the "Duffy Aff."), PP 86-87.)

The instant motion to vacate the attachment was heard on December 7, 2006.

### The Facts

Counsel for the parties have submitted affidavits and exhibits setting forth the following facts.

RPI, incorporated in India on November 10, 1988, is an exporter of agro-products, industrial and mineral products, and one of its directors is also a director of RPL. [*4] (Id. PP 17, 19, 21.) RPL was incorporated on September 9, 2003, and provides logistical and transportation support to shippers (id. PP 10, 12), files its tax returns on an independent basis, and maintains its own bank accounts (id. PP 14-15). According to OGI, RPL and RPI have the same address, phone number, overlapping directors, and are dominated by the R. Piyarelall Group. (Peterson Aff., Dec. 4, 2006 (the "Peterson Aff."), PP 58-69.)

In June 2006, RPI entered into an agreement with China National Mineral Co. Ltd. ("China National") to sell 11,000 metric tons of iron ore fines to China National to be shipped from India and delivered to China with the express understanding that, upon completion of the initial shipment, China National would purchase two further cargos of 20,000 metric tons each. (Duffy Aff. PP 25-26.)

RPI retained RPL on June 21, 2006, to arrange as a disponent owner, on behalf of RPI, as sub charterer/shippers, for the carriage of the iron ore cargo from India to China on board the M/V IKAL. (Id. P 27.) Pursuant to a "Fixture Note" and a "Charter Party" agreement dated June 21, 2006, RPL chartered the vessel, M/V IKAL, from OGI pursuant to which the M/V IKAL was to [*5] carry the cargo of iron ore from India to China in exchange for the payment of freight. (Id. P 28.)

According to OGI, RPL presented or forged authorization on an unauthorized bill of lading. (Peterson Aff. PP 16-21.)

The M/V IKAL loaded a portion of the cargo on June 24 and 25, 2006, but was delayed by a "stability problem" and was unable to load all 11,000 tons. (Duffy Aff. PP 35-39.) The M/V IKAL sailed on July 4, 2006, for China. (Id. P 42.) On arrival at the discharge port of Fang Chang, OGI disputed demurrage calculations and refused to berth the vessel. (Id. PP 46-48.) On July 22, 2006, RPI, OGI, and China National agreed that the payment of $ 45,000 would resolve OGI's claims. (Id. P

50.) Although the payment was made, the cargo was not delivered. (Id. PP 53-55.) China National commenced an action in China resulting in a court order to release the cargo (id. P 57), and China National cancelled the contracts for future deliveries (id. P 60).

On October 13, 2006, RPL and RPI commenced proceedings in the High Court of Kolkata to arrest the M/V UTHAI NAVEE as security for their claim against OGI and the vessel was arrested. (Id. PP 63-66.) The M/V UTHAI NAVEE had been chartered by [*6] OGI, and its owner succeeded in lifting the arrest early in November 2006. (Peterson Aff. PP 42, 47.)

### Discussion

### 1. The Burden of Proof for Vacating a Maritime Attachment

To begin the process by which a party may attach another party's assets, a plaintiff must file a verified complaint seeking attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. Fed. R. Civ. P. Supp. Rule B(1). Thereafter, Rule E(4)(f), Fed. R. Civ. P. Supp. Rule E, provides that any person claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Id. Supp. Rule E(4)(f).

Under Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd., 460 F.3d 434 (2d Cir.2006), in a Rule E(4)(f) inquiry challenging a Rule B attachment, a plaintiff has the burden to show not only that it has met the filing and service requirements of Rules B and E, but also that: (1) it has a prima facie admiralty claim; (2) the named defendants cannot be found within the district; (3) the attached [*7] defendant's property was within the district; and (4) there is no statutory or maritime law bar to the attachment. Aqua Stoli, 460 F.3d at 445. At the Rule E(4)(f) hearing, the defendant can attack "the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. Supp. Rule E(4)(f), advisory committee's note.

