# EXHIBIT A

7940prec (1).txt

9740premC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------x
 3   PRESTIGIOUS SHIPPING,
 4                Plaintiff,
 5            v.                          07 CR 7101
 6   AGROCORP INTERNATIONAL,
 7                Defendant.
 8   ----------------------------x
                                         New York, N.Y.
 9                                       September 4, 2007
                                         2:46 P.M.
10
     Before:
11
                      HON. COLLEEN MCMAHON,
12
                                         District Judge
13
                          APPEARANCES
14
     WAESCHE, SHEINBAUM & O'REGAN, PC
15        Attorney for John Foster
     BY:  JOHN FOSTER, ESQ.
16
     AGROCORP INTERNATIONAL
17        Attorney for Defendant
     BY:  OWEN F. DUFFY, ESQ.
18
19
20
21
22
23
24
25
```

⚲

9740premC

7940prec (1).txt

1          (Case called)

2          THE COURT:  All right.  Ergonomic chair.  So much

3    better, thank you.  Okay, I have read the papers.  Let's see if

4    I can get the facts straight.  Or let's see if I have gotten

5    the facts straight.  Agrocorp bought rapeseed in the Ukraine.

6          MR. DUFFY:  Yes, your Honor.

7          THE COURT:  Right.  And it proceeded to sell the

8    rapeseed to somebody else.

9          MR. DUFFY:  In a back-to-back transaction, yes.  And

10   it had its bank, Indian Bank, finance the transaction.

11         THE COURT:  Right, but Indian Bank did not issue a

12   letter of credit.  Indian Bank was supposed to do a letter of

13   credit transaction with Agrocorp's purchaser.

14         MR. DUFFY:  Ultimate buyer, yes.

15         THE COURT:  The ultimate buyer.

16         MR. DUFFY:  That's correct.

17         THE COURT:  What Agrocorp or what Indian Bank did for

18   Agrocorp was pay the money that Agrocorp would otherwise have

19   had to pay, or that Agrocorp owed, to the person in the Ukraine

20   from whom he bought the rapeseed.

21         MR. DUFFY:  Correct, your Honor.

22         THE COURT:  Okay.  And that's the money that was going

23   through the electronic fund transfer process here in New York

24   when it was netted.

25         MR. DUFFY:  Correct, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

9740premC

1          THE COURT:  Right.  Okay.

2          The money that Indian Bank was extending to pay the

3    debt that was owed by Agrocorp for the rapeseed that Agrocorp

Page 2

7940prec (1).txt

4    bought in the Ukraine, right.  So why is this not just exactly

5    like Judge Pauley's case?

6          MR. DUFFY:  Your Honor, I think -- if I may, Judge

7    Pauley's case, first of all, was a completely different case.

8    That was an alter ego situation where there were two related

9    companies, Mar Trade and Mar Logic.

10          THE COURT:  Right.  And one was being used to pay the

11    debt of the other.

12          MR. DUFFY:  And in obvious method to --

13          THE COURT:  To circumvent this ridiculous Rule B

14    attachment situation that has turned into such a nightmare for

15    everyone, especially since the Winter Storm case.

16          MR. DUFFY:  Correct, your Honor.  And in that case,

17    they came right out in front of -- Judge Pauley found, look,

18    you're both doing the same business, you're doing the business

19    of one or the other, you're an alter ego.  That's why I would

20    submit to you that this case in front of you is more along the

21    lines of prime shipping, although we don't have a letter of

22    credit issued by our bank.  But what our bank did, Indian Bank,

23    they bought those bills of lading.  They were not going to pay

24    any money until somebody gave them bills of lading and they

25    applied title to the cargo which they could then present to get

4

9740premC

1    the money under the other transaction.  This is what banks do.

2    They make money off the backs of other people's transactions,

3    they get interest, and this is part of their normal business.

4    This was not an alter ego situation.  They were not paying a

5    debt for Agrocorp because they were trying to accommodate them

7940prec (1).txt

6      in a Rule B situation.  They were trying to make money.  And

7      they said, fine, we'll do the same thing.  You give me a trust

8      receipt.  I take title to the cargo.  I have full right to

9      collect money from the ultimate seller, and I'm never debiting

10     your account.  I'm not -- I'm not giving you a loan.  This is a

11     finance transaction where I'm going to make some money and you

12     can make your money.  And that's why I submit to you it is the

13     same case as Prime Shipping, in a little different posture.

14              THE COURT:  Okay.  Why is this not Prime Shipping?  I

15     mean I know it is not a letter of credit.  I, to be quite

16     honest, know a lot about letters of credit and nothing

17     whatsoever about trust receipts.  But is there a difference

18     between a trust receipt and a letter of credit, that makes a

19     difference?

20              MR. FOSTER:  Yes, your Honor.  And I think the

21     critical difference between the two cases is that, in Prime

22     Shipping, there was a negotiable letter of credit which the

23     bank there, BNP Paribas, had purchased, and the proceeds that

24     were locked were going to in payment of that letter of credit.

25     So that at the time of the attachment, the defendant didn't

9740premC

1      have any interest in the letter of credit or its proceeds

2      because it had negotiated it away.

3              THE COURT:  That, I understand.  And your opponent

4      says that -- if I understand his argument correctly, that

5      Agrocorp had negotiated away its interest in -- its financial

6      interest in this transaction, although its financial interest

7      was as a payor of the payee, owed money.  That it had

8      negotiated that away.  Because it had sold the bills of lading

Page 4

7940prec (1).txt

9    to Indian Bank in exchange for Indian Bank's agreeing to take

10   over the obligation of making payment for the cargo.  It was

11   out.  It was out.  It is saying it is just as out as somebody

12   who holds an underlying debt but who arranges to make payment

13   for it through a letter of credit.  Where, as Judge Rakoff

14   absolutely correctly indicated, the bank's obligation to honor

15   the letter of credit is completely independent of the

16   underlying debt.  The underlying debt may be a bad debt, that

17   is too bad.  That gets resolved some other time.  If the proper

18   papers are presented at the bank window, the bank must pay out

19   on the letter of credit.  And I -- as I say, I don't -- I never

20   heard of a trust receipt before today.  I don't know what that

21   makes me.  But as it's being explained to me, what is the

22   difference that makes a difference between a trust receipt and

23   a letter of credit.

24            MR. FOSTER:  Well, one difference, your Honor, which

25   is of significance, is that letter of credit is a negotiable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC

6

1    instrument, and a trust receipt is more like a security

2    interest.  And the importance of that goes back to, again, the

3    idea that when the proceeds on the letter of credit were sent

4    to Paribas, they were going to an outfit that at that time

5    owned the letter of credit.

6            In this particular case, your Honor, going back to,

7    you know, your initial line of reasoning, is that the seller in

8    Ukraine issued invoices to Agrocorp which are exhibits to

9    the --

10            THE COURT:  Right.  And whatever the -- whatever -- as

Page 5

7940prec (1).txt

11  far as they were concerned -- the money was going to the
12  Ukraine when it was intercepted, right?  The invoices were
13  being --
14          MR. FOSTER:  Apparently so.
15          THE COURT:  The invoices were being paid.  That was
16  the purpose of the -- whether it was coming from Indian Bank or
17  Agrocorp, it was to pay those invoices.
18          MR. FOSTER:  Right, your Honor.  Those invoices that
19  were addressed to Agrocorp, which were the debt of Agrocorp.
20          THE COURT:  Right.
21          And India Bank had said we'll take on your debt in
22  exchange for title to the rapeseed which we will then make a
23  little money on when we factor it over to the ultimate seller.
24          MR. FOSTER:  well, your Honor, I --
25          THE COURT:  That --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC

7

1           MR. FOSTER:  I wouldn't put it quite that they were
2   taking over the debt.  what they were doing was taking over the
3   documents on the underlying transaction so that they could
4   then, in turn, pass them on to the ultimate purchaser, get the
5   money, keep what it had advanced on its payment with the
6   difference going to Agrocorp.
7           THE COURT:  I'm not sure I understand where the money
8   was.  The money was on its way to the Ukraine, right?
9           MR. FOSTER:  Yes, your Honor.
10          THE COURT:  The money was on its way to the Ukraine.
11  on its way to pay off the original purchase price of the --
12          MR. FOSTER:  Rapeseed.
13          THE COURT:  of the rapeseed.  Okay.  That was a debt
Page 6

7940prec (1).txt

14      that was incurred by Agrocorp.

15          MR. FOSTER:  Yes, your Honor.

16          And in return for that, the bank would get the

17      documents, like the bill of lading and the other shipping

18      documents, which it could then pass on to the ultimate buyer.

19      The ultimate buyer would make the payment, which would go to

20      Indian Bank.  Indian Bank would keep what it had advanced and

21      credit the difference to Agrocorp, which was Agrocorp's profit

22      on it.

23          THE COURT:  Right.  And, eventually, Agrocorp was

24      going to end up with some money here, so -- and isn't that the

25      reason that Indian Bank is not in the same position as Paribas

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

9740premC

1       as the purchaser of the negotiable letter of credit?

2           MR. FOSTER:  If I understand your Honor correctly, I

3       think that is right, I mean in that --

4           THE COURT:  I mean it is just silly to say that

5       Agrocorp was not going to end up with its profit on the

6       transaction.  It wasn't out.  It was going to end up with some

7       money.

8           MR. FOSTER:  Right, your Honor.

9           THE COURT:  Less some fee to Indian Bank.

10          MR. FOSTER:  Right, your Honor.  In other words, I

11      mean just to use numbers, it was buying it -- the rapeseed from

12      the people in Ukraine for a hundred dollars and selling it to

13      the ultimate purchaser for $150.  Indian Bank was advancing

14      that hundred dollars, and from the ultimate proceeds would get

15      that hundred dollars back with Agrocorp keeping it's $50.  But

Page 7

7940prec (1).txt
16    as part of --

17              THE COURT:  That would involve Agrocorp keeping $47

18    because Indian Bank would always take a fee.

19              MR. FOSTER:  Yes, your Honor.

20              THE COURT:  I mean there is no reason to do this

21    otherwise.

22              MR. FOSTER:  Right exactly.

23              But as part of this, Agrocorp incurred a debt to the

24    people at the Ukraine which Indian Bank -- and for which there

25    were invoices which Indian Bank was then transferring money to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            9
        9740premC

1    satisfy.

2              THE COURT:  Correct.  All right.  And you're position

3    on the Judge Pauley case is that it doesn't make a difference

4    that the that two entities were corporately related --

5              MR. FOSTER:  No.  No, your Honor.

6              THE COURT:  -- and that one -- and that they were

7    trying do a slight of hand.

8              MR. FOSTER:  No, your Honor.  I mean this case doesn't

9    involve that.  I mean from everything that counsel has

