CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Defendant,
Agrocorp International Pte. Ltd.
366 Main Street
Port Washington, New York 110050
Telephone:     516-767-3600
Telefax:        516-767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PRESTIGIOUS SHIPPING CO. LTD.,                      :
                                                    :
                                                    :
                    Plaintiff,                      :        07 CV 7101 (CM)
                                                    :
        - against -                                 :
                                                    :
                                                    :
AGROCORP INTERNATIONAL PTE. LTD.,                   :
                                                    :
                                                    :
                    Defendant.                      :
-------------------------------------------------------------x


**ATTORNEY'S REPLY AFFIDAVIT**
**IN SUPPORT OF DEFENDANT AGROCORP'S**
**MOTION FOR COUNTER-SECURITY**
**PURSUANT TO SUPPLEMENTAL RULE E(7)**

State of New York    :
                     :ss.
County of Nassau     :

Owen F. Duffy, being duly sworn, states under penalty of perjury as follows:

1.    I am a member of the Bar of the State of New York, and I am admitted to practice before this Court.

2.    I am a member of the firm of Chalos, O'Connor & Duffy, LLP, attorneys for the Defendant AGROCORP INTERNATIONAL PTE. LTD., (hereinafter "Agrocorp"), in this action.

3.    I am fully familiar with the matters set forth in this affidavit, and my knowledge of the matters set forth in this affidavit is based on information provided to me by Defendant Agrocorp, its agents and attorneys and my own independent research.

4.    I submit this affidavit for the purpose of setting forth additional facts and introducing evidence in Reply to the Opposition of  Plaintiff PRESTIGIOUS SHIPPING CO. LTD. (hereinafter "Prestigious") to Agrocorp's Motion for Counter-Security Pursuant to Supplemental Rule E(7).


## ADDITIONAL EVIDENCE

5.    Attached hereto as Exhibit 1 is a claim letter from third party East West Trading to Defendant Agrocorp dated August 2, 2006, stating that East West Trading is debiting the account of Agrocorp in the sum of $1,205,016.30 because of the breach of the settlement agreement by Prestigious and a Debit Note attached thereto showing a present debt and detriment to the position of Agrocorp.

## TIMELINE

6.    Plaintiff Prestigious, in an attempt to have this Court rule on the merits of

this matter, presents a self-serving highly distorted timeline in its Memorandum of Law at

page 8 with relevant events left out.  As such, please find a timeline with certain relevant

events inserted and notated by italics. The sections not italicized are exactly as recited by

Plaintiff Prestigious with citations omitted.

- *The M/V PRESTIGIOUS arrives in Chittagong, Bangladesh with a sugar cargo much of which is infected with sea water, resulting in substantial delays in the discharge of both the uninfected and the infected sugar.  See, Affidavit of Duffy in Support of Motion to Vacate Attachment dated August 30, 2007, Points of Defence at ¶ 11.*

- *Prestigious settles claims in August of 2005 regarding the sugar cargo infected with sea water that prevented discharge of all cargo for several months.  See, Exhibit 1 attached hereto.*

- The ship completes discharge of the sugar cargo in November 2005.

- *By letter dated June 30, 2006, Prestigious breaches the settlement agreement reached in August of 2005 and now threatens actions against third party East West Trading.  See, Exhibit 1 attached hereto.*

- *East West Trading debits the account of Agrocorp in the amount of $1,205,016.30 by letter dated August 2, 2006.  See, Exhibit 1 attached hereto.*

- Prestigious Shipping demands arbitration of its claim in September 2006.

- Prestigious Shipping serves its Points of Claim in March 2007.

- Agrocorp serves its Points of Defence in May of 2007.

- Prestigious Shipping attaches Agrocorp funds in New York in August 2007.

- *Agrocorp moves to vacate the attachment, specifically reserving its right to amend its pleadings to assert a counterclaim. See, Affidavit of Duffy in Support of Motion to Vacate Attachment dated August 30, 2007, at ¶ 32.*

- The Court denies Agrocorp's motion to vacate the attachment in September 2007.

- Agrocorp asserts counterclaims in the London and New York proceedings in September 2007.

3

- *Prestigious attaches additional funds on October 1, 2007, making the total amount of funds belonging to Agrocorp restrained in this matter $2,160,761.06. See, Affidavit of Foster in Opposition to Motion for Countersecurity at ¶ 2.*

- Agrocorp moves for $2.3 million in countersecurity in October 2007.

## PRESTIGIOUS' ARGUMENT THAT A PORTION OF AGROCORP'S COUNTERCLAIM IS TIME-BARRED

7.     Prestigious requests that this Court reject Agrocorp's request for counter security on claim that are "plainly" time-barred. *See,* Plaintiff's Memorandum of Law in Opposition to Motion for Countersecurity at page 9.

8.     Prestigious overstates its point on the time-bar issue because the merits of the claims, including the claim of time-bar, will be decided by the arbitrators in London.

9.     To the extent that Prestigious has chosen not to respond to the merits of Agrocorp's counterclaim and moved to strike the counterclaim, the Defendant Agrocorp sharply disagrees with the Plaintiff and has presented the argument in support of its disagreement to the London arbitrators.

10.    Attached hereto as Exhibit 2, and as has been submitted to the London Arbitration Tribunal on October 23, 2007, is a true copy of Agrocorp's response to the Plaintiff's application to strike the counterclaim.

11.    As set forth in Exhibit 2, it is self-evident that the Agrocorp counterclaims are not "plainly" time-barred because the Defendant Agrocorp has presented several arguments to demonstrate the that the time bar provision of the charter party has to be construed strictly because it is an exclusion clause and it is inapplicable to the counterclaim because the cargo at issue was not discharged as would normally be

4

expected and because the time bar provision only applies to claims arising from an express, as opposed to an implied, breach of the charter party. *See*, Exhibit 2 at ¶s 3 to 11.

12.    Separate and apart from the applicability of the time bar provision in the charter party, the defendant Agrocorp maintains that the conditions requiring notice of claims were, in fact, satisfied because the claims were repeatedly brought to the notice of Prestigious and Prestigious clearly acknowledged that it was in breach of the charter party and admitted liability for same. *See*, Exhibit 2 at ¶s 12 to 19.

13.    In any event, and as Plaintiff Prestigious clearly accepts, the question of whether the defendant Agrocorp's counterclaims are time-barred is an issue for the arbitrators to decide and, therefore, it cannot be said that the Agrocorp counterclaim is frivolous.

## CONCLUSION

14.    Under these circumstances, where counterclaims arise from the same transactions as the Plaintiff's claims, the counterclaims are not frivolous and requiring counter-security will not prevent the Plaintiff from bringing suit, this court should, pursuant to Rule E (7) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, issue an order to place the parties on an equal footing regarding security for their claims.


Dated: Port Washington, New York
       October 26, 2007



_____
Owen F. Duffy

Subscribed and sworn to before me this
October 26, 2007

_George E. Murray_

Notary Public, State of New York

GEORGE E. MURRAY
Notary Public, State of New York
No. 02MU6108120
Qualified in New York County
Commission Expires April 12, 2008

# EXHIBIT 1

# East West Trading

34 Chand Meah Lane, Khatungonj,
Chittagong, Bangladesh.

Ref : AGC-Prestigious-1/06

Date : 02-08-2006

AGROCORP INTERNATIONAL PTE LTD.
HEX 2201/02 CHINATOWN POINT,
133 NEW BRIDGE ROAD, SINGAPORE 059413

Dear Sir,

Due to your intervention inspite of the heavy losses wehad to incurred due to to the various delays and consequences of water ingress into the vessel M. V. Prestigious, we had settle the matter with owners as per their agreement dated 07-08-2005.

However instead of appreciating our stand in settling the matter amicably the owners have sent the attached letter dated June 30-06-2006 claiming that they have settled in protest and have also spoiled our name by making complaints to various organizations in Bangladesh including the CHAMBER of Commerce.

We therefore consider that they have breached the agreement and since you are contracting party, we would like to revert our original claim and we have no other choice but to debit the same to your account.

Statement of accounts as follows :

AA
----

| | |
|---|---|
| Our original Claim as per our debit note dated 14-06-2005 | USD 21,75,166.30 |
| Less settled at | USD 11,00,000.00 |
| Balance to receive from you | USD 10,75,166.30 |

BB
----

| | |
|---|---|
| Additional damage in Hold No. 3 for | USD 6,29,850.00 |
| Settled at | USD 5,00,000.00 |
| Balance to receive from you | USD 1,29,850.00 |

Total amount receivable from you AA + BB = 12,05,016.30

Please find our debit note as attached.

Thanking you

Sincerely yours.
M/S. EAST WEST TRADING,

East West Trading. Proprietor.

# East West Trading

34 Chand Meah Lane, Khatungonj,
Chittagong, Bangladesh.

Ref : AGC/001-06
Date : 02-08-06

## DEBIT NOTE

Agrocorp International Pte Ltd.
# 22 0/02 Chinatown, 133 New Bridge
Road, Singapore 059413

| PARTICULARS | US DOLLAR |
|---|---|
| Being the amount charged as : | |
| Balance amount receivable from Agrocorp Int'l Pte Ltd. for damage of cargo in Hold No. 3 for breach of agreement by the owner of the vessel. | 10,75,166.30 |
| Amount receivable from you for damage Cargo in Hold No. 1 | 1,29,,850.00 |
| (US DOLLARS ONE MILLION TWO HUNDRED FIVE THOUSANDS SIXTEEN and CENTS THIRTY ONLY) | |
| | 12,05,016.30 |

For, EAST WEST TRADING.
M/S. EAST WEST TRADING.

Proprietor.

## Universal Navigation Pte Ltd

3 Shenton Way, 11-04 Shenton House
Singapore 068805

Tel: 63241466        Fax: 63244450        Tlx: 24974 UNINGN RS
Email: uninav@pacific.net.sg

June 30, 2006

To: East West Trading, Chittagong
To: Musa and Sons, Chittagong
Cc: Mutual Shipping, Chittagong
Cc: Mr Safiuzzaman Chowdhry, President, Chittagong Chamber of Commerce
and Industry.

Dear Sirs,

Re: M/V Prestigious – Chittagong

We refer to the above matter where we, under protest, were made to pay you the
sum of US$1.1 million plus a further US$500,000.00 for the discharge of the
damaged cargo and release of the vessel from further delays at Chittagong.

You would recall that during the discussions we had to resolve the outstanding
dispute between the parties, you had insisted that we pay you compensation on
the basis of the invoiced value of the cargo which you say was US$318.00 per
metric ton. We repeatedly protested and highlighted to you at the material time
that the value of the cargo you declared to the Bangladeshi Customs was
US$179.00 per metric ton and not US$318.00 per metric ton.

In the premises, your assertion and insistence that the compensation payable
must be pegged to US$318.00 per metric ton is not only improper and
inequitable but also in blatant disregard of the applicable laws in Bangladesh.

You are well aware that, under Bangladeshi law, the level of compensation
payable for the subject incident should be no more than the invoiced value of the
cargo as declared to the Bangladeshi Customs. Despite being fully aware of the
above, you continued to insist that we pay you compensation on a basis which
does not conform to Bangladeshi law. Your conduct at the material time had
placed us under extreme and unfair pressure compelling us to accept your
inequitable terms of compensation. You made no secret of your intention to
delay the departure of the vessel from Chittagong unless we agree to your terms.
Your above conduct had caused the vessel to be delayed at Chittagong for more
than six (6) months. We had, at the material time, no option but to accede to
your unfair and unconscionable demands.



REF: 105118-DWS 30-06-2006/15:36:50    FAX NO.    Jun 30 2006 01:00PM P2

We now write to you to put you on notice that unless you reimburse us, the excess monies you compelled us to pay you at the material time, we will take immediate steps to bring this matter to the relevant authorities in Bangladesh including but not limited to the Bangladesh Customs Department and the Chamber of Commerce in Dhaka. A breakdown of the reimbursement demanded is provided in Schedule I attached hereto.