If the plaintiff meets its burden, the defendant may show that vacatur of the attachment would still be appropriate under certain limited circumstances, including when: "(1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." Aqua Stoli, 460 F.3d at 445.

Case 1:07-cv-07101-CM    Document 15-2    Filed 09/04/2007    Page 20 of 22

Page 3
2007 U.S. Dist. LEXIS 46841, *

## 2. The Motion to Vacate the Attachment Is Granted

The Defendants have not contested that they cannot be found within the district or that the attached property of the defendant RPI was within the district. Nor have the Defendants asserted that there is a statutory or maritime law bar to the attachment. Rather, the issues [*8] presented here are whether OGI has shown that it has a valid prima facie admiralty claim against RPI and, if so, whether the Defendants have shown that the attachment warrants vacatur on other grounds.

## A. Prima Facie Admiralty Claims

### i. The Standard

To sustain the attachment, OGI must demonstrate that it has "an *in personam* claim against the defendant which is cognizable in admiralty. . . . In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under *28 U.S.C. § 1333*." *Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002)* (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 Journal of Maritime Law and Commerce, No 4 (October 1989) at 526 & n. 20).

Of the courts in this district that have considered the issue, the majority have interpreted *Aqua Stoli* to require the application of the prima facie claim standard when considering the adequacy of the claim asserted in the context of a maritime attachment. *Compare SPL Shipping, Ltd. v. Gujarat Cheminex. Ltd., No. 06-CV-15375 (KMK), 2007 U.S. Dist. LEXIS 18562, 2007 WL 31810, at *3 (S.D.N.Y. Mar. 15, 2007); Fesco Ocean Mgmt. v. High Seas Shipping, Ltd., No. 06 Civ. 1055 NRB, 2007 U.S. Dist. LEXIS 19970, 2007 WL 76615, at *2 (S.D.N.Y. Mar. 12, 2007);* [*9] *Secil Martima U.E.E. v. Malev Shipping, et al.,* No. 06 Civ. 6345 (S.D.N.Y. Oct. 10, 2006) (transcript of Rule E(4) (f) hearing denying vacatur motion); *Route Holding Inc. v. Int'l Oil Overseas, Inc.,* No. 06 Civ. 3428 (S.D.N.Y. Sept. 29, 2006) (order denying vacatur of maritime attachment); *Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006)* (order vacating attachment), *with Wajilam Exps. (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 2006 U.S. Dist. LEXIS 77033 (S.D.N.Y. Oct. 23, 2006)* (holding that the applicable standard for establishing the *Aqua Stoli* factors is "reasonable grounds" for an attachment). The relevant inquiry is therefore whether OGI has pled a prima facie admiralty claim against RPI. *See Fesco Ocean Mgmt. Ltd., 2007 U.S. Dist. LEXIS 19970, 2007 WL 766115, at *2* ("courts should simply consider whether a plaintiff seeking to maintain a maritime attachment has pled a prima facie case justifying that attachment under Rule B").

Suits in admiralty are subject to *Supplemental Rule E(2)(a)*, which provides that:

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim [*10] arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

Fed. R. Civ. P. *Supp. Rule E(2)(a)*. "This heightened pleading standard is not some pettifogging dechnicality meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in *in rem* admiralty proceedings." *P.R. Ports Auth. v. Barge KATY-B, 427 F.3d 93, 105 (1st Cir. 2005)* (noting that "[o]rdinary notice pleading does not satisfy the stringencies of [the supplemental] rules").

Here, the Complaint has alleged damages arising out of the RPL breach of the charter party and the unlawful arrest of the M/V UTHAI NAVEE in Kolkata. (Compl. P 14.) Although the Complaint has alleged the liability of RPI as the alter ego, partner, joint venturer, or affiliate of RPL (*id.* PP 35-37), OGI has asserted that it has also alleged "a proper direct maritime claim for wrongful arrest damages against both RPL and RPI." (Pl.'s Mem. in Opp'n 2.) Because none of these allegations establish a valid prima facie admiralty claim against RPI, OGI cannot [*11] meet its burden to sustain the attachment. Even if it could, however, there are other grounds sufficient to support vacating the attachment.