10   presented, it looks like a straightforward financing

11   transaction.  So there is none of the funny business going on

12   in that respect.  But it does go back to the basic point which

13   Judge Pauley addressed, which was what does intangible property

14   in Rule B mean.  And he gave it as the Second Circuit did in

15   Winter Storm, a very broad interpretation.

16              THE COURT:  Okay.

17              What else do you want to say to me, and what else do

18   you want to say to me.  And I can ruminate on this for a --
                              Page 8

7940prec (1).txt

19          MR. FOSTER:  Well, your Honor, I would just -- I think
20     that -- I mean I --
21          THE COURT:  I don't buy the Judge Sweet jurisdiction
22     argument, okay, I don't buy that.  I don't buy that that --
23          MR. FOSTER:  I guess, your Honor, I will be the first
24     to recognize that the flourishing of Rule B practice has become
25     an inconvenience unto the Court.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                      10

1          THE COURT:  Well, I think it is more than an
2     inconvenience.  It is just a classic example of not thinking
3     through the practical consequences of a decision.  And I say
4     this with the highest regard to my dear friend, Judge Haight
5     who knows more about ships at see than all of the rest of us
6     combined ever will.  But perhaps less about electronic fund
7     transfers.  And I do note that then Chief Judge Walker,
8     indicated in a footnote in Aqua Stoli that there are at least
9     some people on the Second Circuit who are questioning the
10     correctness or, if not the wisdom, of Winter Storm.  But of
11     course that is their problem to solve, that is not my problem
12     to solve.  I have to do what they tell me to do.
13          MR. FOSTER:  Understood, your Honor.  And all of us
14     can only play the hand we're dealt.
15          THE COURT:  Correct.
16          MR. FOSTER:  But I mean I -- I guess, notwithstanding
17     the footnote in Aqua Stoli which, to my understanding, it has
18     been principally Judge Rakoff who has run with that ball that
19     most of the judges in the district have looked on this whole
20     proceeding as pretty straightforward.  And, in fact, the -- one

Page 9

7940prec (1).txt

21  of the cautions in the Aqua Stoli opinion is that what this

22  should become is a fact intensive sort of exercise, because

23  then we'll --

24          THE COURT:  But that is not the statute Congress

25  wrote.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

9740premC

1           MR. FOSTER:  I'm sorry, your Honor?

2           THE COURT:  Because that is not the statute Congress

3  wrote, or the rule that Congress didn't overturn.

4           MR. FOSTER:  Exactly, exactly.

5           So it is going back to the earlier point.  I mean the

6  rule is what it is.  And Winter Storm and Aqua Stoli are what

7  they are, your Honor.  And my submission would be that I think

8  this is pretty straightforward and that -- and that frankly the

9  whole thing would be simplified if Agrocorp simply gave us a

10  letter of credit.

11          Thank you.

12          MR. DUFFY:  Yes, your Honor.  So I am understanding

13  your point that we're not going too far on the first argument.

14          THE COURT:  We're not going anywhere on the first

15  argumet.

16          MR. DUFFY:  Okay.

17          THE COURT:  I had read Aqua Stoli before today, and I

18  read it again today.  And I do believe that when the Second

19  Circuit uses the word -- is Aqua Stoli here -- jurisdiction --

20  or it talks about districts, not just about jurisdiction.

21          MR. DUFFY:  As opposed to --

22          THE COURT:  Not just about jurisdiction.

23          MR. DUFFY:  Yeah.

Page 10

7940prec (1).txt

24          THE COURT:  It says:  A district court may vacate
25    maritime attachment only if a defendant would be subject to an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

9740premC

1     in personam lawsuit in a jurisdiction adjacent to the one in
2     which the attachment proceedings were brought.  That is the
3     across the river.  A maritime attachment would likewise be
4     properly vacated if the plaintiff and the defendant are both
5     present in the same district and would be subject to
6     jurisdiction there.  Didn't say present in the same
7     jurisdiction.  Believe me, I am sympathetic to the argument --
8          MR. DUFFY:  Yes.
9          THE COURT:  -- that both the plaintiff and the
10    defendant in this case are present in the same jurisdiction,
11    and it is nowhere in the United States.
12         MR. DUFFY:  That's correct.
13         THE COURT:  I am sympathetic to that.
14         But it seems to me, that what the Circuit very clearly
15    said is that I could properly vacate the attachment if both
16    parties were present in the same district, which is a term of
17    art under federal jurisprudence, and refers to a district court
18    within the United States Federal Court system, not someplace
19    overseas.
20         And I know that Judge Sweet opined otherwise.  I can
21    only say this.  That was about the fifth line of reasoning for
22    them.  He didn't have to go there, he didn't have to say that.
23    And because he was so clearly right on everything that had come
24    before that, and -- and I just -- I don't think that that is
25    what the Second Circuit was saying at all so, no, that argument

Page 11

7940prec (1).txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

9740premC

1    isn't going to cut it with me.

2                MR. DUFFY:  Okay.

3                THE COURT:  I --

4                MR. DUFFY:  I'm, you know, I --

5                THE COURT:  And since you conceded --

6                MR. DUFFY:  Yeah.

7                THE COURT:  -- that the Rule B showing has been made

8    with plaintiff, if this were just Agrocorp's application, I

9    would simply deny the motion and that would be it.  The only

10   thing that is intriguing here is the Indian Bank financing

11   argument and application --

12               MR. DUFFY:  Yeah.

13               THE COURT:  -- so.

14               MR. DUFFY:  If you would bear with me one second, your

15   Honor.  The only thing I would say about the district is it

16   kind of reaches in a logical conclusion that if two parties are

17   in the United States in the same district, they are forbidden

18   from coming to New York to get security for an attachment that

19   they are arbitrating down in Huston.

20               THE COURT:  They are not forbidden, but a court

21   exercising equitable discretion may conclude that it would be

22   better to attach whatever assets were down in Huston where the

23   two companies were, than to worry about electronic funds

24   transfers in New York.

25               Look, this whole thing, we don't do a lot of this in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

Page 12

7940prec (1).txt

9740premC

1    White Plains.  And this, the whole thing is a new area of

2    jurisprudence for me.  And I, as a policy, I fine horrifying

3    that -- that one could, by virtue of the fortuity of the fact

4    that every banking transaction in the world seems to hop

5    through New York, you can get in rem jurisdiction in a maritime

6    action, that has nothing do with New York -- or with the United

7    States, for that matter -- and that is between two foreign

8    enterprises and yet if you look back at the history of maritime

9    jurisprudence, there is an awful lot of it that doesn't involve

10   entities on either side that were in the United States.  They

11   happened to have assets in the United States.  I mean in the

12   olden days, it was a cargo ship that was sitting in a harbor

13   somewhere in the United States, and then it was convenient bank

14   account that was kept in the United States.  And the Second

15   Circuit has decided in its wisdom for the time being that they

16   will include electronic fund transfers that are going be here

17   for 10 or 15 seconds in the United States.  So, there is

18   nothing I can do about that.

19        MR. DUFFY:  Okay, point taken, your Honor.

20        I would just address the other point, then on the

21   Indian bank's motion.  And, again, I won't profess to be an

22   expert in secure transactions or anything else like that.  I'm

23   basically a maritime lawyer, but I am familiar with these

24   things.

25        My understanding of trust receipts is it was used in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                    15

1    the United States years ago -- as a matter of fact there was a

7940prec (1).txt

2    trust receipts act that they had that kind of got subsumed by

3    the UCC, in Article 9 secured interest.  And it is just not a

4    popular means of financing in the United States anymore.

5         THE COURT:  Clear that none of us has ever heard of

6    it.

7         MR. DUFFY:  But it's still used.  I mean the clients

8    here are based in Singapore.  But they are basically an Indian

9    trading company, and they are used quite often in foreign

10   countries.  And especially -- I don't want to say -- I'm not

11   going to say it on the it record.  You know, developing

12   countries or expanding countries.

13        THE COURT:  And I would say based on what you have

14   said, it seems that it's something that is still recognized in

15   parts of the old British empire.

16        MR. DUFFY:  Correct, your Honor.

17        And I would submit to you on the same case, I mean the

18   parties in this case, they could have gone and opened up a

19   letter of credit with Indian Bank and said, here, we'll open up

20   a letter of credit in favor of this buyer who is selling

21   Ukrainian rapeseed, but they don't go through all of those

22   motions, because they had a relationship with the bank for 16

23   years.  The bank said, look, alls I'm interested in is I'm

24   willing to pay the money, but I don't want to get in a position

25   where I get scammed, so you make sure that I get the bills of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                    16

1    lading and that there is a buyer set up who has a letter of

2    credit open so that when I collect them and I present them --

3         THE COURT:  I'll forget the documents at the bank

4    window and I'll get paid.

Page 14

7940prec (1).txt

5          MR. DUFFY:  And I'll get paid, and you're out of it
6     until whatever is left over, I'll credit into your account.
7     I'm never debiting your account, I'm never loaning you money,
8     I'm in this for business.  And that is why this is the same
9     case --
10          THE COURT:  I kind of disagree with, I'm never loaning
11     you money.  I'm not giving you a traditional bank loan, but
12     that is not what fact over financing is ever about.  Of course
13     I'm loaning you money.  I didn't buy the rapeseed.  What does
14     Indian Bank want with rapeseed, they have no use for rapeseed.
15          MR. DUFFY:  That's why it is the same as the situation
16     in Prime Shipping because, there, the defendant Wajilam, he
17     went to his bank and he said, look, I need the money fast,
18     discount this and you'll take the money.  And I mean that is
19     exactly what was going on here.  You have more money than I do,
20     you have cash available, you take care of this, and we'll --
21     get things -- we'll get the sale done.
22          THE COURT:  All right.
23          Let me disappear for a few minutes, okay.
24          MR. DUFFY:  Okay, your Honor.
25          THE COURT:  A want to look at Judge Rakoff's and Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                    17

1     Pauley's decision here.
2          (recess)
3          THE DEPUTY CLERK:  Come to order please.
4          THE COURT:  Okay.  See if I can dispose of this.
5          The plaintiff, Prestigious Shipping Company, Limited,
6     obtained from this Court some weeks ago --

Page 15

7940prec (1).txt