Unless we hear from you within the next 7 days, expressly confirming that you will reimburse the sum provided in Schedule I, we will proceed to bring this matter to the relevant authorities in Bangladesh without further reference to you. We will also ask Bangladeshi lawyers to commence proceedings against you in the Bangladeshi Courts to recover the said sums.

Until then, all our rights in this matter are hereby expressly reserved.

Best regards,

*(signature)*

*(company stamp: UNIVERSAL NAVIGATION PTE LTD SINGAPORE)*

Universal Navigation Pte Ltd
For and on behalf of owners
As agents only

## SCHEDULE I

**Cargo Claim Hold No. 1**

Invoice value USD 179 x 3805 mt = 681,095.00

Settled at USD 1,100,000.00

Sum to be reimbursed = USD 418,905

**Cargo Claim Hold No. 3**

Invoice value USD 179 x 1104 mt = 197,616.00

Stevedoring, Lightening cost agreed at = 19,872.00

Customs duty paid = 255,024.00

Total claim = 472,512    settled at USD 500,000.00

Sum to be reimbursed = USD 27,488.00

**Damages due to delays**

Vessel remained extra days in Port = 146.43 days @ USD 10,000 per day = USD 1,464,300.

Lump sum claim at USD  700,000 for settlement.

**TOTAL SUM TO BE REIMBURSED: USD 1,146,393.00**



# M/s. EAST WEST TRADING
### (IMPORTER, COMMISSION AGENT & ORDER SUPPLIER)
### 34, Chand Meah Lane, Khatungonj, Chittagong, Bangladesh.

June 14, 2005

**UNIVERSAL NAVIGATION & TRADING PTE LTD.**
3, SHENTON WAY, 11-04, SHENTON HOUSE,
SINGAPORE-068805

## Claim Bill

Bill No: EWT/2005/102

| Description | AMOUNT IN USD |
|---|---|
| AS PER SURVEY REPORT DAMAGE OF 3805.000 MT OF BAGGED SUGAR IN HOLD NO. 1 EX. M.V. "PRESTIGIOUS" ROT NO. 874/05, LINE NO. MSL-13 TO MSL-16 AGAINST B/L NO. S-13 TO S-16, PURCHASE PRICE @ USD. 330.00 PER MT. EXCHANGE RATE 1 USD = BDT.64.6500 SHIPPER: M/S. AGROCORP INTERNATIONAL PTE LTD., SINGAPORE CONSIGNEE: M/S. EAST WEST TRADING, CHITTAGONG. | |
| PURCHASE PRICE OF 3805 MT. @ USD 330.00 PER MT. | 12,55,650.00 |
| CUSTOM DUTY @ 74.6844 % TO BE PAYABLE AS PER CUSTOM VALUE @ USD 275.00 PER MT | 7,93,951.30 |
| BANK INTEREST, LC COMMISSION, INSURANCE & CPA CHARGES @ 10% ON USD 12,55,650.00 | 1,25,565.00 |
| **TOTAL** | **USD 21, 75,166.30** |
| In Ward: USD. (TWENTY LAC SEVENTY THOUSAND ONE HUNDRED SIXTY SIX AND CENTS THIRTY) ONLY. | |

For East West Trading

As Importer,

21/09/2006

# EXHIBIT 2

# Haridass Ho & Partners

ADVOCATES & SOLICITORS ● COMMISSIONERS FOR OATHS ● NOTARIES PUBLIC

24 RAFFLES PLACE,
#18-00 CLIFFORD CENTRE,
SINGAPORE 048621

TEL:   6533 2323
FAX:   6533 7029 (Not for service of court)

mail@hhp.com.sg  |  www.hhp.com.sg

OUR REF:   RS/55420/2007/sz

YOUR REF:   Please advise if any

Writer's email: srivathsan@hhp.com.sg

Writer's Direct Dial: 6230 1180

23 October 2007

Mr Clive Aston
30 Hobbs Road
2 Jacob Street
London SE1 2 BG

Fax + 44 207 0641633 & Post

Mr Sarosh Zaiwalla
c/o Zaiwalla & Co
46/47 Chancery Lane
London WC2A 1JE
United Kingdom

Fax 44207 4049473 & Email

Dear Sirs

**MV PRESTIGIOUS NOW KNOWN AS MV VICTORY 2**

We refer to the letter from Joseph Tan Jude Benny dated 26th September 2007 enclosing the Claimants' application to strike out the Respondents' Counterclaim ("the Application").

This letter serves as the Respondents' response to the Application.

**No challenge to the Amended Defence**

1.   The Respondents first note and highlight that the Claimants have not raised any issue with the amendments to the Defence. The amendments plead the fact that the vessel was unseaworthy and that as a consequence the cargo was damaged whilst on board. These amendments are not the subject of the Application.

**Background & the Rule B Attachment**

2.   In relation to the Claimants' narration of the background (at paragraphs 3 to 9 of the Application), the Respondents state as follows:

(i)   The ex-parte order referred to in paragraph 7 was obtained by the Claimants without any prior notice to or even a request for security being made to the Respondents (For avoidance of doubt, the Respondents maintain that the Claimants are not entitled to any security at all). The practice of the US courts is also to not to examine the merits of the



claimants claim but rather to rule on the application based purely on procedural considerations.

(ii)    The Respondents did apply by a Motion to the New York District Court to vacate the order.  However, the District Court Jude dismissed this Motion for reasons which the Respondents disagree with.

(iii)   The Respondents then attempted to appeal the Judge's order dismissing the Motion to vacate.  Under the Rules in the US, the Respondents had to seek the leave of the Judge who dismissed the Motion to Vacate, before filing the necessary appeal papers.  For reasons not explained by the Court, the Judge in question refused leave outright without hearing arguments that the Respondents' counsel intended to advance.  In the circumstances, the Respondents were denied leave to appeal and were in effect denied any further access to the Courts in the US to advance their contentions as to why the attachment was wrong in the first place.

(iv)    In this regard, we highlight that this particular form of attachment, called a Rule B attachment, has attracted considerable criticism both in the US and otherwise.  It is in the Respondents' humble view, a draconian process that is purely used by parties to bear pressure on an opponent by freezing the opponent's funds as security when security would otherwise not be ordered by the tribunal or forum which has jurisdiction to rule on the merits of the claim.

        See: http://www.gard.no/gard/Publications/GardNews/RecentIssues/gn182/art_15.htm

(v)     This background is relevant.  We urge this Tribunal to understand that the Respondents now find themselves in a position where their funds in excess of US$2 million are now attached pursuant to the actions of the Claimants and the Respondents have now absolutely no recourse to the Court system in the US for relief.

## The Time-Bar Clause: Clause 30 of the Charterparty .

3.    With reference to paragraphs 10 and 11 of the Application, the Respondents submit that their counterclaim is not time barred because:

i.    Clause 30 has no application on the facts of this case;

ii.   Alternatively, even if the clause applies, it has in fact been satisfied on the facts of this case

We now explain this position below.

## Clause 30 inapplicable: strict interpretation of the clause

4.    Clause 30 must be construed strictly because it is effectively an exclusion clause.

      See: *Exclusion Clauses and Unfair Contract Terms* by Richard Lawson, 8th ed, page 68.

5.    Reading Clause 30 strictly, it is limited by requiring claims to be notified to the Owners within 12 months *". . . from completion of discharge of the appropriate cargo . ."*. [emphasis added]

6.  To the extent that the claims arose as a consequence of damage to a part of the bagged sugar which was **ultimately dumped at sea and not discharged at port**, we submit that Clause 30 does not operate because all of the cargo was not discharged as would normally be expected. We rely on <u>Denny, Mott & Dickson, Ltd v. Lynn Shipping Co., Ltd.</u> LLR [1963] 1 345 in support and refer in particular to the following extract from the Judgment of Megaw J at p 345 of the report *"If the cargo or the part of it covered by a particular bill of lading, can never be discharged because it has been lost, then the provisions of Clause 32, incorporated into the bill of lading, so far as they relate to a time limit for commencing arbitration and to the consequences of a failure to observe the time limit, have no application. The rest of Clause 32 applies."*

7.  Further, we also submit that the cargo affected by sea water was no longer bagged sugar cargo but was in fact sugar syrup which was ultimately dumped at sea. Therefore there was never a point in time when the cargo (i.e. the entire lot of bagged sugar) was discharged from the vessel.  Only a part of the cargo was discharged. The remainder was no longer bagged sugar because of the effect of sea-water and it was dumped at sea.

8.  In addition, we also rely on *Atlantic Shipping & Trading Co* v.  *Louis Dreyfus & Co* [1922] 2 A.C. 250 for the submission that a time-bar clause, such as is found in this case, only applies to claims arising out of a breach of an **express** as opposed to an **implied** term of the charterparty. The duty of seaworthiness in this case is not expressly provided for and as such it is an implied term of the charterparty.

9.  On facts similar to those before this Tribunal, the House of Lords in *Atlantic Shipping & Trading Co* held that the charterer's claim for damage to a cargo of linseed due to unseaworthiness of the vessel at the commencement of the voyage was not time-barred.

10.  Lord Sumner's speech at page 260 and 261-262 of the Report is relevant. At page 260, His Lordships said:

    *"The Shipowners' general liability in respect of damage due to the ship's unseaworthiness, accordingly, remains where the law places it.  Underlying the whole contract of affreightment there is an implied condition upon the operation of the usual exceptions from liability – namely, that the Shipowners shall have provided a seaworthy ship. If they have, the exceptions apply and relieve them ; if they have not, and damage results in consequence of the unseaworthiness, the exceptions are construed as not being applicable for the shipowners' protection in such a case."*

11.  Further, at page 261, His Lordship referred to clause 39 of the charterparty before the House and said:

    *"My Lords, in principle I think that clause 39, in so far as the parties, as it was said, provided that their own stature of limitations, is unavailable to the shipowners as an answer to a claim for damage caused by unseaworthiness.  It does not make any difference that the time allowed is considerable or the formality to be complied with not unreasonable, or that the clause, being a mutual clause, might apply to protect the charterers in certain events, for example, against a claim for demurrage.   The effect is not the clause is deleted from the charter altogether.   The shipowners gain no*

*advantage against the charterer from their neglect to make the ship seaworthy; they merely cannot pray the clause in aid in that case. Nor are the words in question inapplicable because they occur in a mutual arbitration clause and are partly procedural. Even if they read as meaning, "I will be liable for three months and no longer and then only in an arbitration" – they still remain words, which except out of the shipowners' general liability certain losses – namely, losses the assertion of which is belated".*

*There is the further contention that a clause relieving a shipowner from damage to cargo caused by breach of the condition as to seaworthiness, to be effected <u>must be clear</u>.*

### Clause 30 Satisfied In Any Event

12. If the Tribunal finds that Clause 30 can and in fact applies to the counterclaim, then the Respondents submit that it has in fact been satisfied.

13. The crux of the Claimants' application is that they were not given notice of the claims which now form the basis if the counterclaim. This is factually incorrect.

14. The Respondents and their receivers duly and clearly notified the Claimants of the claims which arose as a direct consequence of the Claimants' breach (i.e. the unseaworthy vessel and damage to the cargo). In this regard, the Respondents refer to the following correspondences sent to the Claimants and/or their agents Universal Navigation Pte Ltd, between 15th and 16th June 2005 (attached)

    i. Fax dated 15th June 2006 from East West Trading (the receiver) to Universal Navigation (the Claimant's agents). The receiver's Claim Bill on account of the damaged cargo was also attached.

    ii. Email from the Respondents to the Claimants dated 16th June 2006.

15. The fact that losses were incurred as a result of the Claimants' breach was clearly notified to the Claimants well before the discharge was completed.

16. In this regard, it is necessary to appreciate that Counterclaim is based on and arises out of the Claimants' breach consequent upon damage to the cargo which was a direct result of the unseaworthiness of the vessel.

17. Clause 30 of the Charterparty requires claims to be notified to the other party and this was clearly done both by the Respondents and also by the Respondents.

18. The fact that the Claimants were so notified and that they in fact admitted liability for their breach is evidenced by the Settlement Agreement dated 7th August 2005. This Settlement Agreement acknowledges losses suffered as a consequence of the damaged cargo.