### ii. Breach of the Charter Party

In the Complaint, OGI has asserted that a dispute arose during the course of the charter regarding RPL's failure to pay dead freight and demurrage, but that the dispute was resolved by a tripartite agreement under which OGI was paid $ 45,000 by RPI to resolve the dispute. (Compl. PP 7-9.) The Complaint further alleges that another dispute arose regarding RPL's failure to pay demurrage accrued at the discharge port. (*Id.* P 10.) The details of this second alleged dispute are not made clear in any of the Plaintiff's submissions, which instead indicate that it is the Defendants' protests regarding the validity of the tripartite agreement that form the basis of OGI's claim for RPL's breach of the charter party. (Pl.'s Mem. in Opp'n 7.) OGI, however, continues to assert that the tripartite agreement is valid. (*Id.*)

Any claim for breach of the charter party regarding dead freight, demurrage and detention at load and discharge ports appears to have been satisfied by the pay-

ment made to OGI under the tripartite agreement. OGI [*12] has accepted that payment, and does not dispute the validity of the agreement. Therefore, OGI does not have a valid prima facie claim for breach of the charter party.

Even if OGI were to have a valid prima facie claim against RPL for breach of the charter party sufficient to sustain the attachment, the receipt of the $ 45,000 in satisfaction of the tripartite agreement militates in favor of vacatur, as will be discussed further below.

### iii. Wrongful Arrest

Although the Defendants contend that OGI has failed to assert a direct claim against RPI for wrongful arrest (Defs.' Mem. in Supp. 10), they concede that both RPL and RPI caused the arrest in question (Defs.' Reply 1). Furthermore, it appears from the High Court of Kolkata documents that RPI was a plaintiff together with RPL in the allegedly unlawful arrest of the M/V UTHAI NAVEE. (Duffy Aff. Ex. 16.) Even assuming that OGI may rely on submissions other than the Complaint to justify maintenance of the attachment based on a direct claim of wrongful arrest against RPI, see Tide Line, 06 Civ. 1979, at 13-16, 32-39 (allowing plaintiff to amend complaint where additional allegations and evidence have been submitted to support a claim); Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 527 (S.D.N.Y. 2006) [*13] ("A court also may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing."), it is not clear that OGI has sufficiently pled a prima facie claim of wrongful arrest against either of the Defendants.

In the Complaint, OGI asserts that the M/V UTHAI NAVEE was arrested by RPL in September 2006, that the arrest was wrongful, and that OGI was damaged in the amount of $ 930,962.01 as a result. (Compl. PP 11, 12, 14, 17.) With regard to the instant motion, OGI has further asserted that during the arrest proceedings, RPL and RPI inaccurately alleged that OGI had an interest in the M/V UTHAI NAVEE when OGI had only chartered the vessel from the vessel's head owner. (Peterson Aff. PP 41-42.)

Neither party has made a choice of law argument with respect to OGI's wrongful arrest claim. Without citing relevant case law, Defendants have asserted that to suscain a claim for wrongful arrest "in the U.S. or anywhere else, the claimant must establish that the arrest arose from malice, bad faith or reckless disregard of the other party's legal rights" (Defs.' Reply 2), and that OGI has not asserted any such allegations against either of the Defendants.