```
 7            I can't remember the exact date, but --

 8            MR. FOSTER:  August 9th, your Honor.

 9            THE COURT:  -- August 9.  Thank you.

10            -- a process of maritime attachment and garnishment ex

11    parte against defendant, Agrocorp International, PTE, Limited.

12            Prestigious had asserted a claim against Agrocorp for

13    breach of the charter party, dated February 21, 2005.  That

14    claim is presently being arbitrated in London, England.  With

15    the issuance of the process of maritime attachment and

16    garnishment this Court authored Prestigious to attach property

17    of Agrocorp which could be found in possession of garnishees

18    located in the Southern District of New York up to the amount

19    of $2,160,761.06, as security for the claim which is presently

20    being arbitrated in London.

21            The process of attachment and garnishment was served

22    on several banks in New York.  One garnishee restrained on the

23    21st of August, I believe, and I got that date off one of the

24    exhibits in Indian Bank's submission to the Court, that being

25    the fax from American Express Bank to Agrocorp, indicating that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

9740premC

```
 1    the moneys had been restrained.

 2            So on or about the 21st of August, American Express

 3    Bank restrained an electronic transfer in amount of $604,036.93

 4    that was being remitted by Indian Bank, a bank with which

 5    Agrocorp has had a business relationship for many years --

 6    according to counsel.  I am in no position to dispute that,

 7    seems to be correct.  And it was being remitted to the account

 8    of a nonparty seller whose name is --

 9            Firebird, I believe?
```

Page 16

7940prec (1).txt

10          MR. DUFFY:  Firebird, Limited.  Yes, your Honor.

11          THE COURT:  Firebird, Limited, located in Riga,

12   Lativa.

13          The underlying cargo that this particular transfer

14   related to was a cargo of rapeseed which was being shipped from

15   the Ukraine, where it had been purchased.  And, I believe --

16   let me see if I can -- I have to find it.  The contract date

17   between Firebird and Agrocorp was July 11, 2007.  That is

18   exhibit 2 to Indian Bank's submission.  The invoice was

19   actually dated July 8th, 2007, and that's exhibit 3.  And

20   sometime prior to August 20, Agrocorp had, you know,

21   back-to-back transaction, resold the cargo of rapeseed to

22   another party, who fortunately has nothing do with this matter,

23   because there are already too many parties for me to remember

24   all of the names.

25          So, the attachment and garnishment process issued, as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

9740premC                                                    19

1    I say, on the ninth of August.  The invoice had issued for the

2    rapeseed.  The money was due.  And so it appears that Agrocorp

3    went to its bank, Indian Bank, in Singapore, a bank with which

4    they had a preexisting banking facility -- a copy of which is

5    attached to Indian Bank's application as exhibit 1 - and asked

6    Indian Bank to finance the purchase of the rapeseed.  And the

7    critical exhibit for this purpose is Indian Bank's exhibit 4,

8    by fax and by hand, on Agrocorp International PTE, Limited

9    stationery, dated 20 August 2007 or 11 days after the

10   attachment order issued.  And it's a request for invoice

11   financing for U.S. dollars 604,036.93 import drawn by M.S.

Page 17

7940prec (1).txt

12  Firebird, Limited tort shipment of 1351 MTS Ukraine rapeseed

13  shipped by vessel MV Rita, V70018M.

14          This communication sent by a Mr. Yingar, a director of

15  Agrocorp said: We enclose herewith a copy of the supplier's

16  invoice and the necessary T/R -- which I believe means trust

17  receipts -- form for import trust receipts financing in U.S.

18  dollar currency for amount $604,036.93 for the shipment of the

19  Ukrainian rapeseed from Illichivsk, Ukraine to Chittagong

20  Bangladesh on board MV Riga. We request to seek approval to

21  remit the funds to subject party. Please note that we have

22  taken possession of the goods and sale to MS Bengal Corporation

23  and MS Bismillah Dahl Mill, Bangladesh, on letter of credit

24  sight terms; that is to say that the sale by Agrocorp to its

25  purchaser required the purchaser to post a letter of credit on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                    20

1  sight terms. And Mr. Yingar's communication goes on to say:

2  We will forward the necessary export documents to your bank in

3  due course.

4          Please note that once the above sale of proceeds is

5  received -- that is the money that was to go to the seller, to

6  Agrocorp -- the same can be utilized to adjust the advance

7  before due date. The necessary trust receipts forms are also

8  enclosed herewith. Upon approval, please arrange to remit the

9  total amount of U.S. dollars $604,036.93 to the following

10  account with value date today. The beneficiary is named as

11  Firebird, Limited, and the bank is the Regional Investment Bank

12  JSC, in Riga, Latvia. The transfer is to mention "payment for

13  your invoice 11312, 11297, and 11325-1351MTS, rapeseed. The

14  necessary bank charges can be debited separately to our U.S.