19. Therefore, we submit that clause 30 of the Fixture Note was duly satisfied because the claims were clearly and repeatedly brought to the Claimants notice. And the Claimants clearly admitted liability for their breach.

## Conclusion

20.     For the above reasons, we submit that the Claimants' application must be
        dismissed with costs.

Yours faithfully

**R Srivathsan**

Cc      1.      Joseph Tan Jude Benny (Fax: 62257827) Ref: 2006155418JB/SA/hh
        2.      Clients Attn: Mr Ravi / Mr Vijay

# Exclusion Clauses and Unfair Contract Terms

*Eighth Edition*

## Richard Lawson LLM PhD
### Independent Consultant in Marketing Law



THOMSON

™

SWEET & MAXWELL

possibility of finding electric boilers to be used in the flats. Following a number of discussions and meetings, he purchased through them boilers manufactured by Amptec. The essence of the problem which later led to the litigation was that the boilers had an unsatisfactory Standard Assessment Procedure. This is designed to provide home energy ratings for domestic properties. It was held that the goods supplied were neither of satisfactory quality nor reasonably fit for their purpose.

The contract contained this clause:

> "The Company shall not be liable for any consequential loss or indirect loss suffered by the Customer or any third party in relation to this contract (except personal injury directly attributable to the negligence of the Company) and the Customer shall hold the company fully and effectively indemnified against such losses whether arising from breach of a duty in contract or loss in any way including losses arising from the Company's negligence".

Referring to *Hadley v Baxendale*, the court said that, given that the claimant in this case had full knowledge of the intended purpose of the boilers, and of the possible consequences of an unsatisfactory SAP rating, the damage suffered by the defendant arose naturally from the breach and could not be regarded as consequential.

In *Leicester Circuits Ltd v Coates Bros plc*,[32] a clause excluded liability for "consequential or incidental damage of any kind whatsoever . . .including without limitation any indirect loss or damage such as operating loss, loss of clientele . . ." This was held not to exclude liability for loss of profit since, in the circumstances of the case, this would have been within the reasonable contemplation of the parties and hence within the first limb of the rule in *Hadley v Baxendale*.[33]

**Imposing time limits**

**2.12**  Clauses which require proceedings to be commenced, or defects to be notified, within a certain time are interpreted strictly. In *Atlantic Shipping and Trading v Louis Dreyfus & Co*,[34] a clause in a charterparty required a claim to be made, and an arbitrator appointed, within three months of final discharge. This was held only to apply to the express terms of the contract and not to those implied by law. It has been maintained that there is:

---

[32] [2003] EWCA Civ 333.

[33] The court expressly approved *Croudace Construction v Cawoods Concrete Products*, above n.121. See too *The Simkins Partnership v Reeves Lund & Co Ltd* [2003] EWHC 1946, *Robertson Group (Construction) Ltd v Amey Miller* [2005] CSOH 60. See too *Pegler Ltd v Wang (UK) Ltd*, [2000] EWHC 137, where a clause excluding liability "for any indirect, special or consequential loss, however arising, including . . . loss of anticipated profits . . . in connection with or arising out of the supply, functioning or use of (the goods or services supplied) was loss under the second limb of *Hadley v Baxendale* and hence did not cover loss whereas the loss claimed fell under the first limb. A claim for loss of profits was not within the clause since that clause only covered loss of profits falling within the second limb.

[34] [1922] 2 AC 250.

SOME SPECIAL EXCLUSION CLAUSES

"no reason why [such clauses] should not be drafted so as to apply to even the most serious breaches, for (unless the period is so short that they effectively bar a right altogether) they do not exclude liability, they simply require that buyers take vigilant steps to finalise the transaction."

### Excluding the right to reject

**2.13**   Where clauses purport to exclude an otherwise existing right to reject the goods, it is clear enough that they do not of themselves exclude the right to damages.[35] Since the right to reject does not exist in relation to a breach of warranty, it is supposed that the effect of such clauses is to indicate that the terms to which they apply are warranties, not conditions. This is supported by *Re Walkers, Winser & Hamm and Shaw*,[36] in which such a clause was said to prevent an implied condition arising, and to render it a warranty instead.

### Relevance of contract description

**2.14**   It seems to be established that certain exclusion clauses only operate where goods of the contract description have been supplied. A clause excluding the right to reject the goods "herein specified" is effective only when the goods "herein specified" have in fact been supplied, but not when the goods do not conform with their description. In *Aron & Co v Comptoir Wegimont*,[37] the clause ran: "whatever the difference of the shipment may be in value from the grade, type or description specified, it is understood that any such question shall not entitle the buyer to reject the delivery . . .". It was held that the terms as to shipment were independent and not part of the description so that rejection was still allowed.

### Arbitration

**2.15**   The Arbitration Act 1996, provides that the Unfair Terms in Consumer Contracts Regulations shall apply to a term which constitutes an "arbitration agreement".[38] This is a reference to "an agreement to submit to arbitration present or future disputes or differences (whether or not contractual)".[39] Section 91 of the Act says that an agreement is unfair for the purposes of the Regulations so far as it

[35] *Benjamin's Sale of Goods* (6th ed., 2002), para.13–031.
[36] [1904] 2 K.B. 152 [1921] 3 K.B. 435.
[37] [1921] 3 K.B. 435.
[38] Arbitration Act 1996, s.89. For the Unfair Terms in Consumer Contracts Regulations 1999, see Ch.10.
[39] Arbitration Act 1996, s.89(2).

69

# LLOYD'S LIST
# LAW REPORTS

Editor :

## E. S. MATHERS
of the Middle Temple, Barrister-at-Law

# 1963
# Volume 1

PRINTED AND PUBLISHED BY LLOYD'S

AT LLOYD'S, LONDON, ENGLAND

1963

Denny, Mott & Dickson, Ltd. v. Lynn Shipping Co., Ltd.     [1963] Vol. 1

judges who have considered these matters below. To acquiesce in such an attempt as the appellants have made in this case is in effect to undertake decisions which may be of the highest importance without having received any assistance at all from the judges in the Courts below.

The Lord Chancellor went on to say that there might be very exceptional cases where new matters might be considered, but their Lordships do not regard this case as requiring such exceptional treatment.

Accordingly, their Lordships will humbly advise Her Majesty that this appeal be dismissed, subject to a variation in the amount of damages which by an oversight have been wrongly assessed.

The case presented by the respondent was at all times limited to compensation for the loss of his stock-in-trade although the plaint covered loss of furniture also. Under the policy the stock-in-trade was insured for 40,000s. and the furniture for 10,000s. The evidence of Mr. Patel accepted by the learned Judge as the basis of the assessment of damages related to stock-in-trade only and gave its value on Apr. 9, 1956, as 50,611s. 12 cents. The value of the salved goods was given by another witness as approximately 3729s. 25 cents and judgment was entered for the amount claimed 46,270s. 75 cents (as being a reasonable sum) with interest and costs. Since the claim, save in the formal pleadings, never in fact related to the furniture, the ceiling of the policy, which was subject to an average clause, was 40,000s. and not 50,000s. and the amount of damages must be altered from the sum awarded to 37,035s., with interest at the rate fixed by the learned Judge.

Notwithstanding this variation in the figure of damages, which their Lordships think must in justice be made, the appellants must pay the respondent's costs of this appeal and of the petition for leave to adduce further evidence.

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

### Apr. 23 and 24, 1963

---

### DENNY, MOTT & DICKSON, LTD., AND OTHERS v. LYNN SHIPPING COMPANY, LTD.

#### Before Mr. Justice Megaw

Carriage by sea — Limitation of action — On-deck and under-deck cargo totally lost —Bills of lading incorporating Hague Rules and charter-party provision requiring arbitrator to be appointed " within twelve months of the date of final discharge "—Cargo-owners' claims against shipowners submitted to arbitration nearly two years after loss — Whether claims time-barred—Art. III, r. 6.

Bills of lading issued by respondent owners of steamship *Springdale* in respect of on-deck and under-deck cargo shipped on *Springdale* for delivery in London—Bills of lading incorporating Hague Rules, and Clause 32 of charter-party which provided (*inter alia*):

All claims must be made in writing and the Claimant's Arbitrator must be appointed within twelve months of the date of final discharge otherwise the claim shall be deemed waived and absolutely barred.

Art. III, r. 6, of Hague Rules provided that carrier was discharged from liability unless suit was brought within one year after delivery of goods or date when goods should have been delivered—Total loss of cargoes when *Springdale* sank on June 18, 1959—Submission of claims to arbitration by claimant indorsees of bills of lading against shipowners on June 17, 1961 — Denial of liability by shipowners; contending that claims were time-barred—Interim award by arbitrator (in form of special case) that on-deck cargo claims were not time-barred, but shipowners' liability for under-deck cargo had been discharged—Contention by shipowners that, as Hague Rules had no application to on-deck cargo, Clause 32 was effective to render claims time-barred in that arbitrator was not appointed within 12 months of date when cargo should have been discharged — Contention by cargo-owners that, where there was no final discharge of cargo, provisions of Clause 32 did not apply and six-year limit under Limitation Act, 1939, applied.

———*Held*, by Megaw, J., (1) that the mere inclusion of an arbitration clause in a bill of lading to which Hague Rules

[1963] Vol. 1]     **Denny, Mott & Dickson, Ltd. v. Lynn Shipping Co., Ltd.**

applied as a matter of contract did not deprive carrier of protection of time limit afforded by Art. III, r. 6; and that, therefore, shipowners' liability in respect of under-deck cargo was discharged; and (2) that, if cargo could never be discharged because it had been lost, then provisions of Clause 32, incorporated into bill of lading, so far as they related to a time limit for commencing arbitration and to the consequences of a failure to observe the time limit, had no application; and that, therefore, on-deck cargo claims were not time-barred.

————*Son Shipping Company, Inc. v. De Fosse & Tanghe, et al.,* (1952) 199 F.2d 687, at variance with English law.

————Carver's Carriage of Goods by Sea, 10th ed., p. 191, 3n. said to be incorrect.

————

The following case was referred to:

Son Shipping Company, Inc. v. De Fosse & Tanghe, *et al.,* (1952) 199 F.2d 687; (1952) A.M.C. 1931.

————

This was a special case stated in the form of an interim award by an arbitrator, Mr. Ashton Roskill, Q.C., in a dispute between Lynn Shipping Company, Ltd., the respondent owners of the steamship *Springdale,* and the claimant owners of cargoes of timber on board the *Springdale,* which sank on June 18, 1959, with the loss of her cargo. The claimants were Denny, Mott & Dickson, Ltd.; W. W. Howard Brothers & Co., Ltd.; James Latham, Ltd.; Morgan & Son, Ltd. (trading as William Ridley & Sons); E. Sherry, Ltd.; and W. C. Ware & Sons, Ltd.

The vessel was carrying the timber from Munksund, Sweden, to London. The claimants, all British timber companies, were indorsees of the respective bills of lading. They claimed damages for loss of the timber. The respondents denied liability.

In his interim award in the form of a special case, Mr. Ashton Roskill, Q.C., said (*inter alia*):

" 4. It was agreed by counsel for the Claimants and the Respondents that, for the purpose of this special Case and for such purpose only, it was to be assumed that the Claimants would be entitled to succeed unless their claims were time-barred or unless the liability of the

Respondents in respect thereof had been discharged, in the case of the deck cargo by virtue of the incorporation in the material Bills of Lading of clause 32 of the Charter-party and, in the case of the under deck cargo, by virtue of the incorporation in the material Bills of Lading of Article 3, Rule 6, of the Hague Rules and/or of the said clause 32.

" 5. For convenience of reference I set out the material part of clause 32 of the charterparty:—

32. . . .

All claims must be in writing and the Claimants Arbitrator must be appointed within twelve months of the date of final discharge otherwise the claim shall be deemed waived and absolutely barred.

" 6. Each of the material Bills of Lading provided as follows:—

All the terms, conditions, clauses and exceptions including Clause 32, contained in the said Charterparty apply to this Bill of Lading and are deemed to be incorporated herein.

GENERAL PARAMOUNT CLAUSE.