Without [*14] deciding the choice of law question, it appears fairly certain that United States law would not apply to the wrongful arrest claim here. See Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd., 426 F.3d 580, 586 (2d Cir. 2005) (citing Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309, 90 S. Ct. 1731, 26 L. Ed. 2d 252 (1970); Lauritzen v. Larsen, 345 U.S. 571, 583-92, 73 S. Ct. 921, 97 L. Ed. 1254 (1953); Carbotrade S.P.A. v. Bureau Veritas, 99 F.3d 86, 90 (2d Cir.1996)) (enumerating factors for choice-of-law analysis involving maritime tort as follows: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations); Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 234-35 (4th Cir. 2003) (citing Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953)) (same); Arochem Corp. v. Wilomi, Inc., 962 F.2d 496, 498-99 (5th Cir. 1992) (citing Lauritzen, 345 U.S. at 582; Gulf Trading & Transp. Co. v. Vessel Hoegh Shield, 658 F.2d 363 (5th Cir. Unit A 1981), cert. denied, 457 U.S. 1119, 102 S. Ct. 2932, 73 L. Ed. 2d 1332 (1982)) (same).

Without an understanding [*15] of the applicable law, the Court is unable to determine whether OGI has a valid prima facie claim of wrongful arrest. Since OGI has the burden of affirmatively showing that it has such a claim, taking the strictest approach to this analysis and without more information, Plaintiff has failed to meet its burden with respect to this claim of wrongful arrest.

### iv. Alter Ego

OGI has also contended that RPL's acts in connection with the charter party and the unlawful arrest of the M/V UTHAI NAVEE were as the alter ego of RPI. Because it has been determined that there is no claim for breach of the charter party and it appears that any claim for wrongful arrest can be asserted directly against RPI, it is not necessary for the Court to determine whether OGI has sufficiently alleged its alter ego claim.

### B. Vacatur

Based on the foregoing analysis, OGI has failed to show that it has a prima facie admiralty claim in satisfaction of its burden to withstand a vacatur motion under Aqua Stoli. Even if OGI could meet this burden, however, Defendants have sufficiently shown that vacatur would still be appropriate under the limited circumstances articulated in Aqua Stoli.

First, the Second Circuit held in Aqua [*16] Stoli that even if the plaintiff meets its burden, vacatur would be appropriate if "the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." Aqua Stoli, 460 F.3d at 445. Here, with respect to OGI's claim for breach of the charter party,

OGI has already received $ 45,000 from RPI in satisfaction of the tripartite agreement resolving that dispute. This is roughly the amount that OGI is claiming for demurrage, dead freight and other charges in connection with its claim of breach of the charter party.

Second, the Second Circuit articulated that an attachment would be properly vacated "if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets." *Id. at 444-45.* As pointed out by the Defendants, with respect to OGI's claim for wrongful arrest, both OGI and the Defendants were present in the same jurisdiction during the arrest proceedings, namely Kolkata. OGI did make an appearance during that proceeding and even contemplated posting security to secure the release of the vessel. (Defs.' Mem. in Supp. 9; Peterson [*17] Aff. 46-47.)

Lastly, the Second Circuit also held in *Aqua Stoli* that "vacatur may be warranted when the defendant can show that it would be subject to *in personam* jurisdiction in another jurisdiction convenient to the plaintiff." *Id. at 444.* Although the *Aqua Stoli* court indicated that the concept of convenience was to be narrowly circumscribed, the court was addressing the issue in the context of the proximity of the Eastern and Southern Districts. *See id.* Here, it is questionable whether the Southern District of New York is more convenient to OGI than the other jurisdictions implicated in this matter, including Kolkata and Hong Kong. Furthermore, there is the consideration that United States law most likely does not apply to the wrongful arrest claim and that the arrest itself was authorized by the court in India, thereby implicating issues of international comity. *See Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006)* (citing *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898-99 (7th Cir. 1999); Bigio v. Coca-Cola Co., 239 F.3d 440, 454 (2d Cir. 2000)*) (indicating proper consideration of international comity principles [*18] requires evaluation of various factors, "such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction").

Thus, when combined with these comity considerations, the convenience issue speaks even more strongly against the exercise of jurisdiction and therefore in favor of vacating the attachment.

### Conclusion

Accordingly, for the forgoing reasons, the motion to vacate the order of maritime attachment is granted and the Complaint is dismissed without prejudice.

It is so ordered.

New York, NY

June 21, 2007

ROBERT W. SWEET

U.S.D.J.