Page 18

7940prec (1).txt

15    dollar account with you."

16         The response was that, immediate, the money was wired

17    out.  As so much of the money in the world does, it flitted

18    through New York on its way from Singapore to Riga, and it was

19    netted there by American Express Bank, Ltd. which had

20    previously been served with the maritime attachment process.

21         And, on the following day, the 21st of August, at

22    5:56 p.m., a fax was sent to Agrocorp saying:  With respect to

23    transaction reference number 070320-20878 -- don't quote me on

24    that -- please be advised that AEB New York, American Express

25    Bank of New York, was served with, and several other New York

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                          21

1     banks were also served with, a process of maritime attachment

2     and garnishment.  This writ obliged American Express Bank to

3     block attached funds belonging to Agrocorp International, PT,

4     Limited, up to $2.16 million US.

5          Under applicable US federal law, AEB was required to

6     block your $604,036.93 payment order and to move these funds

7     into a blocked account.  And this was sent to Indian Bank on --

8     apparently with a copy to Agrocorp.

9          Indian Bank responds swiftly, the next day, the 22nd

10    of August saying:  We refer to your swift -- dated -- I

11    shouldn't have said swift --

12         We refer to your transaction, reference number and

13    your swift dated 21 August 2007.  Please note that $604,036.93

14    US dollars belongs to Indian Bank, Singapore fund, and not to

15    our customer, Agrocorp International, PTE Ltd.  Indian Bank has

16    financed Agrocorp's purchase of the Ukrainian rapeseed shipped

Page 19

7940prec (1).txt

17    on the vessel MV Rita, V70018M.  Attached is the request for

18    invoice financing executed by Agrocorp in our favor being sent

19    through your Singapore office.  These moneys belong to us and

20    have been wrongly attached.

21            On successive days last week, orders to show cause

22    were presented by Prestigious Shipping and then by Agrocorp

23    International, both represented by attorney Owen Duffy, seeking

24    vacatur of the attachment of these funds on, essentially, two

25    grounds.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC                                                    22

1            The first ground was that the Court should exercise

2    its equitable power as reserved by the United States Court of

3    Appeals for the Second Circuit in the Aqua Stoli case,

4    460 F3d. 434, and should vacate the attachment on the ground

5    that both the plaintiff and the defendant in this action,

6    Prestigious and Agrocorp, can be found in Singapore, and would

7    be subject to jurisdiction there.  And counsel for Prestigious

8    argued that this was one of the grounds that the Second Circuit

9    had specifically identified in Aqua Stoli, as a ground on which

10    a district court would have equitable discretion to vacate a

11    maritime attachment that complied with maritime Rule B.  And

12    for purposes of this application, it is conceded by Prestigious

13    that this particular attachment complies with maritime Rule B.

14    That is to say Prestigious has conceded for purposes of this

15    motion that -- or I should say Agrocorp has conceded for

16    purposes of this motion that Prestigious has a valid prima

17    fascia admiralty claim against Agrocorp, that Agrocorp cannot

18    be found within the Southern District of New York, that its

19    property may be found within the district, and there is no

Page 20

7940prec (1).txt

20    statutory and maritime bar to the attachment.

21         So until India Bank got in and said it was my property

22    and it is not their property, I had basically a concession that

23    it was a proper Rule B maritime attachment.

24         And, as I say, Mr. Duffy argued that the attachment

25    should be vacated because both plaintiff and defendant were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

9740premC                                                    23

1     present in different jurisdictions and would be subject to

2     jurisdiction there, that jurisdiction being Singapore.

3          As I indicated during oral argument, I did not find

4     this line of reasoning particularly persuasive, although I

5     think it is immensely clever.

6          The Second Circuit in Aqua Stoli basically did all but

7     tie the hands of a district court when confronted with a

8     maritime attachment that complies with the requirements of

9     Rules B and E.

10         The Second Circuit did say that district courts are

11    not without any equitable discretion to vacate maritime

12    attachments that comply with Rule B.  But it said that

13    following integrated and other prerule E(4)(f)cases, we believe

14    that an attachment may be vacated only in certain limited

15    circumstances, taking care to note that the precise bounds of a

16    district court vacatur powers were not then before it.

17         The Second Circuit identified three circumstances in

18    which it thought it would be appropriate for a district court

19    in an exercise in equitable discretion to vacate a maritime

20    attachment.  One was the across-the-river situation, where the

21    defendant can show that it would be subject to in personam

7940prec (1).txt
22  jurisdiction.  In another jurisdiction that was convenient to

23  the plaintiff, the Second Circuit indicated that the concept of

24  convenience was a narrowly circumscribed one, that convenient

25  meant adjacent to the one in the attachment proceedings were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

9740premC                                                    24

1   brought, which would mean were brought -- would mean for our

2   purposes were the attachment proceedings brought here, the

3   eastern, southern -- or eastern, western or northern districts

4   of New York, all of which are, at some point, adjacent to the

5   Southern District of New York, perhaps the District of

6   Connecticut and New Jersey, as well, but there is no evidence

7   in the record to indicate that Agrocorp is present in any of

8   those jurisdictions, so we're not talking about that particular

9   exception.

10          Vacatur would also be proper, the Second Circuit said,

11  if the defendant's assets sufficient to satisfy a judgement

12  have already been secured elsewhere, yet the plaintiff seeks a

13  further attachment.  An example of this particular reason for

14  vacating attachment is Judge Sweet's vacatur of the attachment

15  in OGI Ocean Gate Transportation Company against RP Logistic

16  PVC, Limited, which can be found at 2007 US District Lexus

17  46841.  And, in that case, the amount of the debt was $45,000.

18  And $45,000 had been attached somewhere else.  And, therefore,

19  what I think comes to foster, counsel for what Prestigious has

20  referred to as double dipping reason for exercising equitable

21  discretion and vacating attachment did not apply.

22          So, that leaves the one that the defendant cited.  And

23  the problem is that what the Second Circuit said is not exactly

24  what the defendant said the Second Circuit said.

Page 22

7940prec (1).txt

25          The Second Circuit said the maritime attachment would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

9740premC

1    likewise be properly vacated if the plaintiff and defendants

2    are both present in the same district and would be subject to

3    jurisdiction there.  But the plaintiff goes to another district

4    to attach defendant's assets.  I do not understand the Republic

5    of Singapore to be a district within the meaning of that term

6    as used by the Second Circuit.  And I do not understand the

7    Second Circuit's statement to be an authorization by this Court

8    to vacate a maritime attachment when both the plaintiff and the

9    defendant can be found in another jurisdiction all together,

10   that jurisdiction being in a country half way around the world.

11          Therefore, I have to reject the defendant, Agrocorp's

12   argument that the attachment ought to be vacated on that

13   ground.

14          Much more interesting is the argument made by Indian

15   Bank, which is that the money doesn't belong to Agrocorp, the

16   money belongs to it.

17          Prestigious concedes that there appears to be a bone

18   fida financing transaction between Agrocorp and Indian Bank,

19   which are not related entities.

20          The transaction was conveniently entered into, not at

21   the time of the original purchase of the rapeseed, but at the

22   time the bill came due, with Agrocorp being, at that time, on

23   notice that a process of maritime attachment and garnishment

24   had issued against it and, no doubt, being well aware that in

25   this Circuit, under the Winter Storm decision, electronic fund

SOUTHERN DISTRICT REPORTERS, P.C.
Page 23

7940prec (1).txt
(212) 805-0300

9740premC

26

1    transfers would be attachable under Rule B.

2           So, instead of paying the bill itself to Firebird,

3    Agrocorp went to Indian Bank and got Indian Bank to pay the

4    bill to Firebird.  It was, of course, a debt of Agrocorp that

5    was paid, Indian Bank, having had no prior relationship with

6    Firebird or in connection with this transaction or other reason

7    to pay any money, let alone $600,000 to Firebird, Limited.

8           The question that confronts this Court is really which

9    of two district court decisions, by two eminent colleagues of

10   mine, to follow.