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels 25th August, 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from or limitation of liability.

" 7. It was conceded by counsel for the Respondents that, notwithstanding paragraph 6 of the Amended Points of Defence, the provisions of Article 3, Rule 6, of the Hague Rules (being the Rules referred to in paragraph 6 of the Amended Points of Claim and herein called 'the Hague Rules') were not incorporated in the Bills of Lading covering the deck cargo.

" 8. I find as a fact that the deck cargo and the under deck cargo should have been delivered in London on 28th June, 1959, and that none of the said cargo was delivered in London or elsewhere then or at all.

" 9. It was agreed on behalf of the Claimants and the Respondents that submission to my arbitrament should be deemed to have been made and that ' suit ' should be deemed to have been ' brought ' within the meaning of these words in Article 3, Rule 6, of the Hague Rules on 17th June, 1961.    Such agreement was without prejudice to the Claimants' contention that the third paragraph of Article 3, Rule 6, of the Hague Rules did not apply to cases in which proceedings were by arbitration.

" 10. It was further agreed on behalf of the Claimants and the Respondents that the provisions of the British Maritime Law Association Agreement of 1st August, 1950 (hereinafter called ' the Gold Clause Agreement ') should be regarded as accurately set out at pages 1078 to 1081 (both inclusive) of the 10th edition of Carver's Carriage of Goods by Sea and that the Claimants and the Respondents should for the purpose of this Special Case be deemed to be parties to the Gold Clause Agreement with clause 5 thereof deleted.

" 11. It was further agreed on behalf of the Claimants and the Respondents that the contracts of carriage evidenced by the material Bills of Lading were governed by English law.

" 12. As to the incorporation of Article 3, Rule 6, of the Hague Rules in the Bills of Lading covering the under deck cargo, counsel for the Respondents contended (*inter alia*) as follows:—

(i) The provisions of the third paragraph of Article 3, Rule 6, discharged liability if suit was not brought within one year after delivery of the goods or the date when the goods should have been delivered.    Since no " suit ", either by action or arbitration, had been brought within one year of the date when the under deck cargo should have been delivered (namely 28th June 1959), the Respondents were under no liability to the Claimants in respect of the loss thereof.

(ii) It was irrelevant whether or not " suit " included arbitration proceedings because if " suit " did not include arbitration proceedings, no " suit " had been brought within one year of the date (namely 28th June 1959) when the under deck cargo should have been delivered.

(iii) Alternatively where (as here) the provisions of Article 3, Rule 6, were incorporated in contracts of carriage of goods by sea each of which contained an arbitration clause (namely clause 32 of the charter-party as incorporated in each of the material Bills of Lading) " suit " meant, or included, arbitration proceedings because such proceedings provided the machinery for the resolution of contractual differences which the parties to the contracts had themselves selected.

(iv) The decision of the United States Court of Appeals, Second Circuit, in *Son Shipping Co. v. De Fosse & Tanghe*, (1952) 199 Fed. Rep. (2nd) 687, afforded no useful guidance to the meaning of the word " suit " in Article 3, Rule 6, of the Hague Rules incorporated (as here) in contracts of carriage of goods by sea governed by English law.    The critical examination of this decision by Mr. Justice Hewson in *The Elizabeth H*, [1962] 1 Lloyd's Rep. 172, was relied upon and the accuracy of Note 3 on page 191 of the 10th edition of Carver's Carriage of Goods by Sea was challenged.

(v) The third paragraph of Article 3, Rule 6, of the Hague Rules, discharged the liability of the carrier if no suit was brought within one year after delivery of the goods or the date when the goods should have been delivered.    Where (as here) there was a dispute whether liability was so discharged, the disputed issue was an issue for the arbitrator.

(vi) The statutory periods of time limitation applied to arbitrations (viz.: The Limitation Act, 1939, s. 27(1)).

(vii) The clause in the material Bills of Lading incorporating the Hague Rules was entitled " General Paramount Clause " and the title and terms of this clause showed that, if there was any repugnancy between the provisions of Article 3, Rule 6, and clause 32 of the charterparty (incorporated as aforesaid), the former prevailed.

" 13. As to the incorporation of clause 32 of the charterparty in the Bills of Lading covering the deck cargo and in those covering the under deck cargo, counsel for the Respondents contended (*inter alia*) as follows:—

Clause 32 imposed a time bar.    It also, if the necessary conditions were not fulfilled, discharged liability.    If the material words in clause 32 were construed

literally (namely if "final discharge" meant "actual final discharge") the requirements of clause 32 could never, in the circumstances of the present case, have been complied with and accordingly the Claimants' claim would be absolutely barred. The harsh absurdity of this consequence would, however, be avoided if "the date of final discharge" meant the actual date of discharge, where discharge took place, or, if no discharge took place, what was described by counsel for the Respondents as the "contractual date of discharge". It was implicit in every contract for the carriage of goods that the goods would be delivered in a reasonable time. Where, as here, there was no actual final discharge, the words, "the date of final discharge" meant the date on which the goods should have been discharged. On the facts the material date in this connection was 28th June, 1959. The material words in clause 32 operated, in the appropriate case, to bar claims by both parties to the contract. Here, the Claimants' claims were time-barred by reason of clause 32, both as regards the deck cargo and the under deck cargo, because the provisions of clause 32, construed as suggested, had not been complied with. Further or alternatively, for the same reason, the Respondents' liability in respect of the loss both of the deck cargo and of the under deck cargo was discharged.

"14. As to the incorporation of Article 3, Rule 6, of the Hague Rules in the Bills of Lading covering the under deck cargo, counsel for the Claimants contended (*inter alia*) as follows:—

(i) Article 3, Rule 6, had no applicability where (as here) the ship carrying the goods never reached a port of discharge.

(ii) Alternatively, where in a Bill or Bills of Lading the parties incorporated both the Hague Rules and an arbitration clause (as here in the case of the under deck cargo), the carrier was by necessary inference to be regarded as abandoning the protection which would otherwise be afforded by the provisions of Article 3, Rule 6. This, it was urged, was the effect of the decision in *Son Shipping Co. v. De Fosse & Tanghe, sup.*, and was so irrespective of whether or not the arbitration clause contained (as here) a time limit.

(iii) Alternatively, the word "suit" in the third paragraph of Article 3, Rule 6, could not be construed as including arbitration proceedings where (as here) the material arbitration clause contained a time limit. The parties had, by incorporating clause 32 of the charterparty in the Bills of Lading, contracted out of the Limitation Act, 1939, s. 27(1).

(iv) Alternatively, there was a conflict between clause so incorporated and the third paragraph of Article 3, Rule 6, of the Hague Rules. As a matter of general principle, where a contract contained two exceptions covering the same subject matter and one such exception was more favourable to the party relying upon it than the other, the less favourable exception fell to be applied to the exclusion of the more favourable exception. Therefore the provisions of clause 32 prevailed over those of Article 3, Rule 6.

"15. As to the incorporation of clause 32 of the charter-party in the Bills of Lading covering the deck cargo and in those covering the under deck cargo, counsel for the Claimants contended (*inter alia*) as follows:—

The Respondents' construction of the clause involved reading into the clause words which were not present. There was no justification for so doing. The time limit imposed by the clause applied only in cases where there had been final discharge, the date of which would then be known. There was no justification for putting a gloss upon the language of the clause in favour of the party which sought to rely upon it. In so far as the language of the clause was ambiguous it should be construed against the Respondents, who were relying on it. Alternatively, clause 32, on its strict construction, meant that the Claimants' claim was absolutely barred and/or that the Respondents' liability for the Claimants' loss had been discharged. If so, this result had been produced by the Respondents' breach of contract (assumed as stated in paragraph 4 hereof). But for this breach of contract there would have been final discharge both of the deck cargo and of the under deck cargo and there would then have been a date of final discharge within twelve months of which the Claimants could have made any claims in writing and appointed their arbitrator. The Respondents could not rely on the failure by the Claimants to appoint an arbitrator within the time limited by clause 32 since it had been the Respondents' breach of contract which made it impossible for any action to be taken under clause 32.

"16. Counsel for the Claimants disclaimed any contention that, by reason of the allegation in the first sentence of paragraph 7A of the Amended Points of Claim[*], the Respondents could not in law avail themselves of the time limitation provisions in clause 32 of the charterparty, incorporated as aforesaid.

"17. As to the incorporation of Article 3, Rule 6, of the Hague Rules in the Bills of Lading covering the under deck cargo, counsel for the Claimants contended alternatively that notice of the Claimants' claim with the best particulars available had been given within the period of twelve months pursuant to clause 4 (a) of the Gold Clause Agreement and that the Respondents were bound, under clause 4 of the said Agreement, to extend the time for bringing suit to a date two years from the date on which the Claimants' goods should have been delivered.

"18. With regard to the contentions set out in paragraph 17 hereof, counsel for the Respondents urged that notice of claim with the best particulars available as required by clause 4 (a) of the Gold Clause Agreement had not at any material time been given and/or that there had been undue delay on the part of the Claimants or their underwriters in obtaining the relevant information and formulating the claim. It was accordingly contended that the Respondents were not obliged, under clause 4 of the Gold Clause Agreement, to extend the Claimants' time for bringing suit.

"19. As to the contentions summarised in paragraphs 17 and 18 hereof, I find as a fact that notice of claim with the best particulars available was not given within the period of twelve months after 28th June, 1959, (the date when the cargo should have been delivered). I further find as a fact that there was undue delay on the part of the Claimants or of their underwriters in obtaining the relevant information and in formulating the claim. Subject to the opinion of the Court on the questions of law set out in paragraph 20 hereof, I hold that the Respondents were under no obligation to the Claimants under clause 4 of the Gold Clause Agreement to extend the time for bringing suit.

*7A. It was an implied term of such of the said bills of lading as related to deck cargo and were not subject to the said Law or Rules that the said vessel would be seaworthy at the beginning of the voyage. . . .

"20. The questions of law for the opinion of the Court, as agreed between the parties, are whether on the facts agreed, assumed and found and on the construction of the material Bills of Lading, the Charterparty dated 24th April, 1959, and the Gold Clause Agreement, the Claimants' claims in respect of

(1) the deck cargo and

(2) the under deck cargo

are time-barred and/or the liability of the Respondents in respect thereof has been discharged.

"21. Subject to the decision of the Court I AWARD AND DETERMINE that:

(1) the Claimants' claims in respect of the deck cargo are not time-barred and the liability of the Respondents in respect thereof has not been discharged;

(2) the liability of the Respondents for the Claimants' claim in respect of the under deck cargo has been discharged;

(3) each party do bear and pay its own costs of the hearing before me on 25th and 26th July, 1962 and that the Claimants and the Respondents do each bear and pay one half of the costs of this my Interim Award . . .

The arbitrator then went on to make alternative awards.

Mr. T. G. Roche, Q.C., and Mr. Andrew Bateson (instructed by Messrs. Richards, Butler & Co.) represented the respondents; Mr. H. V. Brandon, Q.C., and Mr. J. F. Willmer (instructed by Messrs. Clyde & Co.) appeared for the claimants.

## JUDGMENT

**Mr. Justice MEGAW:** In June, 1959, the respondents' vessel *Springdale* loaded a cargo of timber at Munksund, in Sweden. The cargo was partly under deck and partly on deck. Bills of lading for different parcels were issued, stipulating for delivery in London. On June 18, 1959, the vessel, while on her voyage towards London, sank, and all the cargo was lost.

The several claimants, who are indorsees of the several bills of lading, made claims on the respondents. The respondents denied liability on various grounds, contending (*inter alia*) that the claims were time-barred by Art. III, Rule 6, of the Hague Rules or by Clause 32 of the *Springdale's* charter-party, which was expressly incorporated in each of the bills of lading, or by both.

344    LLOYD'S LIST LAW REPORTS    [Q.B. (Com. Ct.)

[1963] Vol. 1]    **Denny, Mott & Dickson, Ltd. v. Lynn Shipping Co., Ltd.**    [Megaw, J.

The disputes between the parties were referred to Mr. Ashton Roskill, Q.C., as sole arbitrator, by a submission which was, by agreement between the parties, deemed to have been made on June 17, 1961.