11          Judge Rakoff's decision in the -- I can't remember the

12   name of that case -- Prime Shipping Company case, 2006 US

13   District Lexus 34637, in which Judge Rakoff concluded that, "a

14   defendant, Wajilam Exports, did not have a financial interest

15   in a fund transfer that was made pursuant to an ordinary letter

16   of credit.  That had been issued -- that had been purchased by

17   Bank Paribas, BNP, in order to finance the sale of logs,

18   certain items.  Wajilam sells logs to buyers of Asia.  And one

19   buyer obtained a negotiable letter of credit to purchase a

20   cargo of logs, and Paribas bought that letter of credit and had

21   presented it.  And the funds were being transferred in response

22   to that presentation when they were netted by American Express

23   Bank here in New York.  And Judge Rakoff concluded that because

24   of the nature of the letter of credit transaction, and the fact

25   that the fundamental principle of letters of credit is that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC

27

7940prec (1).txt

1    issuing bank's obligation to honor drafts drawn on a letter is
2    separate and independent from any obligation of its customer to
3    the beneficiary under the sale of goods contract and separate
4    as well from any obligation to issuer to its customer under
5    their agreement.  He concluded that Paribas was entitled to the
6    money, and that the attachment would be vacated.
7           About three weeks ago, my equally eminent colleague
8    Judge Pauley, in a case that did not involve a letter of credit
9    but that involved one related corporation's paying the debt of
10   another related corporation, concluded that even though the
11   paying Corporation -- Judge Pauley in the SR International
12   Limited v. Mar Trade Golf Logistics case, 2007 Westlaw 2456629
13   concluded that the property of Mar Log, a nonparty to the
14   action, could be attached under Rule B, because it was being
15   used to pay the debt of Mar Trade, an affiliated corporation.
16   And, indeed, everybody admitted to Judge Pauley that Mar
17   Log's -- the nonparty Mar Log's payment of an invoice issued
18   from Im Chait to Mar Trade was made not only for Mar Trade's
19   benefit, but that transfer had been orchestrated precisely to
20   avoid the attachment order.  And Judge Pauley concluded that
21   this established that Mar Trade had a property interest in the
22   June 1st electronic funds transfer sufficient to render it
23   attachable under Rule B.
24          He did that in part on the authority of the Middle
25   District of Florida case, Linea Navira De Cabotaje v. Mar

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

♀

28

9740premC

1    Caribe De Navegacion -- which I'll give to the court reporter
2    so she can spell it -- 169 F.Supp 2d. 1341 at 135960, which I

7940prec (1).txt

3    have taken a look at and in which a magistrate judge concluded
4    that the plaintiff had provided evidence that funds nominally
5    belonging to nonparties were, in fact, controlled by the
6    defendant on the basis inter alia that the funds were paid by
7    the nonparty at the party's specific direction, thereby
8    indicating the party, Mar Caribe's, abilities to control the
9    account of the nonparty.
10        One, I had never heard of trust receipts before today.
11    I have been educated on this ancient and venerable method of
12    financing which apparently is not much used, post uniform
13    commercial code in the United States, but there are places in
14    the world where there is no UCC and it is used and, apparently,
15    it can be used as an alternative to a letter of credit.  I am,
16    however, convinced that the differences here are such that it
17    is Judge Pauley's decision, rather than Judge Rakoff's decision
18    that I ought to follow, particularly since the Aqua Stoli court
19    really made it quite clear that district courts are not to get
20    involved in and engaged in these intensive factfinding
21    proceedings, whereas, here, the parties have conceded the
22    procedural and the Rule B regularity of this particular
23    attachment for purposes of the vacatur motion.
24        Now, why do I come down in this particular way.  As I
25    mentioned earlier, the financing for this particular purchase

♀

9740premC

1    was arranged, significantly after the purchase, and shortly
2    after the time that this Court issued the maritime attachment
3    process.
4        Agrocorp, explicitly directed that Indian Bank pay the
5    amount of the invoice that was owed by Agrocorp to Firebird.

Page 26

7940prec (1).txt

6     It was obviously done for benefit of Agrocorp.  Indian Bank

7     takes the position that it was its money, not a loan, to its

8     client, Agrocorp, that was being used to pay these proceeds.

9           That, it seems to me, overlooks the nature of

10    nonletter of credit financing transactions and the realities of

11    those transactions.  It was the intent of parties here, that

12    Agrocorp -- that Indian bank would take possession of, and it

13    may have been in position of the documents that would enable it

14    to present the letter of credit that had been issued by the

15    people who were buying the rapeseed from Agrocorp.  To whatever

16    bank that had issued that letter of credit.  I don't know what

17    bank did that letter of credit, I don't have a copy of that

18    letter of credit.  But Indian bank, therefore, would be in a

19    position to present the letter of credit as Paribas presented

20    the letter of credit, and to collect the proceeds from the sale

21    of the Ukrainian rapeseed by Agrocorp to the third-party

22    purchaser.  And then it was the intention, according to

23    counsel -- of course, I -- I believe him, because it makes

24    sense.  It was the intention of Indian Bank to take possession

25    of the money from the letter of credit and, at that point, to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9740premC

30

1     repay itself for the money that it used to pay Firebird and

2     take out its fee and give the rest of the money, the rest of

3     the profit, to Agrocorp.

4           It is, therefore, not slight of hand.  I don't want to

5     suggest that it is slight of hand.  But it is not exactly

6     correct to say that Indian Bank was not advancing moneys, if

7     not directly to its client, then on behalf of its client.  And,

7940prec (1).txt

8    for that reason, it is possible for this Court to find, as was

9    found in Linea Navira, and this summer by Judge Pauley in the

10   SR case, that the defendant in this case, Agrocorp, has an

11   interest in the funds, that were being EFT'd through New York

12   and that were netted by American Express Bank.  Even though

13   those funds were being EFT'd by a third party, Indian Bank to a

14   third party, Firebird.

15          In so ruling, I am, as Judge Pauley was, defining the

16   word "property" under Rule B, broadly.  The Second Circuit has

17   indicated that we district judges are to define the word

18   "property" broadly.  I believe in the Winter Storm opinion,

19   Judge Haight, whom I know to be a biblical scholar an ardent

20   Episcopalian and former warden of his church, quoted a treatise

21   which said that the words were to be interpreted as broadly as

22   a phrase from the Nicene Creed, all things visible and

23   invisible.

24          And if one interprets the phrase, the word "property"

25   Under Rule B, as broadly as "all things visible and invisible,"

9740premC

31

1    I have a hard time seeing how it is that Agrocorp does not have

2    an interest in the money that Indian Bank was EFT'ing to pay

3    the invoice that Agrocorp owed for the rapeseed.

4          And I think that Indian Bank is, therefore, in a

5    significantly different position than Paribas was in the Prime

6    Shipping case, where Paribas had obtained title to a negotiable

7    letter of credit, appears to have been a sight letter, that was

8    issued by one party to a transaction in favor of the defendant

9    in the Prime Shipping case, and had presented the letter of

10   credit for payment.  And there was really going to be a

Page 28

7940prec (1).txt

11    disruption in the letter of credit process, payment process.

12            Whereas, here, the Indian Bank's position, I can't say

13    this 100 percent for sure because I have looked through these

14    documents at some length, but I'm -- I don't know if I'm

15    missing something.  But Indian Bank appears to have acquired,

16    if I understood counsel correctly, the documents that would

17    allow it to present the letter of credit issued by Agrocorp's

18    seller for payment and get its money back.  And the only person

19    who would appear to be out of pocket would be Agrocorp, which

20    is, after all, the party whose funds, whose property were being

21    attached by the Rule B maritime attachment.

22            So, for that reason, I am going to decline to vacate

23    the attachment, and I'm going to deny Indian Bank's application

24    to free up the money on the ground that the money actually

25    belongs to it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

⚥

9740premC                                                         32

1            And I should say, that there is ample authority among

2    the judges of this Court for the proposition that money can't,

3    in fact, be the property of two or more people.

4            Judge Pauley certainly cited to that proposition.

5    It's been -- Judge Buchwald, in the HBC Hamburg Bulk Carriers

6    case articulated that proposition.  And I have read that case.

7    And, yes, there undoubtedly are overlapping property rights as

8    between Indian Bank and Agrocorp in that $609,000.  But

9    Agrocorp has enough of an interest in that property to make it

10   attachable and to warrant my denying the motion to vacate --

11   motions, I should say, to vacate the attachment.

12           So, there you have it.  I am now rapidly becoming

Page 29

7940prec (1).txt

13    acquainted with this emergent area of the law.  I will be

14    interested to see how these things develop in the Second

15    Circuit, because this could quickly become the immigration

16    docket of the Second Circuit for the Southern District of New

17    York.

18            I think I have another one downstairs waiting to be

19    signed.