At the request of the parties, the learned arbitrator treated as a preliminary issue the question whether the claims were time-barred. He has made an interim award, directed to that issue, in the form of a special case under Sects. 14 and 21 (1) (b) of the Arbitration Act, 1950.

By the award, the learned arbitrator has held, subject to the decision of the Court on the questions of law raised, (i) that the claimants' claims in respect of the cargo which was being carried on deck are not time-barred, and the respondents' liability, if any, in respect thereof has not been discharged; (ii) that the respondents' liability for the claimants' claims in respect of the cargo being carried under deck has been discharged.

The questions of law for the decision of the Court are, in effect, whether the learned arbitrator is right in so holding on these two issues, on the facts agreed, assumed and found, and on the construction of the bills of lading and the charter-party.

I can deal briefly with the second issue relating to the under-deck cargo. Mr. Roche, for the respondents, supported the learned arbitrator's decision, and Mr. Brandon, for the claimants, did not seek to contend that it was wrong. In my judgment, on the facts found by the learned arbitrator, which I need not here set out, his decision was plainly right. The mere inclusion of an arbitration clause in a bill of lading to which the Hague Rules apply as a matter of contract, as here, does not, in English law, deprive the carrier of the protection of the time limit which would otherwise be afforded to him by Art. III, Rule 6, of the Hague Rules. If the United States case, *Son Shipping Company, Inc. v. De Fosse & Tanghe, et al.,* (1952) 199 F.2d 687; (1952) A.M.C. 1931, does indeed decide the contrary, it means that United States law is at variance with English law in this respect. I see no reason to differ from Mr. Roche's submission, not disputed by Mr. Brandon, that Note 3 on p. 191 of Carver's Carriage of Goods by Sea, 10th ed., and the passage in the text as to waiver by submitting to arbitration, are not correct statements of English law.

The real contest relates to the cargo carried on deck. Mr. Roche, for the respondents, conceded that the Hague Rules, incorporated into these bills of lading from Swedish law as a matter of contract, and falling to be construed by English law, had no application to the on-deck cargo. He sought, therefore, to rely only upon Clause 32 of the charter-party, expressly incorporated into each of the bills of lading, as his ground for contending that these claims are time-barred in relation to that part of the cargo.

Clause 32 of the charter-party, omitting references, here irrelevant, to the Scottish Arbitration Act, 1894, is as follows:

Any dispute arising out of this Charter or any Bill of Lading issued hereunder shall be referred to arbitration in accordance with the provisions of the Arbitration Act, 1950, or any statutory modification or re-enactment thereof for the time being in force . . . and Arbitrators shall have power to assess and award damages. All arbitration . . . shall in default of agreement between the parties to the contrary, be held in London . . .

The dispute shall be referred to a sole arbitrator to be agreed between the parties or failing such agreement to two arbitrators one to be appointed by each of the parties with power to appoint an Umpire. The Arbitrators and Umpire shall be commercial men.

All claims must be made in writing and the Claimant's Arbitrator must be appointed within twelve months of the date of final discharge otherwise the claim shall be deemed waived and absolutely barred.

This clause shall not affect any right of arrest to which the Charterers and/or any Receiver would otherwise be entitled.

Mr. Roche emphasizes the words " any dispute " and " all claims ", and he says that it is clear that the arbitration clause as a whole, and the sentence relating to the barring of claims, apply to claims in cases in which the ship and cargo have been lost, just as much as they apply to claims in other cases. They include claims for non-delivery.

It would be ludicrous, he contends, if the words " final discharge " were to be construed as limited to claims arising where the cargo had been actually delivered. If that were the meaning, and the only meaning, of " final discharge ", then, where the whole cargo, or a particular parcel of the

cargo, was lost, there could never be " final discharge " in relation to the cargo as a whole, or to the particular parcel. Therefore, neither the bill of lading holder nor the shipowner could ever present a valid claim, because, under Clause 32, his claim would be deemed waived and finally barred unless it were initiated during a period which *ex hypothesi* could never begin to run.

To avoid such a ludicrous result, Mr. Roche contends that the nine words included in Clause 32, " within twelve months of the date of final discharge ", should be read as being the businessman's more succinct manner of expressing the same conception as is expressed by 18 words in Art. III, Rule 6, of the Hague Rules, " within one year after delivery of the goods or the date when the goods should have been delivered." " Date of final discharge ", Mr. Roche submits, should be regarded as including (i) the date when the cargo, or the relevant parcel, is delivered from the ship; *and* (ii) the date when it should have been delivered, if it is for any reason not in fact delivered; *and*, possibly, (iii) the date when for any reason further performance of the contract is discharged. If the bill of lading holder has appointed his arbitrator within 12 months after any one of these dates (albeit the last of them) his claim is in time; otherwise it is barred.

I am unable to accept Mr. Roche's submission that the words in Clause 32, in their ordinary and natural meaning, should be read as including the date when the cargo, or a particular bill of lading parcel, should have been discharged in due performance of the contract.

Mr. Roche then contends that, if the words in their natural and ordinary sense do not have the meaning for which he contends, some implication is necessary. He submits that the proper implication, applying the ordinary tests of reasonableness and absence of undue width, produces the same result: the implication is that, where for any reason the cargo, or a bill of lading parcel, is not delivered, the 12 months for starting arbitration begins to run from the date when the goods in question ought to have been delivered.

Mr. Brandon, for the claimants, on the other hand submits that the relevant words of Clause 32, either in their natural and ordinary meaning, or, perhaps, by virtue of implication—though I do not think that Mr. Brandon agreed that any implication

was required—apply only where there has been a final discharge of the cargo, or of the part of the cargo relevant to a particular bill of lading in which Clause 32 is incorporated. He says that if, for any reason, there has been no such discharge, then the provisions as to the appointment of an arbitrator within 12 months, and the consequential " otherwise the claim shall be deemed waived and absolutely barred " do not apply. The only limit of time which then applies is that which is provided by general statute, six years. There is, therefore, he says, nothing ludicrous or harsh in the operation of the clause.

In my judgment, Mr. Brandon's submission is right, whether one regards it as a matter of construction of the words in their natural and ordinary sense, viewed in the context of the contract as a whole, or as a matter to be dealt with across the vague and ill-defined border between natural and ordinary meaning in the context and implication reasonably and necessarily made to give business efficacy to the contract.

If it is, indeed, a matter of implication, then, in my judgment, the implication that the time limit has no application at all where there has not been final discharge, in the sense of actual discharge, is more in consonance with the principles for implying contractual terms than is Mr. Roche's suggested implication, namely, that where there has been no actual discharge the time when the cargo, or parcel, should have been discharged is to be introduced as the relevant starting date. In my judgment, Mr. Brandon's suggested implication is both more reasonable and less wide than that for which Mr. Roche contended.

If the cargo, or the part of it covered by a particular bill of lading, can never be discharged because it has been lost, then the provisions of Clause 32, incorporated into the bill of lading, so far as they relate to a time limit for commencing arbitration and to the consequences of a failure to observe the time limit, have no application. The rest of Clause 32 applies.

I agree, therefore, on this issue also with the conclusion of the learned arbitrator.

If I had reached a different conclusion on the matter with which I have already dealt, I should not have been able to accept Mr. Brandon's alternative contention. The basis which both parties accepted, for the purpose of this preliminary issue only, is that the respondents were in breach of

LLOYD'S LIST LAW REPORTS

[1963] Vol. 1]     **Denny, Mott & Dickson, Ltd. v. Lynn Shipping Co., Ltd.**     [Megaw, J.

contract in their failure to bring the cargo to the port of destination and to deliver it there. Mr. Brandon contended that, since the absence of possibility of " final discharge " is thus to be taken as having been caused by the respondents' breach of contract, they could not successfully rely on those provisions of Clause 32 which establish a period of time starting with " final discharge " as a ground for contending that the claimants' claim was contractually barred.

This submission would only be relevant and necessary on the assumption, which I have rejected, that the words of the relevant part of Clause 32, either in their natural and ordinary meaning or by necessary implication, mean that, if the cargo is lost, the relevant date is the date when it ought to have been discharged. If that were the true view, I should have agreed with Mr. Roche that the only effect of the breach of contract, so far as Clause 32 is concerned, would have been to substitute, as the starting date, the date when the goods ought to have been delivered, and not to preclude the respondents from relying on the Clause 32 time limit at all. In other words, the implication would have been " 12 months from the date when the cargo should have been discharged, irrespective of whether the reason for its non-discharge is a breach of contract by the respondents ". In that event, the claimants' claim in respect of the deck cargo also would have been out of time in this case.

As it is, I answer the questions of law stated in par. 20 of the interim award in precisely the same way as the learned arbitrator answered them in par. 21 of the interim award, and accordingly the award as stated in sub-pars. (1), (2), (3) and (4) of that paragraph is affirmed.

Mr. Willmer: My Lord, in those circumstances, I ask that the respondents to the arbitration be ordered to pay the costs of this hearing and of the setting down of the case.

Mr. Justice Megaw: What do you say, Mr. Roche?

Mr. Roche: We have each succeeded in half. I would have submitted that it could go the way the arbitrator did it, each party paying their own costs. We were not told until just before the case started yesterday afternoon that the claimants were not seeking to continue with their contentions as to the under-deck cargo. Of course, that is the point for which all these books are here.

Mr. Justice Megaw: The submission of the interim award in the form of a special case was something which was done at the request of both parties. I think it is so stated in the interim award. Therefore, I suppose, that, unless there was some agreement between the parties, it had to be brought before the Court before it achieved anything.

Mr. Roche: The position was that we had no idea that this point, which had been so hotly argued before Mr. Roskill, was not going to be pursued. I think it was a pure question of chance that we set down and they did not. If at any time we had been told that we were not going to have the privilege of arguing this point, I do not know what we would have done. That is the important point on which we wanted a decision and on which we have now the decision of a Judge affirming Mr. Roskill. I would submit that this is a proper case in which each party should pay their own costs. It is no use saying what we would have done a couple of months ago if we had been told that they were not going to contest that point. We might have gone on to get a decision, or we might not. Anyway, we have the decision on that point.

Mr. Justice Megaw: What do you say, Mr. Willmer?

Mr. Willmer: In my submission, the true position is that the arbitrator awarded in exactly the same terms as your Lordship did, and it was the respondents who then set the award down in order to get the decision of the Court on the point which the arbitrator had already decided in their favour, and also in order, if they could, to get a decision in their favour on the point he had decided against them. From the point of view of the determination of the issues in this particular case, had they not done anything and simply allowed the two months to run out, they would have been, in so far as what has been awarded is concerned, in exactly the same position as they now are. It was not necessary for them to set the award down in order to get the arbitrator's decision upheld on the point he decided in their favour. Had the claimants in the arbitration not set it down, as they would probably not have done, there would have been no necessity for the argument before your Lordship. The necessity for the hearing before your Lordship, in my submission, arises principally, so far as this case is concerned, by the respondents' hope of getting the

arbitrator's decision as to deck cargo reversed, and that question answered in their favour. It may be that the respondents, as shipowners—or perhaps, strictly it may be their underwriters—were interested in getting a decision of the Court and not merely a decision of the arbitrator on a point which the arbitrator decided in their favour. But I submit that that is no reason why the claimants should have to bear their own costs, when the only matter which has been argued before your Lordship has been the matter on which the claimants succeeded, both before the arbitrator and before your Lordship.

Mr. Justice Megaw: I follow all that. I have a good deal of sympathy with it up to a point. But is not this the reality of the matter, that Mr. Roche's clients were not told until yesterday that your side were not going to argue the second issue, and that therefore, presumably, I am entitled, and probably bound, to assume that Mr. Roche came into Court instructed and prepared to argue with the considerable number of authorities that I see on both sides. It may well be that that is a matter which does have an effect on costs in order to try to achieve fairness.