20            Okay.  Very interesting.  Very interesting.

21            MR. FOSTER:  Thank you, your Honor.

22            MR. DUFFY:  Thank you, your Honor.

23            THE COURT:  Thank you, gentlemen.

24            (Adjourned)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT B

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

**CONSUB DELAWARE LLC, Plaintiff, - against - SCHAHIN ENGENHARIA LIMITADA, Defendant.**

**06 Civ. 13153 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*476 F. Supp. 2d 305; 2007 U.S. Dist. LEXIS 10105*

**February 13, 2007, Decided**
**February 13, 2007, Filed**

**COUNSEL:** [**1] For Consub Delaware LLC: Joseph B. Shumofsky, Esq., DORSEY & WHITNEY LLP, New York, NY.

For Schahin Engenharia Limitada: Christopher Carlsen, Esq., CLYDE & CO US LLP, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION:**

[*307] **OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Consub Delaware LLC ("Consub") brings this admiralty and maritime action to recover for breach of contract against Schahin Engenharia Limitada ("Schahin"). After filing its Verified Complaint (the "Complaint"), Consub obtained an *ex parte* order for process of maritime attachment. Schahin moved to vacate that order. The Court heard oral argument on that motion but reserved decision. Thereafter, Schahin moved to seek leave to file an interlocutory appeal in the event that its motion to vacate were denied. For the reasons discussed below, the motion to vacate is denied, but the motion for leave to file an interlocutory appeal is granted.

**I. BACKGROUND**

On November 13, 2006, Consub filed its Complaint seeking damages for breach of contract in the amount of $ 5,986,117.65 inclusive of interest, costs and attorney's fees. n1 The claims in the Complaint arise [**2] out of the ACMA 2001 Submarine Telecommunications Cable Maintenance and Related Services Agreement dated August 10, 2000 (the "ACMA Agreement") and the related Novation Agreement dated November 8, 2001 (the "Novation Agreement"). n2 Consub is not a party to the

ACMA Agreement, but the Novation Agreement, to which Consub is a party, provides that Consub agrees to "be bound by all of the provisions of the [ACMA] Agreement as if it had originally entered into the Agreement." n3

> n1 Consub demands $ 4,765,600 plus interest at 8% per annum and attorney's fees and expenses, which are alleged to be routinely recoverable under English law, totaling $ 5,986,117.65.

> n2 The ACMA Agreement and the Novation Agreement are attached to the Declaration of Ronaldo Gomes Moidano, Telecom Manager for Schahin, in Support of Motion to Vacate Maritime Attachment ("Moidano Decl."), as Exhibits A and B, respectively.

> n3 Novation Agreement, at "Whereas" No. 3.

The ACMA and Novation Agreements both contain choice of law and [**3] forum selection clauses. Article 22.1 of the ACMA Agreement provides that "[t]he validity and interpretation of this Agreement and the legal relation between the Parties thereto shall be governed by the English Law." Article 22.2 provides that "[a]ll disputes . . . between the Parties with respect to any matter or thing arising out of or relating to the Agreement . . . may be referred to litigation in the event that they [*308] cannot otherwise be resolved by the Parties . . . ." Finally, Article 22.4 provides that "[t]he Agreement shall be considered as an Agreement made in England and subject to English law under the exclusive jurisdiction of the courts of England and Wales."

Likewise, the Novation Agreement at paragraph 3.1 provides that "[t]his Novation Agreement shall be governed by and construed in accordance with the laws of England." Paragraph 3.2 provides that "[e]ach of the par-

Case 1:07-cv-07101-CM    Document 23-2    Filed 09/24/2007    Page 34 of 42

Page 2

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

ties hereby submit to the exclusive jurisdiction of the English Courts in relation to any dispute or claim arising out of or in connection with this Novation Agreement."

On November 14, 2006, Consub sought and obtained the issuance of process of maritime attachment and garnishment pursuant to Rule [**4] B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (the "Attachment Order"). The Attachment Order provides that it "shall issue against all tangible or intangible property belonging to, claimed by or being held for Schahin by any garnishees within this District" in an amount to and including the amount of damages sought in the Complaint, and lists by name various garnishee banks found within this District.

On December 5, 2006, pursuant to the Attachment Order, Standard Chartered Bank, one of the named garnishees, seized an electronic fund transfer ("EFT") in the amount of $ 4,281,767.96, that was being routed through its bank. Schahin had instructed its bank, Banco Schahin, S.A. ("Banco Schahin"), a Brazilian bank, to transfer funds from its account at Banco Schahin to a third-party's bank account at Clariden Bank in Zurich, Switzerland, a United States Dollar denominated account. Banco Schahin had to route the transfer through an intermediary bank in the United States in order to convert the funds from Brazilian Real into United States Dollars. Standard Chartered Bank was instructed to serve as that intermediary [**5] bank for this particular EFT.

On December 15, 2006, Schahin moved, by order to show cause, to vacate the Attachment Order and the attachment of the EFT. The Court heard oral argument on the motion on December 22, 2006.

## II. LEGAL STANDARD

### A. Maritime Attachments

In order to obtain a maritime attachment under Rule B, a plaintiff must demonstrate that "(1) it has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment." n4 The defendant then bears the burden to show that an attachment order should be vacated, which it can do by showing that "(1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment . . . ." n5

n4 *Aqua Stoli Shipping Ltd. v. Gardner Smith PTY, Ltd., 460 F.3d 434, 445 (2d Cir. 2006)* (footnote omitted).

[**6]

n5 *Id. at 445 & n.5.*

### B. Interlocutory Appeals Under *Section 1292(b)*

Appeals of interlocutory district court orders are governed by *28 U.S.C. § 1292(b)*. Under *section 1292(b)*, the order being appealed must "(1) involve a controlling question of law (2) over which there is substantial ground for difference [*309] of opinion," and the movant must also show that "(3) an immediate appeal would materially advance the ultimate termination of the litigation." n6 In addition, leave to appeal is warranted only when the movant demonstrates the existence of "exceptional circumstances" n7 sufficient to overcome the "general aversion to piecemeal litigation" n8 and to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." n9 Interlocutory appeal "is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation,' . . . and is not intended as a vehicle to provide early review of difficult rulings in hard cases." n10 The decision whether to grant an interlocutory appeal [**7] from a district court order lies within the district court's discretion. n11

n6 *28 U.S.C. § 1292(b).*

n7 *Williston v. Eggleston, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006).*

n8 *In re AroChem Corp., 176 F.3d 610, 619 (2d Cir. 1999). Accord Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 95 (2d Cir. 1997).*

n9 *In re Flor, 79 F.3d 281, 284 (2d Cir. 1996)* (quotation marks and citations omitted).

n10 *Levine v. Levine (In re Levine), No. 94-44257, 2004 U.S. Dist. LEXIS 6025, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004)* (quoting *German v. Federal Home Loan Mortgage Corp., 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995)).*

n11 *See, e.g., Swint v. Chambers County Comm'n, 514 U.S. 35, 47, 115 S. Ct. 1203, 131 L. Ed. 2d 60 (1995)* ("district courts [have] first line

Case 1:07-cv-07101-CM     Document 23-2     Filed 09/24/2007     Page 35 of 42

Page 3

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

discretion to allow interlocutory appeals"); *In re Kassover*, 343 F.3d 91, 94 (2d Cir. 2003); *D.M. Rothman Co. v. Cohen Mktg. Int'l, Inc.*, No. 98 Civ. 7905, 2006 U.S. Dist. LEXIS 52073, 2006 WL 2128064, at *1 (S.D.N.Y. July 27, 2006).

[**8]

"In regard to the first prong, the 'question of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." n12 The question must also be "controlling" in the sense that reversal of the district court's order would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome. n13

> n12 *In re WorldCom, Inc.*, No. M47, 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

> n13 See *XO Communs., Inc. v. Start Inv., Inc. (In re XO Communs., Inc.)*, No. 03 Civ. 1898, 2004 U.S. Dist. LEXIS 2879, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004); *North Fork Bank v. Abelson*, 207 B.R. 382, 389-90 (E.D.N.Y. 1997).

As to the second prong, the "substantial ground for a difference of opinion" must arise out of a genuine doubt as to whether the district court applied the correct legal standard in its order. n14 The requirement that such a substantial ground exist may be met when "(1) there is conflicting [**9] authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." n15 However, it is not sufficient that the relevant case law is "less than clear" or allegedly "not in accord," n16 or that there is a "strong disagreement among the parties." n17 "A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a [*310] difference of opinion." n18 Rather, the district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is *substantial* ground for dispute." n19

> n14 *In re Worldcom*, 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10 (citation omitted).