Mr. Willmer: It is quite true that my friend was only informed very shortly before the hearing that the Art. III, Rule 6, point was not going to be argued. But there was, of course, nothing to stop the respondents asking the claimants what their attitude was. An award having been made which was favourable to the respondents on under-deck cargo and to the claimants on deck cargo, it could perfectly well have stood. The claimants have made no move to set it down. It was true that once the respondents had set it down it was open to the claimants to argue it, but it did not necessarily follow that they were going to because of the possible bearing, among other matters, that it might have on the question of costs before your Lordship.

Mr. Justice Megaw: If that had been in their minds, I would have expected that the solicitors, being experienced commercial solicitors, might well have taken the step of communicating with the other side and saying " We do not propose to argue this ".

Mr. Willmer: That may be. But, in my submission, it is not a burden which is upon the claimants to tell the respondents that they are not going to seek to upset the award of the arbitrator where it was against them. The respondents have set the case down. From the point of view of the

claimants, they did not know that the respondents wanted a decision of the Court on the point in their favour. From the point of view of the claimants, the apparent purpose of setting the case down is to get the part of the award that was in favour of the claimants upset. In my submission, there is no obligation on the claimants to say, as it were, " We are not going to cross-appeal ". One appreciates that, had this been an appeal to the Court of Appeal from a Judge of first instance, they would have known a bit sooner because they would have seen that there was no cross-appeal. But that does not arise in the setting down of a special case. The respondents have set the case down, so far as the claimants could see, to get the arbitrator's award upset, and the claimants have not contended to the contrary in the part where the arbitrator was against the claimants. In my submission, your Lordship's proper order is to order that the respondents pay the costs of this hearing, in those circumstances.

Mr. Justice Megaw: Do you want to add anything, Mr. Roche?

Mr. Roche: I want to invite your Lordship to deal with it exactly as if Mr. Brandon had argued the Art. III, Rule 6, point. I was not told until literally two minutes before the case started, when I came into Court, that he was not taking it. Therefore, I ask your Lordship to deal with it exactly as if it had been argued.

Mr. Justice Megaw: Is it not a question really, so far as that is concerned now, on whom is the common sense or the moral onus on each side in a case which has been set down like this and there is no question of a notice of a cross-appeal? Is it not a question where those instructing you could get on to those instructing Mr. Willmer and say " Are you going to argue both or either of these points? ", and then, having made up their minds about it, for them to say at the early stage " We do not propose to ".

Mr. Roche: I think the position is this: once it is set down, the last clause ceases to apply. Once it is set down it has to be brought before the Court, and everything is open. If one party wishes, for the purpose of saving costs, to say to the other side " I am not going to do that which I set out to do ", it is exactly as if there was no decision of the arbitrator and no award. You have to come here, and we would have to formally, with a Junior on each side, even if we had agreed to abandon both arguments.

Mr. Justice MEGAW: Just tell me one other thing. I am often puzzled about this. It is as to the costs of setting down. You have set down. Do the claimants incur any costs of setting down, or is it entirely the costs of arguing?

Mr. ROCHE: There are only the costs of arguing. I have not said anything about the setting down.

Mr. Justice MEGAW: I think, in all the circumstances here, the fair thing to do is to order that the respondents shall pay one half of the claimants' costs of the arguing of the special case. There is nothing else, is there?

Mr. ROCHE: No, my Lord.

## QUEEN'S BENCH DIVISION

Mar. 25, 26, 27, 28, 1963

T. C. ROLLAND (A FIRM) v. DASH-WOOD & PARTNERS (MARINE), LTD.

Before Mr. Justice GLYN-JONES

Contract — Fees for consulting engineer's services—Parties not " ad idem "—Reasonable remuneration.

Plaintiff firm of consulting marine engineers employed by defendants to advise in disputes between defendants and manufacturers of marine engines, at fee of 60 guineas per day—Claim by plaintiffs against defendants for £876 15s. in respect of fees—Contention by defendants that plaintiffs could not include travelling time in calculating fees, and that various items were overcharged.

————Held, by GLYN-JONES, J., that parties were never in agreement as to what remuneration should be paid; that, accordingly, plaintiffs were entitled to a reasonable remuneration; and that, therefore, in the circumstances, plaintiffs were entitled to 440 guineas.

In this case, the plaintiffs, T. C. Rolland, consulting engineers, of London, E.C., claimed £876 15s. for fees for professional services rendered to the defendants, Dashwood & Partners (Marine), Ltd., of London, S.W.

The defendants denied that they were liable for the sum alleged.

According to the plaintiffs' amended statement of claim, they claimed £876 15s. for professional services and expenses rendered to the defendants, their servants or agents.

The plaintiffs contended that the contract under which the sum was payable was made orally on Dec. 5, 1957, at 30 Hill Street, London, between Thomas C. Rolland, for and on behalf of the plaintiffs, and John Douglas Clark, for and on behalf of the defendants.

The plaintiffs said that if, contrary to their contentions, it was held that there was no term in the contract for the payment of remuneration to the plaintiffs by the defendants in respect of work done on assessing the fees payable on cancellation of contracts in respect of two Sulzer diesel engines, it was an implied term that the plaintiffs should receive and the defendants should

Case 1:05-cv-11011-DPW   Document 56   Filed 10/26/2007   Page 34 of 51

# 1922.

## THE

# LAW REPORTS

### OF THE INCORPORATED COUNCIL OF LAW REPORTING.

## HOUSE OF LORDS,

## JUDICIAL COMMITTEE OF THE PRIVY COUNCIL

### AND

## PEERAGE CASES.

---

EDITOR—RIGHT HON. SIR FREDERICK POLLOCK, BART., K.C.

REPORTERS.

| | | | |
|---|---|---|---|
| House of Lords | . . . . | H. B. HEMMING, | *Barrister-at-Law.* |
| Privy Council | . . . . | A. M. TALBOT, | *Barrister-at-Law.* |

## 1922.—VOL. II.

PUBLISHED BY THE COUNCIL AT ITS OFFICE, 30, MONTAGUE STREET, LONDON,
W.C. 1,
AND
PRINTED BY W. SPEAIGHT & SONS, LTD., 98-99, FETTER LANE, LONDON, E.C. 4.

Case 1:07-cv-07101-CM   Document 36   Filed 10/26/2007   Page 35 of 51

[HOUSE OF LORDS.]

H. L. (E.)*   ATLANTIC  SHIPPING  AND  TRADING $\Big\}$ APPELLANTS;
1922             COMPANY, LIMITED  . . . . .
April 4.

AND

LOUIS DREYFUS AND COMPANY . . RESPONDENTS.

*Shipping—Charterparty—Arbitration Clause—Term of Clause restricting the Right to sue—Ouster of the Jurisdiction of the Court—Action in Respect of Damage caused by Unseaworthiness—Implied Condition of Seaworthiness—Action whether barred by Arbitration Clause.*

Speech of LORD SUMNER, at p. 260, explained in HONG KONG FIR SHIP-PING CO., LTD. v. KAWASAKI KISEN KAISHA, LTD. [1961] 2 ALL E.R. 257.

A ship was chartered for a voyage from Rosario to Hull with a full cargo of linseed. The charterparty provided for the reference of all disputes under the contract to the final arbitrament of two arbitrators, one to be appointed by each of the parties, with power to appoint an umpire, and the clause continued : " Any claim must be made in writing and claimants' arbitrator appointed within three months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred."

After the arrival of the ship at Hull the charterers brought an action against the shipowners in respect of damage alleged to have been occasioned to a part of the linseed during the voyage by reason of the unseaworthiness of the ship at the commencement of the voyage. The shipowners pleaded that the charterers failed to appoint their arbitrator within three months of the discharge of the ship and that by reason thereof the action was not maintainable, and, by order of the Court, the question whether the claim in the action was barred by the arbitration clause was tried as a preliminary question of law :—

*Held*, (1.) that the arbitration clause was not open to objection on the ground that it ousted the jurisdiction of the Court ; but (2.) that, inasmuch as the claim in the action was founded upon a breach of the implied condition of seaworthiness, there being in the charterparty no express provision relating to unseaworthiness, the shipowners were not entitled to the benefit of the term in the clause restricting the time within which the action could be brought, and that consequently the claim was not barred by the arbitration clause.

*Tattersall* v. *National Steamship Co.* (1884) 12 Q. B. D. 297 applied.
*Bank of Australasia* v. *Clan Line Steamers* [1916] 1 K. B. 39 distinguished.

Decision of the Court of Appeal affirmed on different grounds.

APPEAL from an order of the Court of Appeal reversing an order of Rowlatt J.

* *Present:* LORD BUCKMASTER, LORD DUNEDIN, LORD ATKINSON, LORD SUMNER, and LORD CARSON.

The appellants were the owners and the respondents were the charterers of the steamship *Quantock*.

By a charterparty dated May 2, 1919, and made between the parties it was agreed that the steamship should proceed to Rosario and there load a complete and full cargo of linseed for carriage to Hull. The charterparty was in the printed form of the Chamber of Shipping River Plate Charterparty, 1914. Clause 39 provided as follows: " All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single arbitrator, be referred to the final arbitrament of two arbitrators carrying on business in London who shall be members of the Baltic and engaged in the shipping and/or grain trades, one to be appointed by each of the parties, with power to such arbitrators to appoint an umpire. Any claim must be made in writing and claimants' arbitrator appointed within three months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred."

The *Quantock* duly received the cargo at Rosario and arrived at Hull early in September, 1919.

Shortly after her arrival the respondents gave notice in writing to the appellants that they intended to put in a claim in respect of damage occasioned to some of the linseed carried on board the steamship in the course of the voyage and they withheld payment of part of the freight.

On September 27 the appellants' solicitors wrote to the respondents' solicitors as follows: " S.S. *Quantock*. In consideration of your clients Messrs. Louis Dreyfus & Co. paying the full freight and also any demurrage which may be found to be legally due from them to the shipowners, we, on behalf of the above steamer, are prepared to give an undertaking to pay for any damage to cargo which may be found to be legally due from the steamer to your clients."

The cargo was finally discharged from the *Quantock* on September 29 and on October 31 the respondents paid to the appellants the balance of freight due in respect of the carriage of the goods.

The respondents neither claimed arbitration nor appointed

H. L. (E.)

1922

ATLANTIC
SHIPPING
AND
TRADING CO.
*v.*
LOUIS
DREYFUS
& CO.

Case 1:07-cv-07401-CM   Document 36   Filed 10/26/2007   Page 37 of 51

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

an arbitrator within three months of final discharge or at any time.

On May 3, 1920, the respondents commenced an action in the King's Bench Division against the appellants in respect of the alleged damage to the cargo. By their points of claim the respondents alleged that the appellants in breach of their duty to carry and deliver the linseed in good condition had delivered part of it in bad condition and they claimed 2233l. 4s. 6d. damages. The appellants by their defence alleged (inter alia) as follows : " 5. The said claim in this action arose out of the said charterparty and the plaintiffs failed to appoint their arbitrator within three months of the final discharge of the said ship. The defendants will contend that by reason thereof the plaintiffs must be deemed to have waived their claim and that no action can now be brought in respect thereof."

By their reply the respondents alleged (1.) that by the agreement contained in the letter of September 27, 1919, the appellants waived their rights under the arbitration clause, and (2.) that at the date when the goods were loaded and at the date of the commencement of the voyage with the goods on board the *Quantock* was unseaworthy and unfit to receive the goods on board and that the damage to the goods was caused by the said unseaworthiness and unfitness of the steamer.

Upon the application of the respondents the Court ordered that the question of law whether the claim in the action was barred by the arbitration clause be tried as a preliminary question.

Upon the trial of this question Rowlatt J. held (1.) that the mode of procedure set out in the arbitration clause—namely, that a claim must be made in writing and the claimants' arbitrator appointed within three months of final discharge—was a condition precedent to the bringing of any action at all ; (2.) that the arbitration clause applied even though the vessel was unseaworthy at the commencement of her voyage, as the unseaworthiness of the vessel had nothing to do with the application of the arbitration clause, which dealt

Case 1:07-cv-07101-CM   Document 36   Filed 10/26/2007   Page 38 of 51

with a question of procedure ;   (3.) that the letter of
September 27, 1919, did not affect the legal position of the
parties.