> n15 *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 1997 U.S. Dist. LEXIS 11937, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (cit-

ing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)).

> n16 *North Fork Bank*, 207 B.R. at 390.

> n17 *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)* Nos. 99-45005, 01-02952, M47, 2003 U.S. Dist. LEXIS 11119, 2003 WL 21507196, at *1 (S.D.N.Y. June 30, 2003) (stating that to demonstrate that there is a substantial ground for difference of opinion a party "must show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties") (quotation omitted).

[**10]

> n18 *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 426 F. Supp. 2d 125, 2005 WL 3440701, at *2 (S.D.N.Y. 2005) (citations omitted).

> n19 *In re Flor*, 79 F.3d at 284 (quotation omitted). Accord *Marlin v. United States Trustee*, 333 B.R. 14, 20 (W.D.N.Y. 2005).

Finally, as to the third prong, "'[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial.'" n20 Courts place particular emphasis on the importance of this last factor. n21

> N20 *Transportation Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005) (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998)).

> n21 See *Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865-66 (2d Cir. 1996) ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."); *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 345, 347 (S.D.N.Y. 1998) ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal.").

[**11]

Case 1:07-cv-07101-CM    Document 23-2    Filed 09/24/2007    Page 36 of 42

Page 4

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

## III. DISCUSSION

### A. Vacatur of the Maritime Attachment Order

Schahin does not attempt to meet its burden to show that the Attachment Order should be vacated by relying on any of the three methods established by the Second Circuit. n22 Rather, Schahin argues that the Attachment Order and attachment of the EFT should be vacated on two other independent grounds. *First,* Schahin argues that the EFT that was seized is not property and thus, cannot be seized under the Attachment Order. *Second,* Schahin argues that the forum selection clauses preclude this Court from issuing a Rule B attachment.

n22 *See Aqua Stoli, 460 F.3d at 445* & n.5.

### 1. EFTs Are Property and Subject to Attachment Under Controlling Second Circuit Law

Schahin acknowledges that in *Winter Storm Shipping Ltd. v. TPI,* the Second Circuit held that "EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." n23 Schahin asserts, however, that the Second Circuit's [**12] recent decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith PTY, Ltd.* n24 has undercut *Winter* Storm's holding. This assertion is based on a footnote in the *Aqua Stoli* in which the court states:

> The correctness of our decision in *Winter Storm* seems open to question, especially its reliance on [*United States v. Daccarett, 6 F.3d 37, 55 (2d Cir. 1993),*] to hold that EFTs are property of the beneficiary or sender of an EFT. Because *Daccarett* was a forfeiture case, its holding that EFTs are attachable assets does not answer the more salient question of *whose* assets they are while in transit. In the absence of a federal rule, we would normally look to state law . . . . Under state law, the EFT could not be attached because EFTs are property of neither the sender nor the beneficiary while present in an intermediary bank. n25

[*311] Despite the fact that the Second Circuit -- in dicta -- questioned the correctness of the *Winter Storm,* it did not overrule *Winter Storm.* To the contrary, the *Aqua Stoli* court relied on *Winter Storm* as support for its statement that "EFTs to or from a party are attachable by a court as they pass [**13] through banks located in that

court's jurisdiction." n26 Indeed, the court affirmed the attachment of the EFT at issue in that case. n27 Moreover, the facts of *Winter Storm* are on all fours with the facts of this case in which an EFT, originated by defendant, was attached pursuant to a maritime order of attachment while present in an intermediary bank found in New York. The question raised in *Aqua Stoli* of *"whose* assets they are while in transit" n28 is not at issue here and need not be addressed. Thus, I conclude that *Winter Storm* remains good law and is binding on this Court. n29

n23 *310 F.3d 263, 278 (2d Cir. 2002).*

N24 *460 F.3d at 434.*

n25 *Id. at 446 n.6* (emphasis in original) (citations omitted).

n26 *Id. at 436; see also id. at 446* ("EFTs will still be attached by plaintiffs").

n27 *See id. at 446.*

n28 *Id. at 446 n.6* (emphasis in original).

n29 *Accord AET Inc. v. Martimos, Cardoso & Fonesca, No. 06 Civ. 6845, 464 F. Supp. 2d 241, 2006 U.S. Dist. LEXIS 89628, 2006 WL 3518263, at *2 (S.D.N.Y. Dec. 7, 2006)* (rejecting the same arguments advanced here and following *Winter Storm* as binding precedent to affirm the maritime attachment of an EFT); *Maersk, Inc. v. Neewra, Inc., No. 05 Civ. 4356, 2006 U.S. Dist. LEXIS 73096, 2006 WL 2854298, at *1-2 (S.D.N.Y. Oct. 6, 2006)* (same). No court within the Second Circuit has held to the contrary.

[**14]

It follows that because this Court is bound to follow *Winter Storm* -- which established a rule "derived from federal law" -- "there is no occasion to look for guidance in state law." n30 Consequently, defendant's remaining contentions regarding the propriety of attachment of EFTs under New York State law are inapposite.

n30 *Winter Storm, 310 F.3d at 278.*

Case 1:07-cv-07101-CM    Document 23-2    Filed 09/24/2007    Page 37 of 42

Page 5

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

**2. The Forum Selection Clause Does Not Strip This Court of Jurisdiction to Enter and Enforce the Attachment Order**

Schahin argues that the Attachment Order should be vacated on the basis that the forum selection clauses in the Agreements grant "exclusive jurisdiction" to English courts, thereby precluding Rule B attachments in the United States. n31 The Ninth Circuit, in *Polar Shipping Ltd. v. Oriental Shipping Corp.*, squarely addressed the issue of "whether, in an admiralty and maritime action where there is an enforceable foreign court selection clause, the district court . . . may ensure the availability of security pending [**15] a determination of the merits in the contractually selected forum." n32 The court looked to the language of the forum selection clause, which stated that "[a]ny dispute arising under the charter shall be decided by the English Courts," and found that the parties did not evidence by that language an "inten[t] to limit proceedings to obtain prejudgment security to that forum" because Rule B "attachment does not fit neatly within the word 'dispute.'" n33 Courts within this district have followed this approach. n34

> n31 For the purpose of this discussion, I assume, without deciding, that the forum selection clause in the contract is valid and enforceable.

> n32 *680 F.2d 627, 631 (9th Cir. 1982)*.

> n33 *Id. at 632.*

> n34 *See, e.g., Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal, 411 F. Supp. 2d 386 (S.D.N.Y. 2006)* (following *Polar Shipping* to permit Rule B attachment); *Staronset Shipping Ltd. v. North Star Navigation Inc., 659 F. Supp. 189 (S.D.N.Y. 1987)* (following the reasoning in *Polar Shipping* to permit Rule B attachment even where the claims will be litigated elsewhere). English law is consistent with the approach followed in *Polar Shipping. See generally* Declaration of Timothy Jean-Paul Howe, Consub's proffered expert on English law, as to English law on Exclusive Jurisdiction Clauses PP 11-15.

[**16]

[*312] As detailed above, the language of the forum selection clause in the ACMA Agreement states that "[t]he Agreement shall be considered as an Agreement made in England and subject to English law under the exclusive jurisdiction of the courts of England and Wales." n35 The parties focus their arguments, however, on the forum selection clause in the Novation Agreement, which states that "[e]ach of the parties hereby submit to the exclusive jurisdiction of the English Courts *in relation to* any dispute or claim arising out of or in connection with this Novation Agreement." n36 The parties dispute whether the language in the Novation Agreement provision manifests an express intent to have not only the merits of any dispute arising out of the contract litigated solely in England, but also prejudgment attachment proceedings. n37

> n35 ACMA Agreement P 22.4.

> n36 Novation Agreement P 3.2 (emphasis added).

> n37 Both sides offer parol evidence of the intent of the parties in agreeing upon the forum selection clause. I need not consider that evidence because, as discussed below, I find that the contract language is unambiguous.

[**17]

Schahin argues that the parties' intent as evidenced by that language is that the forum selection clause was intended to be broad and to include prejudgment attachment proceedings. Schahin argues that the "in relation to" any dispute or claim language distinguishes the present case from *Polar Shipping*, which did not include the phrase "in relation to." In other words, Schahin argues that the holding of *Polar Shipping* that Rule B attachments "do[] not fit easily into the term 'dispute'" as used in the clause, n38 does not apply here because Rule B attachment proceedings are "in relation to" a dispute arising out of the Agreements.