The Court of Appeal (Bankes, Warrington and Atkin L.JJ.),
while agreeing with the learned judge as to the construction
of the arbitration clause, reversed his decision on the ground
that the clause was against public policy, as the effect of it
was to oust the jurisdiction of the Court.

1922.   March 7, 9.   *Dunlop K.C.*  and *Jowitt* (1) for the
appellants.   The arbitration clause in the charterparty, as
Rowlatt J. held, affords a complete answer to the respondents'
claim.   The Court of Appeal in holding the clause bad on
the ground that it ousted the jurisdiction of the Court mis-
appreciated the point to be tried as a preliminary question.
The respondents cannot maintain the action, because at
the date of the writ they had no cause of action.   The arbi-
tration clause imposes the condition that the claimants'
arbitrator must be appointed within three months of final
discharge as a condition precedent to the bringing of an
action, but there is no ouster of the jurisdiction of the Court.
If the charterers had made a claim in writing and had
appointed an arbitrator within the stipulated time they
could have brought an action, and, subject to a stay being
granted, the Court would have had complete jurisdiction.
Parties are at liberty to impose any conditions they please
in regard to the constitution of their contractual obligations.
The appellants are submitting to the jurisdiction of the Court,
but are maintaining that the respondents have no cause of
action, and that is a perfectly legitimate attitude to take up :
*Scott* v. *Avery.* (2)   The authorities establish that there is
no objection on the plea that the jurisdiction of the Courts
is ousted to the ordinary clause agreeing to refer disputes
to arbitration : *Doleman & Sons* v. *Ossett Corporation* (3) ;
*Hamlyn & Co.* v. *Talisker Distillery* (4) ;  or to an agreement
by which the award of an arbitrator is made a condition

H. L. (E.)

1922

ATLANTIC
SHIPPING
AND
TRADING CO.
*v.*
LOUIS
DREYFUS
& CO.

(1) Mr. Jowitt was appointed K.C.          (2) (1856) 5 H. L. C. 811.
on March 14, 1922.                        (3) [1912] 3 K. B. 257, 267.
                  (4) [1894] A. C. 202; 21 R. (H. L.) 21.

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

precedent to the right to sue : *Scott* v. *Avery* (1) ; *Caledonian Insurance Co.* v. *Gilmour* (2) ; *Spurrier* v. *La Cloche* (3) ; *Jureidini* v. *National British and Irish Millers Insurance Co.* (4) ; or to an agreement that no claim shall be recoverable unless made within a certain time : *Moore* v. *Harris* (5) ; *Pompe* v. *Fuchs.* (6) The last cited case is closely analogous to the present.

[They also referred to *Ford* v. *Beech.* (7)]

*Neilson K.C.* and *Clement Davies* for the respondents. 1. This clause is void as ousting the jurisdiction of the Courts. On this question there is no real difference between the parties as to the principle to be applied ; the only difference is as to the application of the principle. In the respondents' submission the words mean " We contract not to go to the Court under any circumstances," and the Court of Appeal have so held : *Horton* v. *Sayer.* (8) 2. This vessel was, or for the purposes of the preliminary point must be deemed to be, unseaworthy at the commencement of the voyage, and the loss complained of is due to that unseaworthiness, with the result that the appellants are not entitled to claim the benefit of any of the special clauses in the charterparty. Where goods are shipped on board ship there is an implied condition of seaworthiness, which forms the basis of the contract, and where there is a breach of that condition and the loss arises from that breach the shipowner cannot rely upon the special conditions of the contract. Where the charterparty contains express conditions as to seaworthiness those express conditions are taken to override the implied condition, but here there are no such express conditions. The contention of the respondents is not that the arbitration clause is wholly inoperative, but only that the subsequent words, which might exist without the arbitration clause, do not apply. The time limit stipulation is inserted for the protection of the shipowner, but he can only avail himself of that protection

(1) 5 H. L. C. 811.
(2) [1893] A. C. 85.
(3) [1902] A. C. 446.
(4) [1915] A. C. 499, 505.
(5) (1876) 1 App. Cas. 318.
(6) (1876) 34 L. T. 800.
(7) (1848) 11 Q. B. 852.
(8) (1859) 4 H. & N. 643.

2 A. C.                    AND PRIVY COUNCIL.                    255

when he is sued upon something which is in the contract itself. The obligation of seaworthiness is something dehors the contract: *Kish* v. *Taylor* (1); *The Europa* (2); *Tattersall* v. *National Steamship Co.* (3); *Bank of Australasia* v. *Clan Line Steamers.* (4) 3. The appellants by their own conduct, as evidenced by the letter of September 27, have waived their reliance on the arbitration clause.

*Jowitt* in reply. The arbitration clause is a mutual clause for the benefit of both parties. Therefore it cannot be said that this clause must go, unless it is contended that the whole charterparty must go. This is a procedure clause. The last half is a corollary of the first half and the clause applies in toto. The point sought to be made by the respondents goes far beyond the decisions, which apply only to the exceptions clause—a clause inserted for the benefit of the shipowner: *Joseph Thorley, Ld.* v. *Orchis Steamship Co.* (5); *The Europa* (6); *Kish* v. *Taylor.* (7) The letter of September 27 does not affect the legal position of the parties.

The House took time for consideration.

1922. April 4. LORD BUCKMASTER. My Lords, I have had the opportunity in this case of seeing the opinion that has been prepared by my noble and learned friend Lord Sumner. I agree entirely with its contents and I have nothing to add.

LORD DUNEDIN. My Lords, under the old law an agreement to refer disputes arising under a contract to arbitration was often asserted to be bad, as an ousting of the jurisdiction of the Courts, but that position was finally abandoned in *Scott* v. *Avery.* (8) As I read that case, it can no longer be said that the jurisdiction of the Court is ousted by such an agreement; on the contrary, the jurisdiction of the Court

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

(1) [1912] A. C. 604.
(2) [1908] P. 84.
(3) 12 Q. B. D. 297.
(4) [1916] 1 K. B. 39.
(5) [1907] 1 K. B. 660.
(6) [1908] P. 84, 93.
(7) [1912] A. C. 604, 615–6.
(8) 5 H. L. C. 811.

H. L. (E.)

1922

ATLANTIC
SHIPPING
AND
TRADING Co.
v.
LOUIS
DREYFUS
& Co.

Lord Dunedin.

is invoked to enforce it, and there is nothing wrong in persons agreeing that their disputes should be decided by arbitration. It follows that the clause here is not obnoxious so far as it provides for arbitration. It goes on, however, to say that if the claim is not made and the arbitration started within a certain time the claim is to be held to be abandoned. Now, if it were illegal to arrange that a claim should not be good unless made within a certain time I should understand the argument, but as it is admitted that it is perfectly legal to make such a stipulation—it is done, e.g., every day in insurance policies—then why should it be bad because it is tacked on to a provision for arbitration instead of to an action at law ? All it comes to is this : I stipulate that you shall settle your differences with me by arbitration and not by action at law, and I stipulate that you shall state your differences and start your arbitration within a certain time or you shall be held to have waived your claim. For these reasons, I do not think the judgment of the Court of Appeal can be supported.

We have, however, had another argument which does not really arise on the preliminary question as put, but which, as it has been dealt with in the Courts below, should be disposed of here. The respondents aver that the vessel when starting on the voyage was unseaworthy, and that the damage for which they sue was caused by such unseaworthiness, and they say that if they prove these two facts then the clause in question affords no protection. On this point we have no indication as to what the opinion of the learned judges of the Court of Appeal would have been. Rowlatt J. rejected the contention on the ground that the implied condition of seaworthiness had nothing to do with and was not in any way affected by a condition which was one of procedure only. There was, however, quoted to us a judgment of Bailhache J. in the case of the *Bank of Australasia* v. *Clan Line Steamers* (1) to the opposite effect. In that case there was a clause that no claim could be available which was not made at the port of delivery within seven days of the steamer's arrival there,

(1) [1916] 1 K. B. 39.

AND PRIVY COUNCIL.

and Bailhache J. held that that clause was no bar to an action raised upon the averment that the ship was unseaworthy and that the damage which was sued for was caused by such seaworthiness. His judgment was reversed by the Court of Appeal, but on the ground, which had not been noticed by Bailhache J., that there was in the charterparty an express exception of damage caused by unseaworthiness and that that being so the express clause must be read along with all other express clauses, of which the limitation of liability was one. It is pointed out by the respondents that in this case there is no express clause as to unseaworthiness, which is therefore left to be dealt with on the implied condition.

My Lords, in these commercial cases it is, I think, of the highest importance that authority should not be disturbed, and if your Lordships find that a certain doctrine has been laid down in former cases and presumably acted on in the framing of other contracts you will not be disposed to alter that doctrine unless you think it is clearly wrong.

Before the decision of Bailhache J. there was the earlier case of *Tattersall* v. *National Steamship Co.* (1), a judgment of Day and A. L. Smith JJ., where it was held that, there being no express contract as to unseaworthiness, a clause limiting liability to 5*l.* per animal (the goods shipped were cattle) did not apply to damage done by unseaworthiness. I think it is clear that the learned judges of the Court of Appeal in the *Bank of Australasia Case* (2) approved of that case in terms, and therefore inferentially, though they do not actually say so, approved of Bailhache J.'s judgment if there had not been an express clause dealing with unseaworthiness.

Now, does the present case fall into line with *Tattersall's Case* ? (1)  On the best consideration I can give to the matter, I think it does.  It is quite true that the fact of unseaworthiness does not destroy the contract of affreightment in toto. Such a doctrine would lead to absurd consequences ; the goods might be safely delivered and yet no freight due under the contract, but only a quantum meruit for services rendered. The test seems to me to be whether the particular clause

H. L. (E.)
1922

ATLANTIC
SHIPPING
AND
TRADING Co.
v.
LOUIS
DREYFUS
& Co.

Lord Dunedin.

(1) 12 Q. B. D. 297.        (2) [1916] 1 K. B. 39.

3        S

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

Lord Dunedin.

interferes with the liability which unseaworthiness creates. It is just here that I think Rowlatt J. did not sufficiently distinguish between the two parts of the clause. So far as it dealt with the procedure, I agree with him, and if this clause had been a mere reference to arbitration and had stopped there, I do not think it would have been hit. But it goes on and, under certain conditions, destroys liability. If *Tattersall's Case* (1) is right that you cannot in such cases appeal to a limitation of liability, surely it is a fortiori to say you cannot appeal to its destruction.

I think there is nothing in the waiver point. For these reasons I agree with the motion to be made by my noble and learned friend on the woolsack.

LORD ATKINSON. My Lords, I too have had the pleasure and advantage of reading the judgment about to be delivered by my noble and learned friend Lord Sumner and I concur in it.

LORD SUMNER. My Lords, this case turns upon clause 39 of the charter. The first question is, whether it means that, if the charterer does not make a claim or name an arbitrator within three months of the final discharge, he agrees that he is not in any way or in any circumstances to have any access to His Majesty's Courts for the purpose of raising his claim. The Court of Appeal thought that it does. With great respect, I am unable to agree. The clause does not mean that under no circumstances shall a claimant be allowed to enter His Majesty's Courts at all, but that the cause of action shall not be complete, and therefore cannot be made the subject of proceedings, unless the specified conditions have first been satisfied. The point, however, hardly admits of discussion ; a view is formed of it, one way or the other, simply on the perusal of the words, for the question is purely one of interpretation. I think the words do not exclude the cargo owner from such recourse to the Courts as is always open by virtue of the provisions of the Arbitration Act to a

(1) 12 Q. B. D. 297.

party who has agreed to arbitrate. If so, as of course the
Court of Appeal would have been the first to recognize, the
jurisdiction of the Courts is not ousted, so as to make this
arbitration clause bad altogether. Its terms can be enforced.