> n38 *Polar Shipping, 680 F.2d at 632.*

Consub argues that the "in relation to" language does not distinguish the present case from *Polar Shipping* and its progeny. Indeed, Consub contends that the contract language reveals that the parties intended that the merits of the disputes or claims would be litigated in the English Courts but that ancillary proceedings [**18] such as Rule B attachments would still be available outside of that forum. This is especially so, Consub argues, given the importance in admiralty and maritime proceedings that a plaintiff have the means to secure the enforcement of any ultimate judgment wherever a defendant's assets may be found.

Case 1:07-cv-07101-CM    Document 23-2    Filed 09/24/2007    Page 38 of 42

Page 6

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

Although the use of the words "in relation to" may sound broader than the language in *Polar Shipping*, I find that the language of the Novation Agreement's forum selection clause is unambiguous and that the Agreements' exclusive jurisdiction clauses do not, and were not intended to, preclude Rule B attachment in this Court. Permitting Rule B attachment in the United States District Courts in no way interferes with the exclusive jurisdiction of the English Courts to decide any matter "in relation to any dispute or claim" arising out of the Agreements.

This reading is supported by other provisions in the Agreements relating to arbitration as an alternative to litigation. *First,* the ACMA Agreement states that the arbitration award "may be enforced against the Parties to the arbitration proceeding or their assets *wherever they may be found.* Judgment upon the award may be entered [**19] in *any court having jurisdiction thereof.*" n39 This language anticipates the involvement of courts outside of England for the purpose of satisfying an eventual judgment. *Second,* the Novation Agreement, in the paragraph directly following the exclusive jurisdiction provision, [*313] provides that "[a]s [an] alternative to the English Courts, and if the parties so agree, *any dispute or claim arising out of or in connection with this Novation Agreement* may be settled in arbitration in accordance with [the ACMA] Agreement." n40 This provision, which provides an alternative to the exclusive jurisdiction of English Courts, does not include the phrase "in relation to" but rather uses the same language that was considered in *Polar Shipping* and found not to preclude Rule B attachment. These paragraphs, when read together, demonstrate that the exclusive jurisdiction agreement was not intended to be as broad as Schahin argues. n41

n39  ACMA Agreement P 22.6 (emphasis added).

n40  Novation Agreement P 3.3 (emphasis added).

n41 This interpretation is also consistent with the *Polar Shipping* court's observations regarding the policy behind forum selection clauses in the admiralty and maritime context:

We think that strong policy reasons also support the conclusion just stated. A primary reason for parties to agree to a foreign court selection clause, particularly one

that names the English courts, is to achieve a neutral forum and to take advantage of that forum's expertise in admiralty litigation. In many admiralty actions, it would be merely fortuitous if the foreign forum, selected for its neutrality and expertise, also had available assets of the defendant to ensure that a judgment rendered by that forum would be enforceable there. . . . For the court to infer that parties to a clause, which provides that all disputes under the charter shall be determined by a selected foreign court, intended that proceedings to obtain prejudgment security be limited to that foreign forum, could substantially prejudice an admiralty plaintiff, by leaving it without an effective remedy.

*Polar Shipping,* 680 F.2d at 633.

[**20]

**B. Leave to Appeal**

The sole ground on which Schahin seeks interlocutory appeal is this Court's decision to follow *Winter Storm* and hold that EFTs are property and thus subject to Rule B attachment. I find that this issue warrants immediate review on appeal.

The first prong of *section 1292(b)* is met because the issue to be appealed is a pure and controlling question of law. This issue can be decided with minimal, if any, reference to the record. If reversed, the attachment would be vacated, and it is undisputed that vacatur of the attachment would result in the termination of this action. n42

n42 *Cf. Genentech, Inc. v. Novo Nordisk A/S, 907 F. Supp. 97, 99 (S.D.N.Y. 1995)* ("[Q]uestions of in personam and subject matter jurisdiction warrant certification under *section 1292(b)* because their resolution may dispose of a case." (citing *Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1330 (2d Cir. 1972)*)).

The second prong of the *section 1292(b)* analysis [**21] is also satisfied here. There is certainly "substantial ground for a difference of opinion" as to the issue of whether EFTs are property subject to attachment because

Case 1:07-cv-07101-CM    Document 23-2    Filed 09/24/2007    Page 39 of 42

Page 7

476 F. Supp. 2d 305, *; 2007 U.S. Dist. LEXIS 10105, **

there are conflicting Second Circuit statements on this very issue. Indeed, the Second Circuit in *Aqua Stoli* essentially invited parties to challenge the underpinnings of its prior holding in *Winter Storm* when it stated that "[t]he correctness of our decision in *Winter Storm* seems open to question." n43 The only way that question could ever be raised would be on interlocutory appeal because under the current state of the law, district courts are bound to apply *Winter Storm* to attachments of EFTs.

n43 *Aqua Stoli, 460 F.3d at 446 n.6.*

Finally, as to the third prong, an immediate appeal here would advance the ultimate termination of the litigation because if Schahin prevails on appeal, the Rule B attachment will be vacated, which, as noted    [*314]

above, the parties do not dispute will result in the termination of this litigation. [**22]

**IV. CONCLUSION**

For the reasons set forth above, Schahin's motion to vacate the Attachment Order is denied in its entirety, but Schahin's request for leave to seek an interlocutory appeal of that denial is granted. The Clerk of the Court is directed to close these motions [Nos. 29 and 36 on the Docket Sheet].

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

February 13, 2007

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

NAVALMAR (U.K.) LTD.,              :

                    Plaintiff,  :

    -against-           :

                            :

WELSPUN GUJARAT STAHL ROHREN, LTD.,  :

                  Defendant.  :

------------------------------------------------------------ x

**ORDER GRANTING MOTION TO
CERTIFY FOR
INTERLOCUTORY APPEAL
PURSUANT TO 28 U.S.C.
§ 1292(b)**

07 Civ. 372 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        On January 17, 2007, Plaintiff Navalmar (U.K.) Ltd. ("Navalmar") filed a

complaint in this court against defendant Welspun Gujarat Stahl Rohren, Ltd. ("WGSR") and

moved immediately and ex parte, pursuant to Rule B of the Supplemental Rules for Certain

Admiralty and Maritime Claims, Fed. R. Civ. P. to attach and garnish the property of the

defendant in this district. I granted the motion and issued an order of attachment.

        On February 7, 2007, WGSR moved to vacate the attachment, pursuant to Rule E

of the Supplemental Rules for Certain Admiralty and Maritime Claims, Fed. R. Civ. P.  By

opinion and order of April 24, 2007, I denied Defendant's motion to vacate. See Navalmar

(U.K.) Ltd. v. Welspun Gujarat Stahl Rohren Ltd., No. 07 Civ. 372, __ F. Supp. 2d __, 2007 U.S.

Dist. LEXIS 29789, 2007 WL 1200067 (S.D.N.Y. 2007).  At a status conference before me on

May 11, 2007, Defendant requested an order certifying my order of April 24, 2007 for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  Plaintiff opposed the request.  For the

reasons that follow, Defendant's request is granted, and I hereby certify my order denying

Defendant's motion to vacate for interlocutory appeal.

        As described in the opinion and order of April 24, 2007, Plaintiff Navalmar

brought this action against WGSR pursuant to 9 U.S.C. § 8, in aid of Navalmar's claims against

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/14/07

WGSR in a London arbitration. The parties continue to litigate the merits of their claims in

London, and in Aden, Yemen, not in this Court. Indeed, nothing remains to litigate in this Court

with respect to this case. Thus an interlocutory appeal of this case implicates none of the

concerns typically associated with interlocutory appeals—that it would "prolong judicial

proceedings, add delay and expense to litigants, burden appellate courts, and present issues for

decisions on uncertain and incomplete records, tending to weaken the precedential value of

judicial opinions." In re World Trade Ctr. Disaster Site Litig., 469 F. Supp. 2d 134, 144

(S.D.N.Y. 2007) (citing Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996)). In

addition, those who litigate maritime claims in this Circuit will benefit, should the Court of

Appeals for the Second Circuit accept jurisdiction, from a clarification of the law governing the

issues raised by the parties in this action.

       The parties shall submit a joint letter to the Court every 90 days after the date of

this Order, providing an update on the status of this case and its related proceedings, including

the proceedings in London and Aden, and the status of any appeals.

       SO ORDERED.

Dated:     May __13__, 2007
           New York, New York

                            ALVIN K. HELLERSTEIN
                          United States District Judge