The second point is whether a term, that a claim is to be
absolutely time-barred after three months, if certain con-
ditions have not previously been satisfied, is available for a
shipowner, where the claim is for damage to cargo arising
because the ship was not reasonably fit to carry the goods,
there being in the charter no express exception of unseaworthi-
ness. Of course the clause means that the ship is liable for
proved unseaworthiness under certain circumstances—namely,
if the claim and the nomination are made in time—but not
otherwise. Can it be said that this recognition of liability
sub modo prevents the clause from operating as an exception
at all, and reduces it to a mere "procedural" provision,
fixing the conditions under which liability will be established?
My Lords, with great respect to the opinion of Rowlatt J.,
I do not think that it can. The point of course is not dealt
with in the judgments of the Lords Justices.

The question arose in this way. To save the great expense
of going to trial upon an issue of fact, whether the cargo
was damaged in consequence of the ship's unseaworthiness
or not, which might prove after all to be capable of a short
answer under the charter, by reason of the charterers' non-
compliance with the conditions of clause 39, it was agreed
between counsel that the construction of the charter should
be decided as a preliminary question, as if upon demurrer, it
being assumed against the shipowner that the damage to the
cargo arose in consequence of the ship's unseaworthiness,
and against the charterers, that they were out of time in
making their claim. It is a pity that the agreement was
not embodied in an order, specifying the preliminary question
and directing it to be tried. This ought to have been done;
and, but for the fact that there is no reasonable doubt about
either the agreement or the terms of it, your Lordships would,
I apprehend, have declined, as well you might, to entertain
the question.

H. L. (E.)

1922

ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

Lord Sumner.

3      S 2

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING CO.
v.
LOUIS
DREYFUS
& CO.

Lord Sumner.

By the charter the shipowner undertakes to load and carry the cargo and to deliver it at the destination for a freight payable (except as to advances) on right and true delivery. The undertaking is, of course, subject to numerous exceptions of a usual character. Unseaworthiness itself is nowhere mentioned, nor is liability for the consequences of it excepted under any other term. The fact that the words in clause 39 which are relied on—namely, "any claim must be made in writing and claimants' arbitrator appointed within three months"—are in quite general terms, does not avail, for such mere generality has long been held, in connection with specific excepted perils, not to be inconsistent with liability for the particular cause of loss—namely, unseaworthiness.

The shipowners' general liability in respect of damage due to the ship's unseaworthiness, accordingly, remains where the law places it. Underlying the whole contract of affreightment there is an implied condition upon the operation of the usual exceptions from liability—namely, that the shipowners shall have provided a seaworthy ship. If they have, the exceptions apply and relieve them; if they have not, and damage results in consequence of the unseaworthiness, the exceptions are construed as not being applicable for the shipowners' protection in such a case.

This principle of construction has not been confined to excepted causes of loss; it has been extended to provisions which limit the amount to be paid in satisfaction of the loss, for these equally, though in another way, limit pro tanto the shipowners' liability. There is no difference in principle between words which save them from having to pay at all and words which save them from paying as much as they would otherwise have had to pay. In *Tattersall* v. *National Steamship Co.* (1) the words " under no circumstances shall they be held liable for more than 5*l.* for each of the animals " were held inapplicable to protect the shipowners from liability for the full value of animals lost by the ship's unseaworthiness, in spite of the apparently unrestricted generality of the words " under no circumstances," and in spite of the fact that they

(1) 12 Q. B. D. 297.

recognized liability up to 5l. a head, and did not purport to exclude it altogether. That such words do not avail, where loss is due to unseaworthiness, was virtually recognized in *Baxter's Leather Co.* v. *Royal Mail Steam Packet Co.* (1) and held in *Wiener & Co.* v. *Wilsons, &c., Line.* (2) Bailhache J. expressly so held in *Bank of Australasia* v. *Clan Line Steamers* (3), and the Court of Appeal in reversing his decision recognized that it would have been correct but for a circumstance which he had overlooked—namely, that unseaworthiness was the subject of an express provision and therefore the underlying or implied provision with regard to it was ousted.

My Lords, in principle I think that clause 39, in so far as the parties, as it was said, provided their own statute of limitations, is unavailable to the shipowners as an answer to a claim for damage caused by unseaworthiness. It does not make any difference that the time allowed is considerable or the formality to be complied with not unreasonable, or that the clause, being a mutual clause, might apply to protect the charterer in certain events, for example, against a claim for demurrage. The effect is not that the clause is deleted from the charter altogether. The shipowners gain no advantage against the charterer from their neglect to make the ship seaworthy ; they merely cannot pray the clause in aid in that case. Nor are the words in question inapplicable because they occur in a mutual arbitration clause and are partly procedural. Even if they are read as meaning " I will be liable for three months and no longer and then only in an arbitration "—they still remain words, which except out of the shipowners' general liability certain losses—namely, losses the assertion of which is belated.

There is the further contention that a clause relieving a shipowner from damage to cargo caused by breach of the condition as to seaworthiness, to be effectual must be clear. Now to say that a claim is to be waived is incorrect. If a right has accrued, it must be released or discharged by deed

H. L. (E.)

1922

ATLANTIC
SHIPPING
AND
TRADING CO.
*v.*
LOUIS
DREYFUS
& CO.

Lord Sumner.

(1) [1908] 2 K. B. 626, 632.        (2) (1910) 15 Com. Cas. 294.
(3) [1916] 1 K. B. 39, 40.

Case 1:07-cv-07101-CM    Document 36    Filed 10/22/2005    Page 47 of 51

H. L. (E.)
1922
ATLANTIC
SHIPPING
AND
TRADING Co.
v.
LOUIS
DREYFUS
& Co.

Lord Sumner.

or upon consideration. Waiver applies to an election as to something in futuro ; it is not a term by which to describe the answer to a right, which is complete in præsenti. It seems to me, however, that the words, shall be "deemed to be absolutely barred" are not obscure. Their meaning is plain ; the only doubt is whether they are effective. Accordingly I should not for myself regard these words as falling within the rule in *Elderslie Steamship Co.* v. *Borthwick*. (1)

For these reasons I think the appeal fails. There is nothing in the point about the solicitors' letter.

LORD BUCKMASTER. My Lords, the noble Lord, Lord Carson, desires me to say that he agrees with the opinion that has been expressed.

*Order of the Court of Appeal affirmed and appeal dismissed with costs.*

*Lords' Journals*, April 4, 1922.

Solicitors for the appellants : *Holman, Fenwick & Willan.*
Solicitors for the respondents : *Pritchard & Sons*, for *Andrew M. Jackson & Co., Hull.*

(1) [1905] A. C. 93.

# M/s. EAST WEST TRADING
### (IMPORTER, COMMISSION AGENT & ORDER SUPPLIER)
### 34, Chand Meah Lane, Khatungonj, Chittagong, Bangladesh.

Ref : EWT/001/05                                                              Date: 15-06-05

The Managing Director
Universal Navigation Pte Ltd.
3 Shenton Way, 11-04, Shenton House,
Singapore – 068805

Sub    :    Provisional Claim against damaged cargo for 3916.200MT Brazilian Sugar
            shipped per vessel M. V. Prestigious.

Dear Sir,

Reference above, total 21500MT Brazilian Sugar shipped per your vessel of which cargo for
3916.200MT loaded in Hold No. 1. After arrival of the vessel, we observed that cargo loaded in
Hold No. 1 was water affected and stained and thus accordingly appointed surveyors to ascertain
extent of damage. According to survey by our surveyors in presence of the Master, The Chief
Officer and Port Captain during 1300 hrs to 1530 hrs on 14-06-05, all cargo in hold no. 1 is totally
damaged and thus lodging our claim for the loss due to damaged cargo.

We are enclosing our Provisional Claim Bill for your earliest settlement which will enable us to
continue discharging of sound cargo from other hatches.

In this connections we like to inform you that for any dispute, quality complain or damage cargo if
found in of other hatches of the vessel during discharge, our formal claim for the said dispute,
quality claim or damage cargo will be submitted to you later for your doing the needful.

We further like to inform you that delay in settling the claim will only affect discharging of the
vessel and we have to proceed for taking legal and other means to of protect our interests.

Looking forward to have your feedback immediately and thanking you in anticipation for your
kind consideration.

Very truly yours,
For EAST WEST TRADING

# M/s. EAST WEST TRADING
### (IMPORTER, COMMISSION AGENT & ORDER SUPPLIER)
34, Chand Meah Lane, Khatungonj, Chittagong, Bangladesh.

June 14, 2005

**UNIVERSAL NAVIGATION & TRADING PTE LTD.**
3, SHENTON WAY, 11-04, SHENTON HOUSE,
SINGAPORE-068805

## Claim Bill

Bill No: EWT/2005/102

| Description | AMOUNT IN USD |
|---|---|
| AS PER SURVEY REPORT DAMAGE OF 3805.000 MT OF BAGGED SUGAR IN HOLD NO. 1 EX. M.V. "PRESTIGIOUS" ROT NO. 874/05, LINE NO. MSL-13 TO MSL-16 AGAINST B/L NO. S-13 TO S-16, PURCHASE PRICE @ USD. 330.00 PER MT. EXCHANGE RATE 1 USD = BDT 64.6500 SHIPPER: M/S. AGROCORP INTERNATIONAL PTE LTD., SINGAPORE CONSIGNEE: M/S. EAST WEST TRADING, CHITTAGONG. | |
| PURCHASE PRICE OF 3805 MT. @ USD 330.00 PER MT. | 12,55,650.00 |
| CUSTOM DUTY @ 74.6844 % TO BE PAYABLE AS PER CUSTOM VALUE @ USD 275.00 PER MT | 7,93,951.30 |
| BANK INTEREST, LC COMMISSION, INSURANCE & CPA CHARGES @ 10% ON USD 12,55,650.00 | 1,25,565.00 |
| **TOTAL** | **USD 21, 75,166.30** |
| In Ward: USD. (TWENTY LAC SEVENTY FIVE THOUSAND ONE HUNDRED SIXTY SIX AND CENTS THIRTY) ONLY. | |

For East West Trading

As Importer

## agrocorp

| | |
|---|---|
| **From:** | agrocorp [ravi@agrocorp.com.sg] |
| **Sent:** | Thursday, June 16, 2005 12:17 PM |
| **To:** | Raza taki /Universal Shng (uninav@singnet.com.sg) |
| **Subject:** | FW: Vessel MV Presitigious |

raza/rravii
flwng recd,plse take it comming from us

flwng recd
quote
 Finally the vessel arrived Chittagong and now having complain of which you must be aware of.

After having the complain about the status of the cargo in hatch no 1, we have today send our representative to inspect and assess the cargo.

P&I Club & other surveyors attended the vessel on board at outer anchorage.

Almost full quanttiy of cargo for appx 3916.200MT of Brazilian White Sugar loaded in hatch no. 1 are water stained, became solid, spreeading bad smell and discoloured.

According to the surveyor, total cargo in hatch no. 1 is totally damaged.

We have paid duty and started taking delivery of available sound cargo from other hatches and during taking delivery of sound cargo from other hatches, we observed that some cargo in other hatches may also be affected.

We had to pay customs duty for the full consignment since without payment of duty, we can't take delivery of cargo irrespective of whether or not in sound condition.

We can't left customs duty unpaid for the consignment affected or totally damaged, since we have to pay duty for the whole consignment declared by the shipping agent at the time of submission of IGM.

If we left the cargo without payment of duty, the same will be treated as "SHORT-LANDED" and have to pay penal duty @ 3-4 times of normal duty.

After fruitful negotiation of the matter, you have to take care for disposal of the affected cargo at your risk, cost & rersponsibiliy.

We thus appreciate your immediate intervention into the matter and settle the matter very fast enabling all of us to complete the vessel without elaboration of the situation to any other concerned party.

We have forwarded our formal but provisional claim along with the survey report with a copy to both of you and appreciate your immediate intervension for settlement.

Please note condition of the vessel also very bad and we are very surprised to see that you are effecting shipment in such vessel and putting full risk on our shoulder.

Water continously getting the vessel from the bottom and nobody could detect the damage. As such any delay in settling the claim will not only kill our time but also make things very difficult for the sound cargo.

We appreciate your very prompt intervension and settle the matter within next 2/3 days.

7/1/2005

Please save us by all means and believe if your sincere efforts can be deployed, matter will be amicably settled.

Thanks and Best Regards
Bashar
unquote

rravii

7/1/2005